UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

|  |  |
|---|---|
| J.C., | : Document Electronically Filed |
| | : |
| | :           Civil Action |
| Plaintiff, | : |
| | : Civil Action No.: |
| v. | : 1:17-CV-02778 (RBK/KMW) |
| | : |
| ROWAN UNIVERSITY SCHOOL OF | : |
| OSTEOPATHIC MEDICINE and | : CERTIFICATION OF |
| ROWAN UNIVERSITY, | : JENNIFER J. McGRUTHER |
| | : |
| Defendants. | : |
| | : |

Jennifer J. McGruther, of full age, hereby certifies as follows:

1.   I am a Deputy Attorney General for the State of New Jersey, counsel to the Rowan University defendants in this matter.

2.   Attached as **Exhibit A** is a true and correct copy of excerpts of the Rowan University School of Osteopathic Medicine Education Handbook, revised November 2014.

3.   Attached as **Exhibit B** is a true and correct copy of the Complaint in this matter.

4.   Attached as **Exhibit C** is a true and correct copy of J.C.'s September 29, 2015 request for approval to be placed on a medical leave of absence from August 20, 2015 until October 16,

2015, including Attachments 1 and 2.[1] The remaining 10 attachments have been omitted.

       5.    Attached as **Exhibit D** is a true and correct copy of a July 2015 email exchange between J.C. and Rowan.

       6.    Attached as **Exhibit E** is a true and correct copy of J.C.'s September 15, 2015 Personal Statement including Attachments 7 through 11. Attachments 1 through 6 have been omitted.

       7.    Attached as **Exhibit F** is a true and correct copy of a letter dated October 5, 2015 from Elizabeth Zuckerman, Esq. to Rowan.

       8.    Attached as **Exhibit G** is a true and correct copy of a letter, including three enclosures, dated July 7, 2016 from Mary J. Goodwin, Esq. to Rowan.

       I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.


                       s/ Jennifer J. McGruther
                       Jennifer J. McGruther (JM1907)


Date:  July 17, 2017

---

[1] J.C.'s name has been redacted from Exhibits C through G.

# EXHIBIT A



# EDUCATION HANDBOOK

### Go To Table of Contents

**Acknowledgements**

Preparation of this Education Handbook was made possible through the cooperation of the staff of the Dean's Office, the offices of Academic Affairs, Registrar, Admissions, Alumni and Student Affairs, Graduate Medical Education and Academic Technology.

*When modifications to the Education Handbook occur, students will be notified by e-mail. It is the student's responsibility to check their RowanSOM e-mail on a daily basis and keep abreast of all changes.*

**The Education Handbook is informational only and does not constitute a contract between Rowan University School of Osteopathic Medicine and any student. It may be changed by RowanSOM without prior notice to students. Any rules, regulations, policies, procedures or other representations made herein may be interpreted and applied by RowanSOM to promote fairness and academic excellence, based on the circumstances of each individual situation.**

**Academic Center**
**One Medical Center Drive**
**Stratford, New Jersey 08084-1501**
**(856) 566-6000 • www.rowan.edu/som/education**

Revised NOVEMBER 2014

# Table of Contents

Table of Contents ................................................................................................................ 2

ACADEMIC AFFAIRS ........................................................................................................ 7

ABOUT YOUR MEDICAL EDUCATION AT ROWANSOM ................................................ 8
CAREER COUNSELING ..................................................................................................... 9
COMPREHENSIVE OSTEOPATHIC MEDICAL LICENSING EXAMINATION (COMLEX–USA) ........... 9
COMPUTER LAPTOP PROGRAM ....................................................................................... 9
COURSE REMEDIATION ................................................................................................... 10
CURRICULAR OPTIONS ................................................................................................... 10
CURRICULUM SUMMARY ................................................................................................ 13
DESCRIPTION OF THE CURRICULUM ............................................................................... 15
DUAL DEGREE PROGRAMS ............................................................................................. 18
FIRST-YEAR PROGRAM ................................................................................................... 21
FIRST-YEAR STANDARD CLASS SCHEDULE SAMPLE ...................................................... 22
FIRST-YEAR EXAM WEEK SCHEDULE SAMPLE .............................................................. 23
FIRST-YEAR COURSE DESCRIPTIONS .............................................................................. 24
SECOND-YEAR PROGRAM .............................................................................................. 29
SECOND-YEAR STANDARD WEEK SCHEDULE SAMPLE ................................................... 30
SECOND-YEAR EXAM WEEK SCHEDULE SAMPLE .......................................................... 31
SECOND-YEAR COURSE DESCRIPTIONS .......................................................................... 32
THIRD-AND FOURTH-YEAR POLICIES ............................................................................. 38
THIRD AND FOURTH YEARS (CLINICAL YEARS) - STUDENT RESPONSIBILITIES ............... 42
    Announcements and Notices ......................................................................................... 42
    Attendance ................................................................................................................... 42
    Challenge of Clinical Evaluation .................................................................................. 42
    Charting Responsibilities .............................................................................................. 42
    Clinical Program Evaluation ......................................................................................... 43
    Daily Routine ............................................................................................................... 43
    Daily Time Requirements and Notices .......................................................................... 43
    Evaluation and Grading Clinical Years ......................................................................... 43
    Evaluation Process ....................................................................................................... 44
    General Duties .............................................................................................................. 44
    History and Physical Examinations (H&P's) ................................................................. 45
    On-call Responsibilities ................................................................................................ 45
    Standards of Dress and Behavior .................................................................................. 46
THIRD- AND FOURTH-YEAR REQUIRED ROTATIONS ....................................................... 47
THIRD-YEAR PROGRAM .................................................................................................. 48
    Clinical Instruction ...................................................................................................... 48
    Hospital Contacts ......................................................................................................... 48
    Instructional Goals ....................................................................................................... 48
    Other Helpful Contacts ................................................................................................. 49
    Reporting Information ................................................................................................... 49

THIRD-YEAR COURSE DESCRIPTIONS ............................................................. 50
FOURTH-YEAR PROGRAM ............................................................................... 55
FOURTH-YEAR COURSE DESCRIPTIONS ........................................................ 56
   Independent Study ................................................................................... 61
   Medical Student Performance Evaluation (MSPE) .............................. 61
   Other Curricular Requirements .............................................................. 61
FOURTH-YEAR CLERKSHIP DIRECTORS ......................................................... 62
FOURTH-YEAR ROTATION CONTACTS ............................................................ 62

## ACADEMIC TECHNOLOGY ................................................................. 64

## ACADEMIC RULES AND REGULATIONS .................................... 67

I.      PURPOSE .................................................................................. 67
II.     STUDENT REGISTRATION .................................................... 67
III.    ATTENDANCE ........................................................................... 68
IV.    GRADING ................................................................................. 70
V.     REMEDIATION ........................................................................ 73
VI.    AUDITING COURSES ............................................................. 73
VII.   PRE-CLINICAL YEARS 1 AND 2 ......................................... 73
VIII.  CLINICAL YEARS 3 AND 4 .................................................. 74
IX.    MISSED EXAM ........................................................................ 75
X.     SOM EXAM ADMINISTRATION AND PROCTORING ......... 77
XI.    COMLEX POLICY AND PROCEDURES ............................... 79
XII.   STUDENT ACADEMIC PROGRESS COMMITTEE (SAPC) .... 80
XIII.  REVIEW BY THE STUDENT ACADEMIC PROGRESS COMMITTEE .... 81
XIV.  ACADEMIC WARNING ........................................................... 81
XV.   ACADEMIC PROBATION ........................................................ 82
XVI.  LEAVE OF ABSENCE ............................................................. 82
XVII. STUDENT SCHOLAR ............................................................. 84
XVIII. WITHDRAWAL ....................................................................... 84
XIX.  DISMISSAL .............................................................................. 85
XX.   GRADUATION REQUIREMENTS .......................................... 85
XXI.  ADDITIONAL REQUIRED CLINICAL EXPERIENCES ......... 86
XXII. GRADUATION ON ALTERNATE DATES ............................. 86
XXIII. AWARDING A D.O. DEGREE POSTHUMOUSLY ................ 87
XXIV. STANDARDS OF SATISFACTORY ACADEMIC PROGRESS FOR TITLE IV AND NJ FINANCIAL AID PROGRAM ELIGIBILITY .................................................. 87

## ACCREDITATION OF ROWAN UNIVERSITY ............................... 93

## ACCREDITATION OF RowanSOM .................................................. 93

## ADMINISTRATION OF ROWAN UNIVERSITY .......................... 93

## ADMINISTRATION OF RowanSOM .............................................. 93

## ACADEMIC CALENDARS 2014-2015 ............................................ 95

## ADMISSIONS ....................................................................................... 97

ACADEMIC REQUIREMENTS ........................................................... 97

ACCEPTED STUDENTS DAY ..................................................................................... 98
APPLICATION PROCEDURES ..................................................................................... 99
AACOMAS ............................................................................................................... 99
BACKGROUND CHECK (CBC) ................................................................................. 99
COMMITMENT TO UNDERREPRESENTED MINORITY AND ECONOMICALLY DISADVANTAGED
        STUDENTS ................................................................................................. 101
ESSENTIAL FUNCTIONS FOR ADMISSIONS, MATRICULATION, PROMOTION AND GRADUATION 102
HOUSING     ............................................................................................................ 104
IMMUNIZATION AND HEALTH REQUIREMENTS..................................................... 104
POLICY ON TUITION AND FEES ............................................................................. 106
PREREQUISITES .................................................................................................... 106
STUDENT BODY ..................................................................................................... 107
TRANSFER PROCEDURE .......................................................................................... 107
TRANSFER CREDIT FOR ADVANCE STANDING IN SCIENCE COURSES...................... 107
TRANSFER CREDIT FOR TRANSFER STUDENTS ..................................................... 108
TUITION AND FEES ................................................................................................. 108
    Applicant Fees .......................................................................................... 108
    Tuition for 2014-2015 (per academic year):............................................. 108

ASSESSMENT AND EVALUATION ................................................................... 110

BOARD OF TRUSTEESROWAN UNIVERSITY............................................... 112

CAMPUS INFORMATION .................................................................................. 112

CENTER FOR TEACHING AND LEARNING (CTL) ...................................... 114

CLINICAL EDUCATION & ASSESSMENT CENTER (CEAC)...................... 115

CODE OF ETHICS OF THE AMERICAN OSTEOPATHIC ASSOCIATION ..... 116

CONTINUING MEDICAL EDUCATION .......................................................... 119

FACULTY OF RowanSOM ............................................................................... 120

FINANCIAL AID for RowanSOM STUDENTS ............................................. 129
    THE BURSAR'S OFFICE/BUSINESS OFFICE/ CASHIER ....................................... 129
    FINANCIAL AID....................................................................................................... 129
    SOURCES OF FINANCIAL AID................................................................................. 130

GRADUATE MEDICAL EDUCATION ............................................................. 133

HISTORY OF ROWAN UNIVERSITY ............................................................. 134

HISTORY OF ROWAN UNIVERSITY SCHOOL OF OSTEOPATHIC MEDICINE ............ 134

HONOR CODE OF PROFESSIONAL CONDUCT............................................ 135

INFORMATION RESOURCES AND TECHNOLOGY (IRT) ........................... 139
    ACCEPTABLE USE POLICY ..................................................................................... 139
    COMPUTING ACCOUNTS AND PASSWORD MANAGEMENT ................................. 139
    COMPUTER LABS FOR STUDENTS ......................................................................... 139
    COMPUTER LAPTOP PROGRAM ............................................................................ 140
    GENERAL INFORMATION........................................................................................ 141

GLOSSARY .................................................................................................. 141
PRINTING SUPPORT ...................................................................................... 142
WIRELESS COVERAGE ................................................................................. 142

LIBRARY ............................................................................................ 143

MISSION OFROWAN UNIVERSITY .......................................... 146

MISSION, VISION, ESSENTIAL VALUES and GUIDING PRINCIPLES OF RowanSOM . 146

OSTEOPATHIC MEDICINE ....................................................... 148

OSTEOPATHIC OATH ............................................................... 149

POLICIES .............................................................................................. 150

AA / EEO POLICY AND TO FILE A COMPLAINT ...................................................... 150
ACCEPTABLE USE POLICY ............................................................................. 150
ALCOHOL AND OTHER DRUGS POLICY .......................................................... 150
AMERICANS WITH DISABILITIES ACT ACCOMMODATIONS ............................... 150
CLEAN AIR / SMOKE-FREE ENVIRONMENT ................................................... 150
COCA COMPLAINTS - POLICIES AND PROCEDURES REGARDING COMPLAINTS RELATED TO
    COCA ACCREDITATION STANDARDS ....................................................... 151
CRIMINAL BACKGROUND CHECK ................................................................... 152
DIVERSITY .................................................................................................. 154
DRUG-FREE ENVIRONMENT ......................................................................... 154
EQUAL OPPORTUNITY .................................................................................. 154
FAMILY EDUCATIONAL RIGHTS AND PRIVACY ACT (FERPA)) .............................. 155
INABILITY TO PERFORM ESSENTIAL FUNCTIONS ............................................ 155
INVOLUNTARY LEAVE OF ABSENCE AND INVOLUNTARY WITHDRAWAL ................ 156
MILITARY LEAVE FROM ACADEMIC PROGRAMS .............................................. 156
MISCONDUCT IN SCIENCE ............................................................................ 157
PATENTS .................................................................................................. 157
RESEARCH OMBUDSPERSONS....................................................................... 157
SEXUAL MISCONDUCT AND HARASSMENT POLICY ........................................ 157
STUDENT INTERVENTION COORDINATOR ...................................................... 176
STUDENT RIGHTS, RESPONSIBILITIES AND DISCIPLINARY PROCEDURES............. 177
STUDENTS WITH IMPAIRMENTS ................................................................... 187
STUDENTS PARTICIPATING IN EDUCATIONAL ACTIVITIES OUTSIDE ROWANSOM OR ANY OF ITS
    AFFILIATES ............................................................................................ 188
WORKPLACE DIVERSITY .............................................................................. 192

REGISTRAR ........................................................................................ 193

ADDRESS CHANGES .................................................................................... 193
ACADEMIC ATTIRE ...................................................................................... 193
ANNUAL NOTIFICATION OF RIGHTS UNDER FERPA....................................... 193
COURSE ROSTERS ...................................................................................... 195
DIPLOMAS .................................................................................................. 195
GRADE LEGEND .......................................................................................... 195
GRADE ROSTERS ........................................................................................ 196
NAME CHANGES ......................................................................................... 196

Registration .................................................................................................. 196
Transcripts .................................................................................................... 196
Verifications ................................................................................................. 197

ROWAN SCHOOL OF OSTEOPATHIC MEDICINE OSTEOPATHIC POSTDOCTORAL
TRAINING INSTITUTION OF NEW JERSEY (Rowan SOM OPTI of NJ) ........................... 198

STUDENT AFFAIRS ........................................................................................ 199
Alumni Association/ Alumni Facts ........................................................... 199
Orientation ................................................................................................. 199
Room Reservations must be made 72 hours in advance. ............................... 200
RowanSOM Commencement ...................................................................... 200
School Closing ........................................................................................... 200
Student Health Services .......................................................................... 201
Student Mental Health ............................................................................. 202
Student Wellness Program (SWP) ............................................................. 202
University Commencement ......................................................................... 203
White Coat Ceremony ................................................................................ 203

STUDENT GOVERNMENT ASSOCIATION (STUCO) CONSTITUTION ......................... 204

STUDENT PROFESSIONAL SOCIETIES & CLUBS OF SOM ........................................ 204

TELEPHONE NUMBERS (Area Code 856) ............................................................ 210

INDEX ....................................................................................................... 212

## ACADEMIC AFFAIRS

### Overview

The mission of Academic Affairs is to promote and facilitate academic excellence and lifelong learning and to guide and nurture students in their journey to becoming Osteopathic physicians.

To complete this mission, the Senior Associate Dean for Academic Affairs is responsible for the oversight of the curriculum and coordination of the comprehensive medical education program, student affairs, admissions, clinical education including the clinical education and assessment center, assessment and the center for teaching and learning.

The Office of Academic Affairs is overseen by the Director of Academic Affairs, who is dedicated to excellence in medical education and the development of student doctors who are lifelong learners, independent thinkers, and competent physicians, and who demonstrate compassion in patient care.  The office coordinates years one through four of the curriculum and is responsible for the following services to students and faculty:

- Facilitation of the integrated competency based curriculum
- Preparation of online class schedules for years one and two
- Preparation of clerkship schedules for Years Three and Four
- Coordination of clerkships for visiting students
- Coordination of the Electronic Residency Application Service for students
- Coordination of the Curriculum Committee, Pre-Curriculum Committee Meetings, Program Evaluation and Student, Assessment Subcommittee, Clerkship Directors' Committee, Clerkship Administrators Committee
- Scheduling small groups for the Clinical Medicine Modules
- Coordinating course and clerkship evaluations and tracking student completion rates
- Scheduling, proctoring and grading multiple choice examinations and distributing results to Course Directors
- Making room reservations for the Auditorium and Room 279, Room 273 from 8am to 4pm
- Working with Course Directors to develop course syllabi
- Writing a Medical Student Performance Evaluation (MSPE) for every student
- Providing administrative support for the Senior Associate Dean for Academic Affairs, Assistant Dean for Assessment and Assistant Dean for Clinical Education
- Providing educational support for students and providing instructional support for faculty through The Center for Teaching and Learning
- Supporting the residency application process by offering student support on the preparation of Curriculum Vitae, Personal Statements and the ERAS process

## About Your Medical Education at RowanSOM

The Rowan University School of Osteopathic Medicine is dedicated to providing excellence in medical education with an underlying emphasis on primary health care and community health services.  The School is dedicated to developing compassionate and culturally competent physicians and has been recognized for educational excellence in primary care, geriatric education and osteopathic manipulative medicine. The learning environment is based on principles of adult learning including independent self-directed learning and respect for the individual learner. Students will begin interacting with patients in the first year of their medical education. Osteopathic concepts and methods and an interdisciplinary approach are integrated throughout the curriculum.

A new integrated competency based curriculum was developed by the faculty and implemented in the fall of 2009. The new curriculum is based on the Seven Competencies of the American Osteopathic Association:

1. Osteopathic Philosophy and Osteopathic Manipulative Medicine
2. Medical Knowledge
3. Patient Care
4. Interpersonal and Communication Skills
5. Professionalism
6. Practice Based Learning and Improvement
7. Systems Based Practice

The curriculum utilizes many teaching and learning techniques including lecture/discussion, small group sessions, online learning, standardized patient encounters, simulators, the Year One preceptor program, and community involved primary care projects.  There is an increase in case based learning, especially in Year Two.  This learning technique, presently utilized in the curriculum, is student directed learning in small groups based on cases written by and facilitated by faculty members.

In comparison to the former curriculum at RowanSOM, this new curriculum decreases the classroom time for first and second year students.  A 21% decrease in student classroom hours was accomplished by eliminating redundancy, utilizing online resources, and incorporating student-directed learning techniques in the design process.  Another important goal was to emphasize musculoskeletal medicine and to increase the content in pediatrics and geriatrics.  This is an important goal for an osteopathic medical school curriculum.  The musculoskeletal medicine content has been increased from two weeks of rheumatology and orthopedics in the present curriculum to a four-week module that integrates not only rheumatology and orthopedics, but also physical medicine and rehabilitation, sports medicine, and OMM. Both pediatrics and geriatrics are now three-week courses that conclude the curriculum; a significant increase in content from the former curriculum.

8

## Career Counseling

The Office Academic Affairs staff will work together in providing ongoing Career Counseling. All students have the opportunity use the online resources of Careers in Medicine (CiM) provided by RowanSOM's subscription.  Career planning sessions are held throughout the four years, meeting the needs of students at their stage of training.  Starting in third year, more targeted sessions are delivered to allow students to plan for specific residency applications. A one-on-one career counseling session is provided to every student in the spring of their third year to identify and discuss students' specific career plans.

## Comprehensive Osteopathic Medical Licensing Examination (COMLEX–USA)

**National Board of Osteopathic Medical Examiners**
**8765 W. Higgins Road, Suite 200**
**Chicago, IL 60631-4174**
**Telephone: 773-714-0622**
**www.nbome.com**

All students must meet all requirements for the COMLEX. See Section XI of Academic Rules and Regulations for specific COMLEX requirements.

COMLEX is administered by the National Board of Osteopathic Medicine (NBOME) as published in the AOA Standards of Accreditation.  Students are required to take and pass COMLEX – Level 1, 2CE and 2PE in order to graduate from RowanSOM.

## Computer Laptop Program

Since all students at RowanSOM must use computer access learning technology, it is vitally important that all students have access to reliable computing devices. Further, since many technologies (virtual microscopy, online learning system, and exams) demand specific configurations of both hardware and software, it is equally important that these devices reliably function and can be supported by RowanSOM IST staff.

RowanSOM has determined that a standardized computer laptop program is the best way to provide a stable and network compliant computing platform with easy and consistent access to all our educational resources. To this end, students entering RowanSOM will receive a standardized Dell laptop computer during RowanSOM orientation week. This laptop will be theirs, not only throughout their experience at RowanSOM, but also beyond.

Each computer will be specially configured and preloaded with the software necessary to meet the demands of the RowanSOM curriculum as well as access our Library's medical resource materials, the wireless network within the RowanSOM campus and on-campus printers. They will be delivered with the full manufacturer's warranty and insurance coverage. The insurance will include three years of accidental damage replacement of the device.

The program's goal is to support computer literacy skills, provide a dedicated laptop throughout our students' medical education and give our students optimal tools to assist with learning, test taking and research.

## Course Remediation

Consistent with the Academic Rules and Regulations, it is the responsibility and discretion of the Course Directors to prepare remediation exams for their respective courses.

The course features weekly lectures, workshops and seminars on problem solving and standardized test preparation and a complete review of anatomy, biochemistry, microbiology, osteopathic principles, pathology, pharmacology and physiology.

## Curricular Options
### Problem-Based Learning (PBL) at Rowan University School of Osteopathic Medicine

The Problem-Based Learning Curriculum (PBLC) is a curricular track available to six to eight students annually.  The PBLC was established to meet the needs of those applicants who find problem-based learning an attractive option.  It is a two-year program, and with the start of the clerkships in the third year, PBLC students join the rest of their classmates.

**What is Problem-Based Learning?**

Problem-based learning is the learning which results from the process of working toward the understanding and resolution of a problem.  In the PBLC, the problems students encounter are those of actual patient cases, which present in a variety of formats.  The patient problems serve as the stimulus for acquiring the basic science knowledge needed to understand underlying mechanisms and they also serve as the focus for the development of clinical reasoning skills.  Self-directed learning is motivated by a need to resolve the patient problems.  Many patient cases are encountered in real and simulated clinical settings, providing valuable, early clinical experience.

**The Tutorial Group Process**

Students in the PBLC meet in a small group of six to eight with a trained faculty tutor.  Patient problems, presented in a carefully designed printed format, serve as stimuli for learning.  Students also encounter standardized patients, persons trained to simulate an actual patient problem, who aid in the acquisition and development of clinical and interpersonal skills.  Patient problems in all formats include the element of free inquiry.  Thus, students approach the patient problems just as a physician does.  They can ask any question, perform any item of physical examination, or order any diagnostic or laboratory procedure, as in the real clinical situation.

The tutorial group begins with the patient's presenting situation and proceeds to take a medical history, perform a physical examination of the patient, and order diagnostic tests, all as

appropriate.  Faculty tutors guide students in reasoning their way through the patient's problem.  Significant findings are recorded by the group along with their hypotheses and learning issues, knowledge needed to better understand and to pursue further the patient problem.  Using tutorial skills, the tutor facilitates students' access to their own prior knowledge as well as their identification of the limitations of their knowledge.  The tutor also guides students to articulate their knowledge of the relevant disciplines as it relates to the patient problem at hand.  As students progress through the curriculum, they learn to reason through patient problems effectively and efficiently.

As mentioned, the need for information required to understand the problem generates learning issues for further study.  Learning issues represent all relevant disciplines.  Students, working independently or in small groups, then identify and use a variety of resources to study these issues and return to the group in order to discuss and share what they have learned and to apply their new knowledge to the problem.  Students are expected to consult a variety of available resources while pursuing the learning issues.

As students return with knowledge, they apply it to the patient problem and are able to either confirm or reject their hypotheses.  The tutorial group process allows for integration of learning, as students study all facets of the patient problem.  Because the integration of knowledge is essential to medical problem solving, information from all relevant disciplines is studied and applied to each case.  Many learning issues are repetitive and overlap between the units and years of the curriculum, helping to reinforce students' learning.  The group also assesses the resources brought to the group by each member.

Following completion of each case, the group informally evaluates each member on the four curricular goals; input is provided by the student, peers, and the tutor.  This provides students with positive reinforcement regarding their strengths as well as constructive feedback for rectifying any identified deficiencies.  Tutorial sessions are scheduled by the group two or three times per week, for two to three hours per session.  Groups have the flexibility to schedule as much time as they need for each case.  A particularly complex case may require more or longer sessions.

While self-directed learning is an important element of the program, the PBLC is not an independent study curriculum.  Each student works as a member of the tutorial group and the group works together in resolving patient problems.  As a result, teamwork is an essential ingredient in problem-based learning.  The PBLC appeals to students who enjoy independent study as well as working with others in the small group learning process.

**Curriculum Organization**
The two years of the PBLC are organized into ten primarily organ-based units; six units in the first year and four in the second year.

***Year One***
- Respiratory
- Cardiovascular/Renal
- Sensorimotor Systems and Behavior

11

- Energy and Nutrition
- Endocrine/Reproduction
- Integrative Unit

The disciplines of Anatomy, Physiology, Biochemistry, Behavioral & Social Sciences, Humanities, and Clinical Medicine are emphasized during the first year. The patient problems encountered in these units provide a broad overview of medicine. The six organ-system units include relevant patient problems, which span all the disciplines listed above. During the Integrative Unit, each student is assigned to at least one primary care physician associated with a hospital for a one week stay. This experience provides students with an intimate look at health care delivery.

*Year Two*
- Hematology/Immunology
- Cardiovascular/Renal/Respiratory
- Gastrointestinal/Endocrine/Reproduction
- Nervous System/Musculoskeletal Systems/Psychiatry

The second year emphasizes the disciplines of Pathology, Microbiology, Immunology, Pharmacology, Clinical Medicine, Radiology and Medical Humanities. Students encounter patient problems which represent these disciplines during each of the four units, while also revisiting the disciplines of the first year.

**Admission Procedures to Apply to the Problem-Based Learning Curriculum**
Students offered admission to RowanSOM may submit a PBLC Supplementary Application. Upon receipt of the application, the Director of the PBLC will schedule an interview. Acceptance into the PBLC is determined by the Admissions Committee and the Director of the PBLC. For further information about the PBLC, to make arrangements to observe a tutorial session, or to meet PBLC students, please contact:

**Director of the PBL Program at SOM**
T. Peter Stein, Ph.D.
One Medical Center Drive
P.O. Box 1011
Academic Center, Suite 210
Stratford, NJ 08084
Phone (856) 566-6739
Fax: (856) 566-6341
Email: tpstein@rowan.edu

## Curriculum Summary

| Year | Course | Hours |
|------|--------|-------|
| 1 | Biochemistry/Human Genetics | 95 |
| 1 | Clinically Integrated Human Anatomy | 165 |
| 1 | Histology | 74 |
| 1 | Medical Physiology | 99 |
| 1 | Microbiology/Immunology | 83 |
| 1 | Neuroscience | 35 |
| 1 | On Doctoring I | 72 |
| 1 | Osteopathic Manipulative Medicine I | 83 |
| **1** | **Total Weeks of Instruction** | **39** |
| 2 | Clinical Medicine | 249 |
| 2 | Clinical Psychiatry | 29 |
| 2 | Death and Dying | 8 |
| 2 | Geriatric Medicine | 47 |
| 2 | On Doctoring II | 120 |
| 2 | Osteopathic Manipulative Medicine II | 104 |
| 2 | Pain Seminar | 10 |
| 2 | Pathology | 74 |
| 2 | Pediatric Medicine | 22 |
| 2 | Pharmacology | 75 |
| **2** | **Total Weeks of Instruction** | **38** |

**CURRICULUM SUMMARY (Cont'd.)**

| Course or Clerkship | Third Year (Weeks) | Fourth Year Weeks) |
|---|---|---|
| Clinical Skills Orientation | 1 | |
| Cardiology or Pulmonary Elective | 4 | |
| Family Medicine | 10 | |
| General Internal Medicine | 6 | |
| Geriatrics | 4 | |
| Obstetrics and Gynecology | 4 | |
| Osteopathic Manipulative Medicine | 2 | |
| Psychiatry | 4 | |
| Pediatrics | 4 | |
| Surgery/Anesthesiology | 6 | |
| Elective | 4 | |
| **Total Weeks of Instruction** | **48** | |
| Emergency Medicine | | 4 |
| Fundamentals of Medicine II (COMLEX Review) | | 4 |
| Family Medicine Pain and Palliative Care | | 4 |
| Subspecialty | | 4 |
| Electives | | 16 |
| Medicine Cores (Cardiology, Pulmonology and/or Intensive Care) | | 4 |
| **Total Weeks of Instruction** | | **36** |

14

## Description of the Curriculum

### Year One

The first semester of Year One is heavily involved in the basic sciences critical to success as a physician.  Also integrated throughout Year One are OMM (including functional anatomy), and On Doctoring I, which is a course that focuses on the skills necessary to interact with patients.  The semester begins with a block of the fundamentals of basic science, which includes principles of mammalian physiology, biochemistry, genetics, tissue types, and an introduction to microbiology and immunology.  The next weeks are dedicated to cardiovascular science including physiology, histology, biochemistry, anatomy, microbiology and genetics.

The spring semester of Year One begins with a renal/respiratory unit, then a three -week block of gastrointestinal science followed by a three -week block of endocrine/reproductive science.  Each of these blocks includes separate courses in physiology, histology, anatomy and microbiology.  The semester concludes with a large block of neuroscience and musculoskeletal.  This exciting module integrates both the basic science and clinical medicine into one unit, and includes neuroscience, microbiology, genetics and pathology.

### Year Two

The second year curriculum is organized through systems-based modules. These modules integrate clinical medicine, pharmacology, pathology, OMM, and On Doctoring II. The semester begins with the fundamentals module that introduces the basic tenets of pharmacology and pathology.  Clinical medicine starts in the next module with prevention, which not only reviews health and promotion prevention but also nutrition and many of the learning objectives of the practice learning-based competency including biostatistics and epidemiology. Prevention is followed by neurology/musculoskeletal, endocrinology, cardiology, pulmonology, and nephrology/urology modules. Professionalism, ethics and medical issues are integrated through all case-based learning sessions and standardized patient encounters. Psychiatry remains a course throughout both semesters of Year Two:  in the fall it is a stand-alone intersession, and in the spring it is integrated with modules/courses. The Year Two spring semester begins with three weeks of gastroenterology and hematology/oncology, one week of pain management, addiction medicine, and issues surrounding death and dying, followed by three weeks of women's health, and four weeks of geriatrics and pediatrics modules. The semester concludes with a formal preparatory time for COMLEX Level I examination.

### Integration of Basic Science, Clinical Medicine and OMM

The curriculum strives to integrate basic science and clinical medicine. Much of this occurs in small group physiology sessions, clinical teaching in biochemistry and genetics, and case-based learning in the histology course. Anatomy instruction is fully organized around clinical issues and radiology. Neuroscience is a fully integrated module with neurology.

The Year Two curriculum integrates clinical medicine, pathology, pharmacology, physical diagnosis, and infectious diseases within the modules. The practice-based learning objectives and the practice-based learning competency, personal communication, and

systems-based practice are integrated throughout the year.

Instruction in OMM continues throughout every year of the medical school curriculum. The new learning formats allow for increased integration of OMM, especially in Year Two when instruction focuses on the patient's clinical presentations that are discussed that week. OMM is also integrated into case-based learning cases and many standardized patient encounters.

### *Year Three*

Years Three and Four mark the beginning of the concentrated clinical component of the medical education program. In the third and fourth years, students learn patient care and develop clinical technical skills and serve as members of a medical team.  Students spend time with clinical faculty at the Kennedy University Hospital located in Stratford, Cherry Hill, and Washington Township, Our Lady of Lourdes Medical Center in Camden, Inspira Health in Vineland and Woodbury, CarePoint -Christ Hospital in Jersey City, Meridian - Ocean Medical Center in Brick, Meridian - Southern Ocean Medical Center in Manahawkin, Atlantic Health - Morristown Medical Center in Morristown, Atlantic Health - Overlook Hospital in Summit, and at other instructional sites in the area.

The following specialty areas offer clinical instruction in the third year: Family Medicine, General Internal Medicine, Obstetrics/ Gynecology, Pediatrics, Psychiatry, Geriatrics, Surgery/Anesthesiology and Cardiology/ Pulmonary. Basic procedures are demonstrated and practiced by students in each of these areas. Students learn about the standard operating procedures of the hospital and office practice.

### *Year Four*

The Rowan University School of Osteopathic Medicine's fourth-year instructional format includes a series of clinical experiences. The student is given patient-care responsibilities on each service through which he / she rotates. Instruction takes place at the bedside and in clinical conferences. During the year, students develop skill and competency in history taking and physical examination, creating a differential diagnosis, ordering and using laboratory tests; learning procedures in making a diagnosis and providing treatment; establishing professional relationships with patients; participating in the management of patient care during the hospital stay and in subsequent follow-up visits; recording data, understanding diagnostic findings, writing progress notes, and presenting cases.

A primary purpose of instruction in this year is to help the fourth-year student apply the didactic background and preliminary clinical training to more intensive clinical experiences. Through direct and extensive patient contact, the student has many opportunities to practice the concepts of osteopathic diagnosis and therapeutics and to learn through instruction by interns, residents, and faculty.  The case specific learning experiences are a valuable aspect of the program.

Innovative components have been placed throughout all four years of the curriculum.  Ethics, clinical osteopathic manipulative medicine, and pain management are examples of curricular topics that are integrated within courses and clinical experiences spanning the four years of medical school. Traditional lecture formats are augmented and supported by an emphasis

placed on self-directed study, online learning, videos, standardized patient lab, and a multitude of teaching strategies and technologies.

The Handbook describes many of the key components of the curriculum and is designed to serve as a guide to understanding the educational program. In addition to the handbook, each clerkship director provides a syllabus that describes the course requirements, including such important information as reading assignments, required and recommended textbooks, lab assignments, evaluation processes and criteria, clinical and patient care responsibilities, core clinical skills to be learned, presentations and report assignments, and community service requirements. Also, students will be asked to accept responsibility for evaluating courses and faculty.  This feedback is an essential part of the curriculum development process.

Written documents cannot completely take the place of open communication among students, faculty and staff.  Students have joined a community of scholars who embrace the concept of lifelong learning and are dedicated to the education of professionals who are patient-oriented, sensitive and aware of their future responsibilities as osteopathic physicians.  Support and services are available to help with questions, concerns and studies.  We invite students to ask questions, voice concerns, seek assistance with their studies and become participants in the Rowan University School of Osteopathic Medicine community.

Osteopathic medical education requires each student to participate fully in a wide range of clinical and educational scenarios throughout the educational continuum. It is understood that students will perform a variety of diagnostic and therapeutic procedures on their peers, simulated and actual patients.

17

* * * * *

## First-Year Program

### Overview

The academic year begins with the implementation of the integrated, competency based first year curriculum.  Multiple disciplines are taught in an integrated format with greater coordination of system content among basic science courses.  The first three modules consist of core basic science fundamentals.  The subsequent system modules will build upon these principles and will provide a deeper understanding of the underlying mechanisms necessary for responsible clinical care.

Semester one begins with Fundamentals of Basic Science modules followed by the Cardiovascular module.  Semester two begins with the Renal/Respiratory and then the GI and Reproductive/Endocrine modules followed by integrated Neuroscience/Neurology.  The traditional courses will run throughout the school year delivering information in a systems based approach, although each course will be graded independently.

The Course Director retains responsibility for content and delivery of material.  Module directors will organize, administer, proctor and grade exams.  The exact nature of exams (length of time, inclusion of lab practicals, etc.) may vary according to the content of each module and will be established prior to the exam date by the module director and Course Directors involved.  Course, syllabi, and examination preparation and grade reporting, posting of grades, determination of advanced standing, exam question review and challenges will still be handled by individual Course Directors.  Each module will also have a coordinator who is responsible for scheduling oversight and the coordination of interdisciplinary examinations.

All students will be required to complete online HIPAA training before being permitted to begin their clinical training (including Year One preceptorships).

### Evaluation

Students are evaluated on the basis of written examinations, laboratory exercises, performance in the standardized patient laboratory, practical skills tests, and participation in small group discussions. Evaluation methods vary depending upon course goals, objectives and content and are described in the course syllabus.  Each semester, students complete a mandatory evaluation of courses.

### Grading

It is the responsibility of each Course Director to describe in detail the performance criteria to meet each of RowanSOM's grading categories of Honors, High Pass, Pass and Fail.  This information, along with the method used to calculate the course grades, is provided in the course syllabus distributed at the beginning of the course.  Courses that use multiple exams describe the "weight" of each exam toward the final grade and courses that incorporate multiple evaluation measures (i.e. exams, practicals, labs, etc.) describe the "weight" of each measure toward the final grade.

* * * * *

## Second-Year Program

Overview
The second-year curriculum places great emphasis on wellness and disease prevention and prepares students to be patient-oriented and keenly aware of their future responsibilities as osteopathic primary care physicians.  A multidisciplinary teaching approach integrating basic sciences and clinical sciences is the focal point of this curriculum.

The second-year Clinical Medicine course incorporates and integrates the views of several teacher-specialists into each subject area.  For example, the content of Pathology and Pharmacology are presented concurrently to complement the information in Clinical Medicine. Also, Health Promotion and Disease Prevention is taught simultaneously with these courses to provide the clinical correlates in preventive medicine and public health.  Courses in the behavioral sciences, Interpersonal Communications, and Introduction to Clinical Psychiatry, expand the students' understanding of the truly holistic model of health care in physical diagnosis provides instruction in the art of physical diagnosis, the structural exam, and the more complex osteopathic treatment techniques.

The second-year curriculum uses the multifaceted teaching methods that began in the first year and function as key aspects of the process of educating primary care physicians. The curriculum includes traditional lectures small group sessions where students give presentations and participate in discussions that focus on analysis of clinical case problems, opportunities to develop unique programs on public health topics, time to design and implement group projects that involve community-based patient education or prevention activities, learning via online instruction, and standardized patient laboratory experiences. Students begin their clinical training in history taking and physical examination skills through supervised contact with patients.

Evaluation
Student performance is evaluated with written examinations and other measures such as take-home assignments, projects, and practical and/or oral exams. The instruments used to evaluate students, remedial procedures, and the method used to calculate the final grades for each course are described in the course syllabi. Students also evaluate faculty and courses.

* * * * *

## Third-Year Program

### Clinical Instruction
The following specialty areas offer clinical instruction in the third year: Family Medicine, General Internal Medicine, Geriatrics, Obstetrics/Gynecology, Osteopathic Manipulative Medicine, Pediatrics, Psychiatry, Surgery/Anesthesiology, and Cardiology or Pulmonary.

Basic procedures are demonstrated and practiced by students in each of these areas. Students learn about the standard operating procedures of the hospital and office practice.

### Hospital Contacts
**Kennedy University Hospital**
Director of Medical Education..........................................................(856) 346-7828
and Medical Director Christopher J. Barone, D.O.
**KUH – Stratford** ........................................................................**(856) 346-6000**
Administration Office, First Floor
**KUS – Cherry Hill** ....................................................................**(856) 488-6802**
Administration Office, First Floor Kristen DeCicco
**KUH – Washington Twp.**............................................................**(856) 582-2802**
Administration Office, Third Floor Renae Alesczyk
**Our Lady of Lourdes Medical Center** ........................................**(856) 365-7874**
Director of Medical Education.......................................E. Frederick Ashong, M.D.
Medical Education Office, Sixth Floor....................................................Sande Ritz
**Our Lady of Lourdes Medical Center, Burlington**
Refer questions to Veronika Kramer-Feeley at .............................**(856)-566-7012**
**Ocean Medical Center**
Refer questions to  .........................................................................**(856)-566-6726**
**Christ Hospital** ..........................................................................**(201) 795-8201**
Director of Medical Education.....................................Anthony Tsompanidis, D.O.
GME Coordinator ..................................................................... Elyse Castillo
**Overlook Hospital** ......................................................................**(908) 522-2852**
Medical Student Coordinator.............................................................Peggy Liddy
**Morristown Memorial Hospital**..................................................**(973) 971-6442**
Medical Student Coordinator......................................................Elizabeth Siccone
**South Jersey Regional Medical Center** .......................................**(856)-641-8661**
Medical Student Coordinator..............................................................Nancy Perez

### Instructional Goals
The third year of instruction at Rowan University School of Osteopathic Medicine inducts the student in to the clinical training programs. Courses emphasize the practical application of

concepts of osteopathic medicine.  The clinical sessions, seminars, and electives are designed to provide a multifaceted introduction to the practice of medicine.  It is expected that the variety of experiences will challenge the student's intellect and, at the same time, allow for the development of specific skills.

## Other Helpful Contacts

If you have a question or concern about a **third-year** rotation, these contacts can either answer your questions or help you get in touch with the person responsible for making a needed decision. However, to request changes in rotation assignments, dates, etc., you must call the Office of Academic Affairs, (856) 566-6726.

Family Medicine .................................................. Doreen Cameron (856) 566-6085
General Internal Medicine ..................... Veronika Kramer-Feeley (856) 566-7012
Geriatrics .............................................................. Kathy Alburger (856) 566-7141
Obstetrics and Gynecology ................................... Donna Dymond (856) 566-7098
Osteopathic Manipulative Medicine .......................... Kathy Kupiec (856 566-2877
Pediatrics ............................................................. Denise Hauger (856) 582-2372
Psychiatry ................................................................. Elaine Evans (856) 482-9000
Surgery/Anesthesiology ........................................ Colleen Corsetti (856) 566-6875

## Reporting Information

Students will receive reporting information for all required rotations prior to the start of each academic year.  Reporting instructions are posted under each clerkship on Blackboard.

\* \* \* \* \*

## Fourth-Year Program

### Instructional Goals
The Rowan University School of Osteopathic Medicine's fourth-year instructional format includes a series of clinical experiences. The student is given patient-care responsibilities on each service through which he / she rotates. Instruction takes place at the bedside and in clinical conferences. During the year, students develop skill and competency in history taking and physical examination, creating a differential diagnosis, and ordering and using laboratory tests and procedures in making a diagnosis and providing treatment; establishing professional relationships with patients; participating in the management of patient care during the hospital stay and in subsequent follow-up visits; recording data, understanding diagnostic findings, writing progress notes, and presenting cases.

### Clinical Instruction
The following specialty areas offer clinical instruction in the fourth year: Family Medicine Pain and Palliative Care, Emergency Medicine, Subspecialties, Medicine Specialties and Electives. A primary purpose of instruction in this year is to help the fourth-year student apply the didactic background and preliminary clinical training to more intensive clinical experiences. Through direct and extensive patient contact, the student has many opportunities to practice the concepts of osteopathic diagnosis and therapeutics and to learn through instruction by interns, residents, and faculty. The case-specific learning experiences are a valuable aspect of the program.

### Elective Rotations
Fourth-year electives may be completed at RowanSOM affiliate hospitals or at out-of-system sites. The elective options provide opportunities to extend advanced clinical experience in many areas. An evaluation of each student is required at the end of each rotation and each student is required to evaluate his/her elective experience.

Students who choose to complete out-of-system electives need to follow the Rowan University/ Rowan SOM policy for "Students Participating in Educational Activities Outside RowanSOM or Any of its Affiliates" as referenced in the "Policies" section of this Education Handbook.

### 4th Year Clerkship Application
Requests for electives must be submitted by completing the "Fourth Year Clerkship Application" form. Electives are approved by the Department of Academic Affairs. The form is endorsed and processed by the Registrar's Office. The student is responsible for providing the preceptor's e-mail address to the Clinical Education Coordinator during the first week of the clerkship. The elective preceptor evaluates the student's performance and submits a grade online via One45.

* * * * *

For more information about Electives contact the Clinical Education Coordinator at (856) 566-6726 or the Associate Registrar at (856) 566-7055 in Suite 210 of the Academic Center.

## Independent Study

Independent Study is when a student requests or is mandated to take time off during their academic program but will still be working on academic requirements during the time off.  (For example, a student taking time off from rotations to study for COMLEX.)  Independent Study may not last more than one (1) year cumulatively.  During an Independent Study period, students are still actively enrolled at SOM.  An "Independent Study" course will appear on the student's transcript with a grade of "NC" which indicates a non-credit course.  If a student is given permission to remain on Independent Study for more than one year, the student will be defined as not making satisfactory academic progress and will be placed on Financial Aid Probation.

## Medical Student Performance Evaluation (MSPE)

A Medical Student Performance Evaluation (MSPE) is compiled for each graduating student.  The MSPE includes dates of attendance at RowanSOM and specific information from the student's academic file, including didactic and clinical records, COMLEX Level 1 status, COMLEX Level II and COMLEX PE status and comments by clinical faculty about the student's medical education at RowanSOM.  Histograms of course performance by the student's class are also provided as a comparison to individual student performance. Each student meets with a member of the Academic Affairs Dean's staff in the spring of their third year to generate the "Unique Characteristics" paragraph of the MSPE. MSPEs are sent to all residency programs using the Electronic Residency Application Service (ERAS) on October 1 of the fourth year.

## Other Curricular Requirements
### Fundamentals of Medicine II
The goal of this requirement is to provide a broad-based, thorough review of clinical science to help fourth-year students better prepare for their fourth year and for the Level 2 CE and PE examinations. Students will be exposed to review sessions by RowanSOM faculty members, review sessions by professional medical test preparation personnel, standardized patient labs, individual and/or small group tutoring opportunities, and strategies for test taking.

Content to be covered includes:  reviews of clinical scenarios to re-examine the various body systems, various patient presentations and a review of clinical pathways for the most common diagnoses and procedures.  These will be considered through the lenses of the NBOME-identified 'physician's tasks':  history & physical, health promotion and disease prevention, drug and disease mechanisms, diagnostics, management and ethics/jurisprudence.

* * * * *

## ACADEMIC RULES AND REGULATIONS

### I.    Purpose

The Academic Rules and Regulations (ARR) of the School of Osteopathic Medicine define the standards of academic and professional performance for students who are candidates for the degree Doctor of Osteopathic Medicine.  The ARR have been developed by the faculty and student members of both the Curriculum Committee and the Student Academic Progress Committee (SAP) and have been approved by the Executive Council, the faculty, and the Dean of the School of Osteopathic Medicine.  Actions of the Committee are recommendations to the Dean who may approve, disapprove, modify, or return the recommendations to the Committee for further consideration.  The decision of the Dean of the School of Osteopathic Medicine is final in all cases concerning student academic performance.

The ARR define the procedures by which students are considered for promotion, graduation, remedial instruction, leaves of absence, and dismissal.  Students with problems in personal adjustment are also considered by the Committee.  The members of the Committee, in consultation with faculty advisors, and faculty members, will attempt to identify how students in academic difficulty may be helped to continue and complete their professional training within the policies of the ARR.  The welfare of the public, whom the graduates of the School will serve, in addition to the welfare of the student and the institution, is paramount in reaching a recommendation in all cases before the Committee.

### II.    Student Registration

No student will be considered registered for attendance at the School of Osteopathic Medicine unless he/she has fulfilled the registration requirements prescribed by the Committee.  These requirements are:

A.    Entering Students

    1.    Receipt by the Office of the Registrar of the final and complete transcript of record of attendance at all institutions attended for the completion of the entrance requirements to the School of Osteopathic Medicine;

    2.    Completion of the official registration form;

    3.    Completion of the required medical history and physical examination and all immunizations and testing as required by the Office of Student Health, for all entering students and transfer students;

4.      Completion of arrangements for the payment of the tuition charge, or payment made at the time of registration; and

5.      Automatic enrollment in the student health plan offered through the University or completion of the online waiver indicating comparable coverage through an approved plan.

B.      Continuing Students

1.      Completion of the annual official registration form for the Office of the Registrar;

2.      Completion of arrangements for the payment of the tuition charge, or receipt of advance payment;

3.      Automatic enrollment in the student health plan offered through the University or completion of the online waiver indicating comparable coverage through an approved plan.

C.      Supernumerary Students and Student Scholars ''
A Maintain Matriculation fee of $50 will be charged to students designated as Supernumerary or Student Scholar.

D.      Late Registration
Student Scholars are those who take time off from rotation to pursue other academic endeavors for a fixed period of time.  Supernumerary students are those who are returning to school after a Leave of Absence or those who have to repeating coursework. A late fee of $100 per day will be charged to students whose registration is incomplete on the first scheduled day without approved prior notice to the Office of the Registrar at SOM, Stratford Campus. **Please note:** Students in either status must abide by the curriculum and policies that are in place when they return or when they repeat the academic requirement(s).

E.      Good Standing
A student who has registered and has active student status will be considered a student in good standing.

## III.  Attendance

**<u>Attendance in first and second years</u>**
Attendance at class sessions is at the discretion of the course directors. Students need to check their syllabus and schedule for required sessions. The Course Director establishes criteria for excused absences.  Students unable to attend required classes due to illness or unforeseen circumstances must contact the Course Director and Office of Academic

Affairs before scheduled class(es) or as soon as possible thereafter.  A doctor's note will be required when you return to school. This needs to be submitted to the course director and Academic Affairs. Courses/sessions that expect attendance may require students to sign in. It is a violation of the honor code to sign in for another student.

*Conferences*
Conferences can be stimulating and add another valuable dimension to the medical school experience. Students can request an excused absence for medical conferences from their course director. Permission for release from required activities, including exams is at the discretion of the course director. Most times this will be limited to one day for conference and one day for travel, as most student conferences are held on the weekends. Make-up exams, when required, it also at the discretion of the course director, but typically would be as soon as possible after your return. Documentation of your role in the conference must be submitted with your request. **You must get permission from the course or course director before you make reservations and pay for trip.**

**<u>Attendance in third and fourth years</u>**
Daily attendance is required on all clinical rotations and preceptorships. Excused absences from clinical rotations must be approved by the Clerkship Director and the Academic Affairs office.  "Absence Request" forms are available in the Academic Affairs office and website.  These forms must be completed and returned to clerkship director no later than **<u>two weeks prior to the start of the clerkship,</u>** except when absence mandated by Academic Affairs.  Exceptions on prior notice timing can be made for last-minute invitations for residency interviews at the discretion of course director.

*Personal Days*
Students are allowed 5 personal days per academic year.  There is a limit to 1 day off for a 2-week rotation, 2 days off per 4 or 6-week rotation, and 4 days off per 8-12 week rotation. Students must attend a minimum of 85% of the required rotation workdays in order to get credit for the course (including all days missed for any reason). If there are any absences over the maximum allowed, students must submit a make-up request form to Academic Affairs and this is decided at the discretion of the course director.

*COMLEX*
Students are allowed one day off to take each COMLEX exam.  USMLE exams are not required; therefore students must use a personal day for that.

*Residency Interviews*
Fourth year students may take a maximum of 3 days off per rotation for residency interviews.

*Illness/Emergencies*
In cases of absences for emergencies or illness, it is the responsibility of the student to notify the housestaff officer/preceptor on the assigned service, the Clerkship Director, and the Office of Academic Affairs.  All absences of this type must be accompanied with

a note from a doctor or other documentation of emergency upon return to school.  This needs to be submitted to the clerkship director and Academic Affairs.

*Conferences*
Students can request an excused absence (without using personal days) for conferences when they are making a presentation, or when representing the school as a leader in a national group.  Most times this will be limited to one day for conference and one day for travel, as most student conferences are held on the weekends.  Documentation of your role in the conference must be submitted with your request.  Each student is limited to one conference during third year, except for students holding a national leadership position and with permission from Academic Affairs.  **You must get permission from the course or clerkship director before you make reservations and pay for trip.**


## IV.   Grading

A.    Official Grades
The school will use the following grading scale:

H = Honors 90-100
HP = High Pass 80-89
P = Pass 70-79
F = Fail Below 70
RP = Remediated Pass
AS = Advanced Standing
AUD = Audit
INC = Incomplete
IP = In Progress
NC = No credit
WNC = Withdrawn, no credit
WP = Withdrawn, passing
WF = Withdrawn, failing

Prior to academic year 2013-2014, the grading scale included grades of LP = Low Pass 65-69 and LPR = Low Pass after remediation.

Course Directors have the right to establish their own numerical ranges for letter grades provided it is stated in the course syllabus.  If alternate numerical ranges are not in a course's syllabus, the ranges listed above must be used.

A student who chooses to appeal a grade must contact the Course Director.  After the Course Director has made a determination, if the student chooses to make a second appeal, it is made to the Department Chair. A final appeal can be made, if the student so chooses, to the Senior Associate Dean for Academic Affairs.

70

No grade changes will be accepted after the final course grade has been posted for one calendar year.

B.     Advanced Standing for an SOM Course completed at Graduate School of Biomedical Sciences- Stratford Campus (GSBS)

Students may receive a grade of AS (Advanced Standing) in an SOM course provided the course meets the following criteria:

1.     The course has been identified as an SOM course taken by students at GSBS on the Stratford campus.  A list of these courses may be found in the Office of the Registrar.
2.     The student must have taken the course within two years of the current academic year and must have received at least a B+ in the course.
3.     The student must complete the SOM Advanced Standing Form and obtain the signature of the Course Director.
4.     If the student satisfies the criteria identified above, the student will be exempt from the course. The Course Director will forward the form to the Office of the Registrar and a grade of AS (Advanced Standing) will be recorded on the academic transcript.

Advanced Standing for an SOM Course or Degree taken elsewhere:

A student seeking a grade of AS (Advanced Standing) for a course that was not taken at GSBS on the Stratford campus must:

1.     The student must complete the SOM Advanced Standing Form, attach proof of the earned grade or degree and discuss the proposed exemption with the SOM Course Director.
2.     The Course Director will review the academic credentials of the student to determine whether or not Advanced Standing is warranted. The Course Director will determine if the content of the course is equivalent to what is offered in the SOM course and that the student's knowledge is at the level of High Pass or greater.  If so, the Course Director will approve, sign and date the form.
3.     The Course Director will forward the form to the Office of the Registrar and a grade of AS (Advanced Standing) will be recorded on the academic transcript.

C.     Passing Courses
A student is considered to have passed a course if a grade of Pass (P) or higher is achieved.  All students must achieve a passing grade in all courses and clinical rotations in order to graduate.

D.     Recording Grades

71

A grade of Fail may only be changed to Remediated Pass (RP) and the notation of Incomplete (INC) to the earned grade upon receipt of a Grade Change form from the Course Director to the Associate Registrar if a student has satisfied his/her deficiencies.  Students will only be required to repeat courses they failed.

E.   Leave of Absence Grading
If a student takes a leave of absence, the following policies will apply regarding grading courses that are not complete at the time of the leave:

1.   The student will receive a final grade for all courses for which they have met all requirements in the course syllabus.

2.   For year-long courses, if the student has completed all of the requirements of the fall term at the time of the leave, the student will receive an INC (Incomplete) and will not be required to start that course over in the fall term. The student will be permitted to return to complete the second half of the year-long course at the beginning of the spring term the year that student returns from leave.  When all course requirements are completed, the INC will be changed to the final grade the student earns.

3.   For first and second-year courses that have <u>concluded</u> and for which the student has not completed all requirements, the student will receive one of the following grades.

   a)   INC if the student is completing the final requirements of a first or second-year course within 30 days of the last day of the term. After the remaining requirements have been completed, the INC will be replaced by the final course grade.

   b)   WP (Withdrawn: Passing) if the student will not be completing the final requirements and had a passing average at the time of the leave.  The WP grade remains permanently on the transcript.

   c)   WF (Withdrawn: Failing) if the student will not be completing the final requirements and had a failing average at the time of the leave.  The WF grade remains permanently on the transcript.

   d)   WNC (Withdrawn: No Credit) if the student will not be completing the final requirements and had not completed enough work to determine performance at the time of the leave.  The WNC grade remains permanently on the transcript.

4.   No "credit" will be given for completion of a partial term's work.  A student who leaves in the middle of a term without completing all course requirements will receive a WP, WF or WNC depending on the student's performance at the time of the leave.  The grade will remain permanently on the transcript.

The student will be required to repeat and complete the course starting at the beginning of the course when the student returns from leave. The course will be listed a second time on the transcript with the final grade the student earns in that course.

## V.    Remediation

Appropriate remedial procedures to change a failing grade include taking a reexamination covering all or parts of a course, taking appropriate course work at other institutions, or retaking the course at School of Osteopathic Medicine. Appropriate use of all these remedial procedures is outlined in the Academic Rules and Regulations. These remedial procedures should be prescribed or approved by the Course Director to enable the Committee to formulate its recommendations on an individual basis.

## VI.    Auditing Courses

A student may be required to audit a course(s) upon the recommendation of the Committee. A regularly enrolled student may elect to audit course(s) appropriate to his/her academic classification. The name of an auditing student will appear on the roster provided by the Associate Registrar to the Course Director. The Course Director is responsible for determining course requirements for auditing students, including attendance, participation in laboratory exercises, interval tests, and other required work. An auditing student is not required to pass the final examination. Audited courses will appear on the student's official transcript with the notation Audit.

## VII.    Pre-clinical Years 1 and 2

A.    Students must pass all courses.

B.    Students may not enter the third year without passing all previous course work from years one and two except for students missing a seminar course with an excused absence.

C.    A student has failed a course when s/he receives a grade of Fail at the completion of the course before remediation.

D.    Students who fail one course in any term, but have a grade of 55-69, may remediate that course by comprehensive examination and continue studies. Students who fail with a grade less than 55 may not remediate by exam; they must repeat the course.

73

E.    If the student fails a remediation exam, s/he must repeat the SOM course or take a summer course approved by the Course Director.  If a student chooses, with the approval of the Course Director, to remediate by taking a summer course, the summer course is considered a second taking of the course.  Students who fail the same course twice will be recommended for dismissal.

F.    Students who fail two courses in an academic year, before remediation, may not remediate the courses by exam but must repeat the courses they have failed.

G.    Students who fail three or more courses, before remediation, in any academic year will be recommended for dismissal.  For example, if a student fails one course in the first semester, remediates successfully by examination, then fails two courses in the second semester, he/she will be recommended for dismissal.

H.    Students are limited to one remediation exam per course.

I.    Students repeating courses will be required to audit Osteopathic Manipulative Medicine courses for the purpose of maintaining their skills.

J.    Students must complete all coursework in the maximum time frame specified for their degree program, not including approved leaves of absence.

## VIII.  Clinical Years 3 and 4

Third-year students are expected to successfully complete Cardiology or Pulmonology, Family Medicine, Geriatrics, General Internal Medicine, Osteopathic Manipulative Medicine, Obstetrics/Gynecology, Pediatrics, Psychiatry, Surgery and one elective. Fourth year students are required to successfully complete Emergency Medicine, Family Medicine, Medical Humanities, one core Medicine rotation, one additional Subspecialty rotation and a minimum of four elective rotations (totaling sixteen weeks of electives). For required rotations, all departments will submit the RowanSOM online evaluation form for each student at the end of each clinical rotation.  Additional evaluation forms may be required by individual departments.  Student Evaluation Forms must be completed by the evaluating faculty member.  For elective rotations, a single evaluation form completed by the student's site supervisor is acceptable.  The Registrar's Office will review all clinical evaluations for third- and fourth-year students during the academic year.  Any student who is identified by the Clerkship Directors as unsatisfactory in academic and/or clinical performance will be referred to the Student Academic Progress Committee for a complete review of his/her record.  Students whose conduct merits concern will be referred to the Assistant Dean for Student Affairs.  Failure to meet departmental requirements and satisfactory evaluation will result in a grade of Fail.

A.    Students in the clinical years must pass all rotations.

B.      Students may not begin their fourth year clinical rotations until they have passed the Clinical Skills Competency Exam (CSCE).  If students do not pass the CSCE, they will be placed in Independent Study and will not be permitted to begin fourth-year clinical rotations until they pass the CSCE.  After passing the CSCE, students will begin clinical rotations on the first day of the next rotation period of the academic calendar.

C.      Students who take approved time off for independent study, leave of absence, student scholar, etc. during clinical rotations are required to make up any rotations or partial rotations that are missed.  Makeup dates will be scheduled by the Clinical Education Coordinator.  Students are not permitted to schedule their own makeup dates.  Students are not permitted to make up any rotation at the same time they are scheduled for another rotation.

D.      Clerkship Directors have the option of allowing students who have failed a required rotation to remediate by repeat examination if the clinical performance of the student was adequate.  If the student is unsuccessful in remediating the rotation by exam, the student must repeat the rotation.  If the student fails the rotation a second time; he/she will be recommended for dismissal.

E.      Students who fail an elective rotation must complete another elective rotation. The student is not required to complete the additional elective in the same discipline.  If the student fails the second elective he/she will be recommended for dismissal.

F.      Students who fail two rotations, before remediation, will be recommended for dismissal.


## IX.    Missed Exam

This policy applies to all written examinations, practical examinations, COMAT exams, Standardized Patient Lab examinations and similar encounters, and will be in effect during all examinations unless the Course Director specifically announces a change in this policy.

A.      Students are expected to take all exams during assigned times, as listed on the publicized course or clerkship schedule, or as confirmed by the Clinical Education & Assessment Center (CEAC) for an SP exam.  Students are responsible for noting any changes in the examination schedule by referring to the online calendar and/or email updates.

B.      Any student who anticipates missing an examination must submit their request in writing to Director, Academic Affairs, who will determine the validity of the excuse, in conjunction with the Course Director.  If deemed valid, the request will be forwarded to the Center for Teaching and Learning (CTL), and, if applicable,

to the CEAC to schedule/administer the make-up exam in coordination with the Course Director.

C.　　Valid reasons for missing an examination include but are not limited to:

    1.　　Personal illness or other health issue (student needs to be examined personally by a health care provider and secure the necessary medical documentation).

    2.　　Substantiated family emergency, such as significant illness of immediate family member/death in family.

    3.　　<u>Pre-approved</u> attendance at osteopathic national meetings (AOA, ACOFP, AAO etc.) (See E. below) [Student will need to provide verification of attendance.].

    4.　　Religious exemptions (requests must be made at the beginning of the semester).

D.　　Unacceptable reasons for missing an examination include but are not limited to:

    1.　　Not feeling prepared for the examination;

    2.　　Non-emergency travel plans, regardless of when these plans were made;

    3.　　Not having read an email announcement of a rescheduled examination;

    4.　　Appointment at a time that conflicts with the examination.

E.　　Students wishing to reschedule an examination to attend a national meeting must request prior approval from the Office of Academic Affairs at least two weeks before the examination. This will be discussed with Course Director. Students on Academic Warning / Probation are not permitted to attend meetings/conferences.

F.　　If a student misses an examination without a valid reason, the Course Director may assign a grade of zero (0) for that examination.

G.　　When make-ups for written exams are necessary, a single make-up examination date for that exam will be established in consultation with the Course Director(s). Make-up arrangements that are necessary beyond this will be made at the discretion of the Course Director.

H.　　For standardized patient (SP) exams, the student is responsible for coordinating the make-up exam with the CEAC, within the parameters set forth by the Course Director.  SP exam make ups will be arranged on a case-by-case basis, depending

on the CEAC's roster of programming.  The Course Director will provide a "to-be-completed-by" date for such circumstances.

I.  The Course Director reserves the right to create a make-up exam that is different in format, content or length from the examination that was administered to the class on the original exam day.  The student is responsible for all material tested on the original or make-up examination.

## X.   SOM Exam Administration and Proctoring

This policy will be in effect during all examinations unless the Course Director specifically announces a change in this policy.

A.  All students are expected to begin examinations on time.  For written examinations, if, because of an emergency or unforeseen event, a student is **twenty (20) minutes or later to the exam** administration site, s/he must obtain approval from Director, Academic Affairs to start the exam late and will have the time deducted from the scheduled exam time.  **Students who are repeatedly late for exams may be subject to disciplinary action**.  No one may leave the exam room within the first twenty minute period after the exam administration has begun.

B.  For SP encounter exams, late arriving students will be handled as follows:

1.  Student will miss all or part of the brief orientation session which usually precedes SP encounters;

2.  The student will not be permitted to make up a missed encounter;

3.  If the student arrives after an SP encounter has begun, the student may complete the encounter using only whatever time is left on the clock.  It is at the discretion of the Course Director to allow the student to make up part or all of an SP exam in accordance with Section IX.H (Missed Exam Policy).

C.  All personal belongings, including but not limited to book bags, purses, electronic equipment (i.e., cell phones, pagers, calculators, headsets), are not permitted in the exam room or outside of the exam room.  Students must leave personal belongings either in their locker or in their car.  Students who use a cell phone, pager, calculator or any device with internet or communication capability in the examination room will be subject to disciplinary action and, at the discretion of the Course Director, may receive a zero (-0-) for the examination.

D.   Students may bring beverages into the examination room only in approved containers that are available for purchase at the student store.  Proctors have the right to inspect items brought in by students into the exam room.

E.   Students may be provided scrap paper for an exam. This is determined by the Course Director and, when available, will be provided by the proctor.  Students are not allowed to write anything on the scrap paper until after the exam begins.

F.   For written exams, one male and one female student are permitted to leave the exam room for a bathroom break at the same time.  These breaks are limited to one ten (10) minute break per two (2)-hour exam period.  Students who need to use the restroom must check in with the proctor prior to leaving and upon returning to the exam room.  The proctor will record the name of each student and the times s/he leaves and returns to the exam room.  Break time is deducted from the total exam time.  No additional time will be provided.  A student taking a bathroom break is not allowed to refer to course materials while they are out of the exam room.  Any violation of this will be subject to disciplinary action.

G.   In the case of exams involving standardized patients, only one student is permitted to leave the CEAC at a time, and only after notifying a staff member.  Bathroom breaks should be restricted to time between SP encounters, as the exam is paused to wait for the student's return.  In the event that a student must take a bathroom break during an SP encounter, the encounter is consider completed once the student leaves the exam room, and the student will not be permitted to return to the encounter regardless of time left on the clock.

H.   Requests for exam accommodations for documented disabilities must be arranged with CTL staff in at least two (2) weeks in advance.  No time adjustments will be made by the proctor at the time of the exam administration.

I.   For written exams, the exam proctor, if it is not the Course Director, cannot be held responsible for decisions made affecting the exam.  S/he is only there to relay information from/to the Course Director who makes all decisions regarding the exam, its administration, and the grading policies.  The Course Director, proctor, or faculty, will not answer student questions during the exam administration.

J.   Any student requesting to bring essential medical supplies into the exam room is required to arrange this special circumstance with the Senior Associate Dean for Academic Affairs in advance.  Proctors will be provided with a list of students who have been authorized to bring in specifically listed medical supplies.  No additional authorization will be granted by the proctor at the time of the exam administration.

78

K.  When emergency situations make it difficult or impossible for a student to take an exam at the time it is scheduled, these situations will be addressed by the Director of Academic Affairs.  (See Section IX., Missed Exam Policy)

L.  All students are expected to maintain standards of behavior as noted in the School of Osteopathic Medicine Education Handbook regarding the Honor Code of Professional Conduct (the Honor Code) and adhere to the Code of Ethics of the American Osteopathic Association.

M.  In case of an emergency, students should leave laptops at their seats and follow any emergency instructions being given.

## XI.   COMLEX Policy and Procedures

A.  Per the NBOME, a student is eligible to take COMLEX Level 1 upon satisfactory completion of the first year in an AOA approved medical school and by approval of the Dean.

B.  The school will allow students to register and schedule the examination as soon as allowed by the NBOME.  However, the student is not permitted to schedule the examination on a date prior to the anticipated completion of all the academic requirements for Year Two (for COMLEX Level 1) or Year Three (for COMLEX Level 2 PE & CE), including mandatory board preparation courses.

C.  Students must achieve a passing grade on a COMSAE exam before they are allowed to take COMLEX.

D.  Beginning with the Class of 2016, all students must take COMLEX Level 1 before being permitted to start third year rotations.

E.  If a student is not prepared to take COMLEX 1 prior to the start of third-year clinical rotations, the student may request time off from clinical rotations for independent study.  However, the student is required to take COMLEX Level 1 no later than August 31st, unless exempted by the Senior Associate Dean for Academic Affairs.

F.  Students who fail any COMLEX exam will be required to discontinue rotations on a date determined by Academic Affairs and placed on independent study until they retake the exam.  This period of independent study may not last more than one year.

G.  Students who are entering a dual degree program are required to take COMLEX Level 1 by August 31 immediately following the end of the second year of their SOM curriculum.  They must pass COMLEX Level 1 before they will be permitted to return to the D.O. portion of the program.

79

H.      Students who have failed any one COMLEX examination will be placed on Academic Warning.  Students who fail two or more COMLEX examinations will be placed on Academic Probation.

I.      Students who fail any COMLEX examination three times will be recommended for dismissal.

J.      COMLEX Level 2-CE and Level 2-PE must be taken by November 15th of 4th year, unless exempted by the Senior Associate Dean for Academic Affairs.

K.      If a student has not successfully completed COMLEX Level 2-CE and COMLEX Level 2-PE by the expected graduation date but has completed all coursework, the student will be allowed a maximum of one additional year to complete the licensing exams.  That additional year will start the day after the last course ends.  The student will be designated as a Supernumerary student but will be enrolled as less than half-time and will not be eligible for financial aid.

L.      All students must pass COMLEX Level 1, Level 2-CE, and Level 2-PE to receive their D.O. Degree.

## XII.   Student Academic Progress Committee (SAPC)

The Student Academic Progress Committee, composed of faculty and elected student members, is responsible for formulating recommendations to the Dean regarding grades, absences, promotions, graduation, and dismissal.  The School of Osteopathic Medicine reserves the right to require the withdrawal of any student at any time the School deems necessary to safeguard its ideals of scholarship and character and to secure compliance with its regulations.  The records of each student are reviewed periodically by the Student Academic Progress Committee.  The Dean of the School acts upon the recommendations received from the Student Academic Progress Committee and may:

• promote students whose work is satisfactory;
• warn students whose work is less than satisfactory that they must improve their scholastic performance;
• direct that students whose work is unsatisfactory be placed on probation with an opportunity to repeat  specified courses;
• approve the dismissal of a student who is considered an unpromising candidate for the degree of Doctor of Osteopathic Medicine.

The Dean, with the advice of the Student Academic Progress Committee, may require the withdrawal of a student at any time if, in the opinion of the majority of the members of the Committee, the student should not continue in the School.

A student may appeal any recommendation of the Student Academic Progress Committee to the Dean of the School within two weeks of notification.

## XIII.   Review by the Student Academic Progress Committee

Any student who is identified by the Course Directors or Academic Affairs as unsatisfactory in academic and/or clinical performance will be referred to the Committee for a complete review of his/her record.  The Committee shall review, among other items, grades, faculty evaluations, professional demeanor, professional conduct, concern for the welfare and dignity of patients, concern for the rights of others, responsibility to duty, trustworthiness, ethical conduct, aberrant behavior, and general or specific conduct meriting concern.  At these meetings, the Committee will formulate recommendations for individual students based upon data provided by Academic and Student Affairs and others.  These recommendations may include, but will not be limited to: 1) a program of remedial instruction, 2) leave of absence, or 3) dismissal.  The Committee may request the appearance of a student at any scheduled meeting to discuss matters pertaining to his/her standing.  A student may also request a personal appearance before the Committee during its regularly scheduled meetings.  Students may be accompanied by a faculty advocate or a Student Representative when the Committee is considering a recommendation for dismissal.

A student who is required to appear before the Committee has the option to request support through the process from one of the Student Representatives to the Committee. That Student Representative will attend the meeting with the student and will attend the closed discussion by the Committee.  The Student Representative will not be present for the Committee vote.

## XIV.   Academic Warning

Academic Warning provides an 'early warning' mechanism for the Student Academic Progress Committee to identify students whose academic performance is below average. Students will be placed on Academic Warning if their average is below 70 in one or more courses, after 30% of the course grade has been calculated.   Students who fail any one COMLEX examination or any one course per term will also be placed on academic warning.

Students on Academic Warning are required to meet with the Center for Teaching and Learning (CTL) staff and complete all agreed-upon learning programs.  They are prohibited from travel to conventions, conferences, meetings, recruiting trips or other travel that will require time away from the classroom.  The Student Academic Progress Committee can make other prohibitions at their discretion for students on Academic Warning, including limiting a student's choice of clerkship hub.  Students who fail to

comply with all requirements of Academic Warning will receive a private letter of admonishment or other disciplinary action at the discretion of the Committee.

If a student's academic performance improves and their average rises above 70 for the course(s) in question and for two consecutive exams, they can request a review of their current academic record to have the status removed through CTL.

## XV.   Academic Probation

The Committee has wide discretion on placing a student on Academic Probation, including limiting a student's choice of clerkship hub.  In general, a student who fails two courses in their academic career, or any two COMLEX examinations, will be placed on Academic Probation for a period of at least one calendar year.  In the case of failed COMLEX examinations, the student will be on Academic Probation at least until the student has passed the examination.  Academic Probation requires:

1.   Possible ongoing appearances before the Committee according to a schedule set out by the Committee members.

2.   Student compliance with all recommendations of the Committee.

3.   Prohibition against student holding any office in student government, clubs, etc.

4.   Prohibition against student serving on any committees.

5.   Prohibition against student travel to conventions, conferences, meetings, recruiting trips or other travel that will require time away from the classroom.

6.   Participation in an individualized remediation program designed with the Center for Teaching and Learning.  The Committee may make other academic requirements.  Students on Academic Probation who fail to meet all requirements of Academic Probation may be recommended for dismissal.

## XVI.   Leave of Absence

A.   Administrative Leave of Absence

1.   A student may be placed on administrative leave of absence for academic or personal circumstances following review by the Committee.

2.   A student may be placed on administrative leave of absence any other time by the Assistant Dean for Student Affairs on the basis of academic or personal circumstances.  The circumstances and the conditions of the

leave will be provided in writing to the student and the Committee by the Assistant Dean for Student Affairs.

B.    Medical or Personal Leave of Absence

    1.    A leave of absence may be granted by the Committee upon recommendation of the Assistant Dean for Student Affairs for a student having personal or medical problems that are unlikely to be resolved while the student is in full-time attendance.

    2.    Any student requesting a leave of absence for personal or medical reasons shall consult with the Assistant Dean for Student Affairs before submitting a written request.

    3.    Written requests for leave of absence for personal or medical reasons for students in good academic standing may be acted on by the Assistant Dean for Student Affairs.  Leaves of Absence cannot be used to avoid dismissal for academic or disciplinary reasons.  Written requests for medical leave of absence must be accompanied by verification from the student's healthcare provider.  However, it is within the discretion of the Assistant Dean for Student Affairs to grant a request for a personal or medical leave of absence for emergent circumstances.

C.    Maximum Leave of Absence
Maximum cumulative leaves of absence are two years, unless the student is participating in an approved dual degree program, or for other reasons as specified by the Committee.  A student is normally limited to two (2) leaves of absence during the four-year curriculum.

D.    Return from Medical Leave of Absence

    1.    Students planning to return from medical leave should submit a letter to the Assistant Dean for Student Affairs requesting return from medical leave no later than thirty days before the intended date of return.

    2.    The student is then instructed by the Assistant Dean for Student Affairs to make an appointment with the Director of Student Health, School of Osteopathic Medicine, for evaluation of readiness to re-enter the program.

    3.    The Director of Student Health will present a report and recommendation to the Assistant Dean for Student Affairs for subsequent review and recommendations of the Committee.

    4.    The student will be placed in Supernumerary status upon return.

5.      In the absence of the thirty day required written notification from a student regarding their intention to return to the School from a medical leave of absence, the student will be administratively withdrawn.

E.      Return from Personal Leave of Absence

1.      Students planning to return from personal leave should submit a letter to the Assistant Dean for Student Affairs requesting return from personal leave no later than thirty days before the intended date of return.

2.      The student will be placed in supernumerary status upon return.

3.      In the absence of the thirty day required written notification from a student regarding their intention to return to the School from a personal leave of absence, the student will be administratively withdrawn.

## XVII.  Student Scholar

Students occasionally want to enhance their academic program with non-curricular opportunities such as research or clinical experiences that last longer than a typical elective period.  Those students are designated as Student Scholar.

A student who is approved for Student Scholar has active, full-time enrollment status. The student remains eligible for financial aid, student health insurance, parking, etc. Student Scholars are charged a Maintain Matriculation fee but are not charged tuition. The designation of Student Scholar is listed as a non-credit experience on the student's transcript for each approved term.

To obtain approval for the Student Scholar designation the student submits the "Request to Participate in a Non-Credit Clinical Experience" form along with a detailed description of what they plan to do to the Senior Associate Dean for Academic Affairs.  The Senior Associate Dean meets with the student to review the plan and approves or disapproves the plan in writing.  The student returns to their for-credit curricular requirements at the conclusion of the experience.

## XVIII. Withdrawal

Withdrawal from the School of Osteopathic Medicine is defined as permanent separation of an individual from the School of Osteopathic Medicine.  A student may voluntarily withdraw or may be involuntarily withdrawn by administrative action ("Administrative Withdrawal").

The withdrawal mechanism cannot be used to avoid dismissal for academic or disciplinary reasons. Withdrawal is not permitted once a disciplinary hearing has started. A student wishing to withdraw must submit a written request to the Senior Associate Dean for Academic Affairs who will notify the student of the actions taken.

Based upon the status of the individual in each course at the time of voluntary or administrative withdrawal, the grade will be recorded on the transcript as follows:

WNC = Withdrawn: No Credit
WP = Withdrawn: Passing
WF = Withdrawn: Failing

## XIX.   Dismissal

In cases where dismissal is being considered, the dismissal will not become final until the school's internal appeal process, if instituted, has been completed and a final determination has been made by the Dean.  The effective date of dismissal will be the date of final action by the Dean.  Pending the Dean's final decision and in accordance with school-specific policies governing student dismissals, the student is allowed to continue their participation in all academic activities for which they are enrolled and will continue to be bound by all school and university regulations and obligations, including those regarding the assessment and collection of tuition and fees.  Reasons for dismissal may include, but are not limited to, the following:

A.      Failure in three or more courses in an academic year.

B.      Failure of the same course two times.

C.      Failure of four courses in the first two years.

D.      Failure of the same COMLEX exam three times.

E.      Failure to complete all required coursework within the maximum time frame specified for their degree program (not including approved leaves of absence.

F.      Absence of the personal qualifications and attributes deemed necessary to perform the duties of an osteopathic medical student and the osteopathic medical profession.

## XX.   Graduation Requirements

All academic work must be completed no later than June 30 of a given year for students who wish to be counted as a graduate of that given year.  Students who must complete

additional work beyond the graduation ceremony date will receive their diploma following satisfactory completion of their requirements.  Students who successfully complete all requirements for graduation as prescribed by the faculty will be recommended by the Student Academic Progress Committee to the Dean for graduation. A list of the candidates for the degree of Doctor of Osteopathic Medicine must be presented by the Dean to the faculty for their approval.  Candidates approved by the faculty and the Board of Trustees, for the distinction of Doctor of Osteopathic Medicine, are then eligible to receive the degree at the next commencement.  Candidates for the degree of Doctor of Osteopathic Medicine must exhibit the requisite knowledge and skills to complete the prescribed course of study and must also possess personal qualifications and attributes deemed necessary to perform the duties of the osteopathic medical profession.

## XXI.   Additional Required Clinical Experiences

Students who will be completing their degree requirements between July 1 – February 28 (after the May in which they were originally anticipated to graduate) will be scheduled for their remaining clinical rotations as well as one or more non-credit experiences, in order to keep their clinical skills current in preparation for residency.  Each student's schedule will be individually designed by the Clinical Education Coordinator, in consultation with the SOM Registrar, to ensure that all degree requirements will be met.

## XXII.  Graduation on Alternate Dates

The Doctor of Osteopathic Medicine (D.O.) degree is usually awarded in May after completion of the fourth-year curriculum.  A student who will complete all of his/her degree requirements after the month of May can be awarded the D.O. degree at a later time subsequent to completion of all degree requirements.  The maximum time for completion of the academic program is five years, not including any time on approved leave of absence.  To be awarded the D.O. degree, students must have the approval of all of the following: the SOM Student Academic Progress Committee, the SOM Executive Council, and the SOM Faculty and the Rowan University Board of Trustees.  A student must complete all degree requirements to receive the D.O degree.  Students will be permitted to participate in the Convocation and Commencement ceremonies in May if it is anticipated that they will complete their degree requirements by August 31st.  Students who complete their degree requirements after August 31st will be permitted to participate in the RowanSOM Commencement and the University Commencement ceremonies the following May and will be considered members of that graduating class for alumni purposes.

## XXIII. Awarding a D.O. Degree Posthumously

Rowan University School of Osteopathic Medicine seeks to recognize the academic achievements of its students.  This policy establishes guidelines for the posthumous awarding of a D.O. degree in the event a student dies before completing all of the requirements for the D.O. degree.  Consideration is given to academic and institutional integrity according to the following criteria:

A.      The student was enrolled in the second half of his/her final year of study at RowanSOM at the time of death.

B.      The student successfully completed the core clinical rotations.

C.      The student was in good standing and would likely have completed all of the degree requirements had he/she not died.


## XXIV. Standards of Satisfactory Academic Progress for Title IV and NJ Financial Aid Program Eligibility

A.      Purpose
This policy defines satisfactory academic progress for all School of Osteopathic Medicine (SOM) matriculating students.

B.      Accountability
The Senior Associate Dean for Academic Affairs, the Associate Registrar and the Student Academic Progress Committee ("the Committee") are responsible for implementing this policy.

C.      Policy
Satisfactory Academic Progress is the successful completion of degree requirements according to published increments that lead to degree completion within published time limits.  Sound academic principles require that students be required to maintain standards of satisfactory academic progress.  In addition, federal regulations require the School to establish satisfactory academic progress standards.  The following standards apply to all matriculating students, whether they are financial aid recipients or not.  Students who fail to maintain satisfactory academic progress during the established period of review must be informed of their academic status and may be placed on financial aid probation, suspended or dismissed, in accordance with the policies of the school.  Satisfactory Academic Progress will be reviewed each academic term.  The standards of satisfactory academic progress measure a student's performance in four areas:  completion rate, cumulative grade point average, COMLEX performance and maximum time frame.

1.     Completion Rate
Each academic term the Associate Registrar in consultation with the Committee will evaluate all students' academic progress by comparing the number of attempted courses with the courses successfully completed during the academic term.  The program completion rate standards listed below differ between the Traditional curriculum and the Problem Based Learning curriculum due to the different number of total courses required for each of those programs.  A student in the Traditional D.O. degree program must complete the following minimum number of courses at the end of each academic term in order to be considered to be making Satisfactory Academic Progress.

While enrolled in the first and second year curriculum:
Terms 1 and 2 – The student must complete 7 courses out of 8 attempted. If the student does not complete 2 courses in one academic term or over both terms of the first year, the student will not be considered making satisfactory academic progress.  The student will be placed on a lightened load curriculum.
Terms 3 and 4– The student must complete 9 courses out of 10 attempted. If the student does not complete 2 courses in one academic term or over both terms of the second year, the student will not be considered making satisfactory academic progress.  The student will be placed on a lightened load curriculum.
(If needed to complete curriculum) Terms 5 and 6 – Students on the lightened load curriculum must complete all remaining courses in the first or second year curriculum to be considered making satisfactory academic progress.

While enrolled in the third and fourth year curriculum:
Terms 5 and 6 – The student must complete 8 courses out of 9 attempted. If the student does not, the student will not be considered making satisfactory academic progress.
Terms 7 and 8 – The student must complete 9 courses out of 10 attempted. If the student does not, the student will not be considered making satisfactory academic progress.
(If needed to complete curriculum) Terms 9 and 10 – The student must complete all remaining courses in the third and fourth year curriculum to be considered making satisfactory academic progress.

A student in the Problem-Based Learning (PBL) D.O. degree program must complete the following minimum number of courses at the end of each academic term in order to be considered to be making satisfactory academic progress.

While enrolled in the first and second year curriculum:

Terms 1 and 2 - A student in the PBL curriculum must successfully complete all courses attempted each term during the first two terms of their enrollment.  If the student does not, then the student will be offered the option of repeating the first year in the traditional curriculum.  If the student does not complete 2 courses in one academic term or over both terms of the first year, the student will not be considered making satisfactory academic progress.

Terms 3 and 4 - A student in the PBL curriculum must successfully complete all courses attempted each term during the third and fourth terms of their enrollment. If the student does not complete 2 courses in one academic term or over both terms of the second year, the student will not be considered making satisfactory academic progress.

(If needed to complete curriculum) Terms 5 and 6 – PBL students who switch to the traditional curriculum must complete all courses attempted to be considered making satisfactory academic progress.

While enrolled in the third and fourth year curriculum:

Terms 5 and 6 – The student must complete 8 courses out of 9 attempted. If the student does not, the student will not be considered making satisfactory academic progress.

Terms 7 and 8 – The student must complete 9 courses out of 10 attempted. If the student does not, the student will not be considered making satisfactory academic progress.

(If needed to complete curriculum) Terms 9 and 10 – The students must complete all remaining courses in the third and fourth year curriculum to be considered making satisfactory academic progress.

Courses will be considered as attempted or earned as follows:

Attempted and Completed
Courses with a grade of H, HP, P, RP or AS (as well as LP and LPR grades that were in existence prior to academic year 2013-2014)
Courses successfully repeated (counted once towards attempted in the calculation of the completion rate)

Attempted but not Completed
Courses with a grade of F, INC, IP, WP, WNC or WF

Not Attempted and Not Completed
Courses with a grade of AUD or NC

2.    Cumulative Grade Point Average
Each academic term the Associate Registrar in consultation with the Committee will evaluate whether each student has achieved the equivalent of a "C" average.  SOM does not compute grade point average using letter grades.  The grade of P (Pass) is considered equivalent to a "C."

Each student must also achieve the standards established by the following SOM Academic Rules and Regulations:

a)      Section IV. Grading
b)      Section V. Remediation
c)      Section VI. Auditing Courses
d)      Section VII. Pre-clinical Years 1 and 2
e)      Section VIII. Clinical Years 3 and 4
f)      Section XI. COMLEX Policy and Procedures
g)      Section XIV. Academic Probation
h)      Section XIX. Graduation Requirements
i)      Section XXI. Additional Required Clinical Experiences

When courses are repeated and passed, only the grade for the second instance of each course will be calculated toward the determination of satisfactory academic progress. Grades earned at another institution to remediate a failed course will be included in the determination of satisfactory academic progress.  Grades earned at another institution by students who transfer to SOM will not be included in the determination of the "C" equivalent.

3.      COMLEX

To be making Satisfactory Academic Progress a student must also complete the COMLEX Level 1, Level 2-CE and Level 2-PE.  If the student fails any COMLEX three times the student will not be making satisfactory academic progress.  Students must successfully complete COMLEX Level 1 to continue third-year rotations.  If a student fails COMLEX 1, the student will be required to stop coursework and will be placed on Independent Study and will be placed on Financial Aid Warning.  If a student remains on Independent Study for more than one year, the student will not be making Satisfactory Academic Progress and will not be eligible for financial aid and will be recommended for dismissal.  If a student has not successfully completed all COMLEX requirements by the expected graduation date but has completed all other graduation requirements, the student will be designated as a supernumerary student and will be allowed a maximum of one additional year but will be enrolled as less than half-time and will not be eligible for financial aid.

4.      Maximum Time Frame
Maximum time frame is defined by SOM as the maximum number of years after first enrollment that a student may complete SOM courses in the full-time pursuit of a degree.  Each academic year the Associate Registrar and the Committee will evaluate whether each student can

complete the program without exceeding the maximum years in which courses were attempted.  A student must complete all requirements for their specific degree program within the maximum time frame specified in the chart below, not including time for approved leave of absence (see Academic Rules and Regulations Section  XV. Leave of Absence).

| Degree Program | Standard Length | Maximum Length |
|---|---|---|
| D.O. - Student enters 1st year (Traditional or PBL) | 4 years | 5 years |
| D.O. - Lightened Load | 5 years | 6 years |
| D.O. - Student transfers into 2nd year | 3 years | 4 years |
| D.O. - Student transfers into 3rd year | 2 years | 3 years |
| D.O./J.D. | 6 years | 7 years |
| D.O./M.A. | 5 years | 6 years |
| D.O./M.B.A. | 5 years | 6 years |
| D.O./M.P.H. | 5 years | 6 years |
| D.O./ M.S. | 5 years | 6 years |
| D.O./Ph.D. | 7 - 9 years | 10 years |

5.     Notification of Lack of Satisfactory Academic Progress
Following the evaluations required by Sections A, B and C of this policy, the Committee will transmit written notification to all students who have not met the standards for Satisfactory Academic Progress, with copies to the Rowan University Office of Financial Aid, Senior Associate Dean for Academic Affairs, Director of Academic Affairs, Associate Registrar and the Center for Teaching and Learning.  The notification will indicate the nature of the deficiency, any methods that may be available for correcting the deficiency and any consequences that have resulted or may result, such as probation, suspension or dismissal.  A student may re-establish Satisfactory Academic Progress by demonstrating achievement of the completion rate and GPA required pursuant to Sections A and B of this policy within the maximum time frame required in Section C of this policy.

6.     Financial Aid Warning
Students who have been determined not to be making satisfactory academic progress will automatically be placed on Financial Aid Warning. While on Financial Aid Warning the student is eligible for financial aid for a period of one term. No appeal is necessary. The student will be reviewed again at the end of the next term of enrollment. The student must complete the following term's courses successfully as well as complete any other requirements established by the Committee. If the student is still not making satisfactory academic progress, see section 7. Appeal for Reinstatement of Financial Aid Eligibility and section 8. Financial Aid Probation.

7.     Appeal for Reinstatement of Financial Aid Eligibility

91

Students who have been on Financial Aid Warning in the previous academic term and are still not making satisfactory academic progress by the end of that term are not eligible for financial aid. A student may appeal being designated ineligible for financial aid due to extenuating circumstances such as serious illness or death of a family member.  The student must submit a written appeal to the Senior Associate Dean for Academic Affairs or designee.  If that appeal is approved the student will be placed on Financial Aid Probation (see section 8.)  If the student's appeal is denied then the student is not eligible for financial aid.

8.      Financial Aid Probation
While on Financial Aid Probation the student is eligible to receive financial aid for one term.

9.      Academic Plan
An Academic Plan is created for a student who will not be able to complete the necessary requirements to regain satisfactory academic progress status within the one term of Financial Aid Probation. The Academic Plan includes requirements that must be successfully completed for each successive term in order to continue on the plan and continue to be eligible for financial aid.  At the end of each term the student's progress will be reviewed. If the student does not meet the measures of the academic plan then financial aid eligibility will end.

10.     Dismissal or Withdrawal
Students who are dismissed or withdrawn from the school are not making Satisfactory Academic Progress and are not eligible to receive financial aid.

11.     Documentation
Documentation of decisions concerning status of satisfactory academic progress, probation, dismissal, appeal, or re-establishment of Satisfactory Academic Progress shall be transmitted to the affected student and maintained in the student's academic file in the Office of the Registrar and the Committee file in accordance with Rowan University record retention requirements.  All statistical data regarding Satisfactory Academic Progress and appeal actions will be maintained by the Committee.

12.     Dissemination
This policy will be published in the same manner as other academic policies of the school, including online publication and inclusion in all new editions of the Education Handbook and will be reviewed annually. The school will disseminate any additional standards of Satisfactory Academic Progress to all students when they enroll in the degree program.

92

* * * * *

## CENTER FOR TEACHING AND LEARNING (CTL)

**Center for Teaching and Learning**
Jacqueline Giacobbe, MS.Ed., M.A., Director
One Medical Center Drive, Suite 210
P.O. Box 1011
Stratford, NJ  08084-1501
Telephone:  (856) 566-6738
Fax:  (856) 566-6341
E-mail:  giacobja@rowan.edu
Website:  www.rowan.edu/som/education/CTL


The Center for Teaching and Learning was established to maximize the educational experience of the osteopathic medical student, as well as to support and enhance the instructional methods used by RowanSOM faculty.  For students, the Center focuses on strengthening academic skills relevant to basic science and clinical coursework as well as addressing challenges posed at crucial points in the curriculum.  In this vein, the Center provides a variety of supportive academic services, including peer tutoring, group workshops on topics related to academic success and individual confidential consultation on learning issues.

* * * * *

## HISTORY OF ROWAN UNIVERSITY

http://www.rowan.edu/subpages/about/history/


## HISTORY OF ROWAN UNIVERSITY SCHOOL OF OSTEOPATHIC MEDICINE

The Rowan University School of Osteopathic Medicine (RowanSOM) was founded on December 17, 1976.  From that time until June 30, 2013, the school operated as part of the University of Medicine and Dentistry of New Jersey (UMDNJ). As a result of the New Jersey Medical and Health Sciences Education Restructuring Act of 2012, UMDNJ was disbanded; the school became part of Rowan University on July 1, 2013.

To initiate the educational program, a plan was developed to use the basic science facilities at Rowan University Rutgers Medical School (now Robert Wood Johnson Medical School) in Piscataway for the first two years of the curriculum, and affiliated community hospitals in southern New Jersey for the last two years.  Shortly thereafter, on September 7, 1977, the first class with 24 students began its osteopathic medical training.

RowanSOM's first affiliate and its current principal teaching hospital is Kennedy University Hospital, with divisions in Stratford, Cherry Hill and Washington Township.  Other hospital affiliates include:  Our Lady of Lourdes Medical Center in Camden, Lourdes Medical Center of Burlington County in Willingboro, Christ Hospital in Jersey City, St. Joseph's Regional Medical Center in Paterson, Morristown Memorial Hospital in Morristown, and Overlook Hospital in Summit.

Over the years, RowanSOM has greatly expanded.  In 1987, the School opened the Specialty Care Center.  In 1989, the adjoining Primary Care Center building was purchased.  In July of 1990, RowanSOM completed the first phase of the Science Center and became a unified four-year campus in Stratford, two full years ahead of schedule.  In the fall of 1993, the Academic Center was opened and completed the campus by providing students with state-of-the-art teaching facilities.

* * * * *

## MISSION OF ROWAN UNIVERSITY

A leading public institution, Rowan University combines liberal education with professional preparation from the baccalaureate through the doctorate. Rowan provides a collaborative, learning-centered environment in which highly qualified and diverse faculty, staff, and students integrate teaching, research, scholarship, creative activity, and community service. Through intellectual, social and cultural contributions, the University enriches the lives of those in the campus community and surrounding region.

## MISSION, VISION, ESSENTIAL VALUES and GUIDING PRINCIPLES OF RowanSOM

Mission:  The Rowan University School of Osteopathic Medicine is dedicated to providing excellence in medical education, research and health care for New Jersey and the nation.  An emphasis on primary health care and community health services reflects the School's osteopathic philosophy, with specialty care and centers of excellence demonstrating our commitment to innovation and quality in all endeavors.  The School seeks to develop clinically skillful, compassionate and culturally competent physicians from diverse backgrounds, who are prepared to become leaders in their communities.

Vision:  To be the best osteopathic medical school in the nation by providing a premier, dynamic academic environment that attracts and nurtures outstanding faculty, staff and students who are dedicated to our mission to promote health and treat illness.

**Essential Values and Guiding Principles:**

*Collegiality*
Promote mutual respect, reward collaboration, encourage the open exchange of ideas, and facilitate the growth and advancement of individuals.
*Guiding Principle*
We recognize that it is outstanding, innovative, dedicated people, working as a team, who make our mission, vision, and values a reality.

*Compassion*
Be aware of, accept and respond to the physical, emotional, spiritual, and intellectual needs of others.
*Guiding Principle*
We consider the well-being of people to be preeminent in all of our activities.

*Diversity*
Support and foster tolerance, cross-cultural awareness and the dignity of all, regardless of race, color, ancestry, ethnicity, religion, gender, pregnancy or reproductive status, national origin,

disability, age, sexual orientation, gender identity or expression, marital, familial or domestic partner or civil union status, military or veteran status, genetic information, or physical ability.
*Guiding Principle*
We embrace all individuals in our communities and are committed to enhancing their health knowledge, overall well-being, and opportunities.


*Excellence*
Provide superior education, patient care, and research.
*Guiding Principle*
We are committed to excellence in osteopathic medical education, research, and clinical care, especially acknowledging the importance of our major partnerships in the fulfillment of our mission.  We measure our excellence against other outstanding academic health centers with a similar tripartite mission.


*Innovation*
Discover new ideas and develop cutting edge knowledge to enhance the prevention, treatment, and cure of disease.
*Guiding Principle*
We are committed to innovation and collaboration across all aspects of our mission in the creation, discovery, delivery, and dissemination of new knowledge.


*Integrity*
Demonstrate fairness, honesty, sincerity, professionalism, and a consistent commitment to our mission, vision, and values.
*Guiding Principle*
We hold ourselves accountable for incorporating our mission, vision, and values into all operational processes, decision making, actions, and partnerships of the School.

Approved by the General Faculty September 19, 2012

## OSTEOPATHIC MEDICINE

Osteopathic Medicine is a distinctive form of medical practice in the United States.  Osteopathic Medicine provides all of the benefits of modern medicine including prescription drugs, surgery, and the use of technology to diagnose disease and evaluate injury. It also offers the added benefit of hands-on diagnosis and treatment through a system of therapy known as Osteopathic Manipulative Medicine.  Osteopathic Medicine emphasizes helping each person achieve a high level of wellness by focusing on health education, injury prevention and disease prevention.

Osteopathic physicians, also known as D.O.s, work in partnership with their patients. They consider the impact that lifestyle and community have on the health of each individual, and they work to erase barriers to good health. D.O.s are licensed to practice the full scope of medicine in all 50 states. They practice in all types of environments including the military, and in all types of specialties from family medicine to obstetrics, surgery and aerospace medicine.

D.O.s are trained to look at the whole person from their first days of medical school, which means they see each person as more than just a collection of body parts that may become injured or diseased.  This holistic approach to patient care means that osteopathic medical students learn how to integrate the patient into the health process as a partner.   They are trained to communicate with people from diverse backgrounds, and they get the opportunity to practice these skills in the lab with standardized patients.

Because of this whole-person approach to medicine, approximately 50 percent of all D.O.s choose to practice in the primary care disciplines of family practice, general internal medicine, obstetrics/gynecology and pediatrics.

In addition to studying all of the typical subjects you would expect student physicians to master, osteopathic medical students take approximately 200 additional hours of training in Osteopathic Manipulative Medicine. This system of hands-on techniques helps alleviate pain, restores motion, supports the body's natural functions and influences the body's structure to help it function more efficiently.  In addition to a strong history of providing high quality patient care, D.O.s conduct clinical and basic science research to help advance the frontiers of medicine and demonstrate the effectiveness of the osteopathic approach to patient care.  The National Osteopathic Research Center conducts osteopathic clinical outcomes research and serves as a national catalyst to develop and conduct multi-center, collaborative clinical research studies focusing on demonstrating the effectiveness of osteopathic manipulative medicine as it applies to many facets of patient care.

## OSTEOPATHIC OATH

*I do hereby affirm my loyalty to the profession I am about to enter.*

*I will be mindful always of my great responsibility to preserve the health and life of my patients, to retain their confidence and respect both as a physician and a friend who will guard their secrets with scrupulous honor and fidelity, to perform faithfully my professional duties, to employ only those recognized methods of treatment consistent with good judgment and with my skill and ability, keeping in mind always nature's laws and the body's inherent capacity for recovery.*

*I will be ever vigilant in aiding in the general welfare of the community, sustaining its laws and institutions, not engaging in those practices which will in any way bring shame or discredit upon myself or my profession.*

*I will give no drugs for deadly purposes to any person, though it be asked of me.*

*I will endeavor to work in accord with my colleagues in a spirit of progressive cooperation and never by word or by act cast imputations upon them or their rightful practices.*

*I will look with respect and esteem upon all those who have taught me my art.  To my college I will be loyal and strive always for its best interests and for the interests of the students who will come after me.*

*I will be ever alert to further the application of basic biologic truths to the healing arts and to develop the principles of osteopathy which were first enunciated by Andrew Taylor Still.*

# POLICIES

## AA / EEO Policy and to File a Complaint

http://www.rowan.edu/hr/affirm/documents/EqualEmploymentOpportunityPolicyStatement2.pdf

Dr. Johanna Velez-Yelin, Assistant Vice President
Equity & Diversity/ Chief Equity Compliance Officer
To file a complaint by phone via the **24 hour Hotline: 855-431-9967**
Or via the web: **https:// rowan.alertline.com**

## Acceptable Use Policy

http://www.rowan.edu/toolbox/policies/policy/policy.html

## Alcohol and Other Drugs Policy

http://www.rowan.edu/studentaffairs/communitystandards/documents/RowanUniversityStudentHandbook2013-2014.pdf

## Americans with Disabilities Act Accommodations

http://www.rowan.edu/hr/affirm/documents/ADAACCOMMODATIONPOLICYANDPROCESSPacket_000.pdf

## Clean Air / Smoke-Free Environment

In an effort to provide a safe, healthy and comfortable environment for all patients, faculty, staff members, students, volunteers, visitors and the general public, smoking is prohibited in all University owned or leased facilities and vehicles.  The Stratford campus became smoke free on July 1, 2012.

This policy regarding a clean air / smoke - free environment in all University-owned or leased facilities and vehicles is set to protect the health of non-smoking patients, faculty, staff members, students, volunteers, visitors and the general public; to help those who wish to quit smoking do so; and to serve as an example to the community.

150

\* \* \* \* \*

# INDEX

AA / EEO Complaint, Policy on, 152
AACOMAS, 100
AAMC, 108
Absence Request, 43
Absence Requests, 38
Absences, 70
Academic Affairs, 7
Academic Attire, 195
Academic Calendars, 96
Academic Plan, 92
Academic Probation, 82
Academic Requirements for Admission, 98
Academic Rules and Regulations (ARR), 67
Academic Technology, 64
Academic Warning, 81
Acceptable Use Policy, 141, 152
Accepted Students Day, 99
Accreditation of Rowan University, 94
Accreditation of SOM, 94
Address Changes, 195
Administration, Rowan University, 94
Administration, SOM, 94
Admission Prerequisites, 107
Admissions, 98
Admissions Office, 98
Advance Standing, 109
Advanced Standing, 71
Alcohol and Other Drugs Policy Guide, 152
Alumni and Student Affairs, 201
Alumni Association, 201
American Association of Colleges of Osteopathic
    Medicine, 94
American Association of Colleges of Osteopathic Medicine
    Application Service, 100
American Osteopathic Association, 94
Americans with Disabilities Act, 152
Announcements and Notices, 42
Appeal, 81, 92
Appeal a grade, 71
Appearance Guidelines, 46
Applicant Fees, 109
Application Procedures, Admissions, 100
Application, 4th Year Clerkship, 55
Assessment and Evaluation, Office of, 111
Association of American Medical Colleges (AAMC), 108
Attendance, 42
Attendance Policy, 68
Auditing, 73
Background Check, 100
Bill of Rights, Campus Sexual Assault, 176
Blackboard, 65
Board of Trustees, Rowan University, 113
Books, Required for SOM, 110
Bursar's Office, 130
Calendars, Academic, 96
Campus Information, 113
Career Counseling, 9
Careers in Medicine (CiM), 9
Cashier's Office, 130

Center Directors, SOM, 95
Center for Teaching and Learning (CTL), 115
Chairpersons, SOM, 95
Charting, 42
Clean Air/Smoke Free Environment, 152
Clinical Education & Assessment Center (CEAC), 116
Clinical Experiences, Additional Required, 86
Clinical Skills Competency Examination, 59
Clinical Years 3 and 4, 74
Closing of SOM, 202
Clubs, Student, 206
Code of Ethics of the American Osteopathic Association,
    117
Colleges of Osteopathic Medicine, 154
COMLEX, 9, 38, 69, 82, 90
COMLEX Policy and Procedures, 79
Commencement, RowanSOM, 202
Commencement, University, 205
Commission on College Accreditation (COCA)
    Osteopathic Association, 94
Commission on Osteopathic College Accreditation, 154
Complaints Related to the COCA Accreditation Standards,
    153
Compliance Officer, 152
Comprehensive Osteopathic Medical Licensing
    Examination, 9
Computer, 110
Computer Labs for Students, 142
Computer Labs, Access to, 142
Computer Laptop Program, 9, 142
Computing Accounts and Password Management, 141
COMSAE, 79
Conferences, 70
Constitution, STUCO, 206
Continuing Medical Education (CME), 120
Core Rotations, Fourth Year, 39
Counseling, 204
Course Remediation, 10
Course Rosters, 197
Criminal Background Check, 154
Criminal Background Check, for Admission, 100
Crisis, 205
Curricular Options, 10
Curriculum Description, 15
Curriculum Summary, 13
D.O. / MBA Degree Program, 19
D.O./J.D. Program with Rutgers School of Law, 19
D.O./M.A Program with Saint Joseph's University, 20
D.O./M.P.H. Program, 18
D.O./M.S. Program, 18
D.O./Ph.D. Program, 18
Diplomas, 197
Director of Student Health, 203
Disciplinary Infractions, 181
Disciplinary Procedures, 179, 188
Disclosure Form, 158
Dismissal, 85
Dismissal or Withdrawal, 92
Diversity, Statement of Student, 156

Dress Code, Kennedy University Hospital, 46
Drug-Free Environment, Policy on, 156
Dual Degree Programs, 18
Echo360 Lecture Capture System, 65
Education Handbook, 201
Elective Rotations, 55
EMERGENCY: 911, 175
Equal Opportunity (EEO), 157
Equity & Diversity, 152
Equity and Workplace Diversity, Office of, 194
ERAS, 134
Essential Functions, 157, 189
Essential Functions for Admissions, Matriculation,
    Promotion and Graduation, 103
Evaluation Process, 44
Evaluation, Clinical, 42
Evaluation, Clinical Program, 43
Exam Administration and Proctoring, 77
ExamSoft Computer Based Testing, 66
Exhibit C, Waiver and Release for Study Outside
    RowanSOM or its Affiliates, for Students, 193
Export controls, 193
Faculty, of RowanSOM, 121
Family Educational Rights and Privacy Act (FERPA), 157
Fellowships, 134
FERPA, 157, 195
Financial Aid for RowanSOM Students, 130
Financial Aid Probation, 92
Financial Aid Warning, 92
Financial Aid, Sources of, 131
Financial Aid, What is, 130
First-Year Course Descriptions, 24
First-Year Exam Week Schedule Sample, 23
First-Year Program, 21
First-Year Standard Class Schedule Sample, 22
Fitness Center, 113
Fourth-Year Clerkship Directors, 62
Fourth-Year Course Descriptions, 56
Fourth-Year Program, 55
Fourth-Year Rotation Contacts, 62
Free Application for Federal Student Aid (FAFSA), 131
General Service Fee, 110
Glossary, IS&T, 143
Good Standing, 68
Grade Legend, 197
Grade Point Average (GPA), Cumulative, 90
Grade Rosters, 198
Grades, Official, 70
Grading, 21, 70
Grading Requirements for MSIII Core Required Clerkships
    Policy, 43
Graduate Medical Education (GME), 134
Graduate School of Biomedical Sciences (GSBS), 18
Graduation fee, 110
Graduation on Alternate Dates, 86
Graduation Requirements, 86
Harassment, Sexual and Other Types, Rowan University
    Policy on, 160
Health Sciences Library, 145
Heat Ticket, 143
History and Organization of Rowan University, 135
History and Physical Examinations (H&P's), 45

History of SOM, 135
Honor Code of Professional Conduct, 136
Honor Code of Professional Conduct of RowanSOM, 180
Housing, 105
Illness or Emergencies, 70
Immunization and Health Requirements, for Admission,
    105
Immunization Recommendations, 192
Independent Study, 61, 75
Information Resources and Technology (IRT), 141
Insurance, Disability, 110
Insurance, Health, 110
International Requests, 39
Internships, 134
Intervention Coordinator, for Students, 179
Involuntary Leave of Absence, 188
Involuntary Leave of Absence and Involuntary Withdrawal,
    Policy on Student, 158
Involuntary Withdrawal, 188
IRT services, 143
Joint Commission on Accreditation of Health Care
    Organizations, 94
Laptop Program, 9
Laptops, 147
Late Fee, 68, 107
Leave of Absence, 75, 83
Leave of Absence, Administrative, 83
Leave of Absence, Grading, 72
Leave of Absence, Involuntary, 190
Leave of Absence, Maximum, 83
Library, 145
Library Hours, 145
Literature Searches, 146
Maintain Matriculation fee, 68
Maintaining Matriculation fee, 110
Make-up Requests, 40
Medical Humanities, 59
Medical Insurance for Students, 203
Medical or Personal Leave of Absence, 83
Mental Health Assistance, 176
Mental Health, of Students, 204
Middle States Commission, 94
Military Leave Policy, 159
Misconduct in Science Policy, 159
Misconduct includes, 139
Missed Exams, 75
Mission of Rowan University, 148
Mission of SOM, 148
MSPE, 61
Name Change Form, 198
National Board Course, 110
National Board of Medical Examiners (NBOME), 9
NBOME, 9
North Jersey Requests, 39
Ombudsperson, Student, 181
Ombudspersons, Research, 159
On-call Responsibilities, 45
One45 Curriculum Management System, 66
Orientation, 201
Osteopathic Medicine (definition), 150
Osteopathic Oath, 151
Out-of-System Medical Core Option, 40

Outside Activities, Policy on Students Participating in Educational Activities Outside RowanSOM or Any of its Affiliates, 190
Parking fee, 110
password assistance, 141
Password Assistance, 141
Patents, 159
Personal days, 38
Personal Days, 40, 69
Policies and Procedures Regarding Complaints Related to the COCA Accreditation Standards, 153
Policies of Rowan University and RowanSOM, 152
Policies, Third and Fourth Year, 38
Posthumous Award of Degree, 87
Pre-clinical Years 1 and 2, 73
Pre-Professional Advisory Committee, 108
Prerequisites for Admission, 107
Printing, 147
Printing Support, 144
Problem-Based Learning, 10, 89
Problem-Based Learning Admission Procedures, 12
Provisioning, 144
Public Safety – **EMERGENCY**, 212
Public Safety (Non-Emergency), 212
Public Safety Department, 175
Public Safety Police Emergency Telephone Number, 205
Reference Services, 146
Registrar, 195
Registration, 67, 198
Registration, Late, 68
Remediation, 40, 73
Request a Room or Table, 205
Residency, 134
Residency Interviews, 70
Resources, 146
ResponseWare – Turning Technologies, 66
Room Reservations, 202
Rotations, Required Third and Fourth Years, 47
Rowan School of Osteopathic Medicine Osteopathic Postdoctoral Training Institute of New Jersey (Rowan SOM OPTI of NJ), 200
Rowan University, History and Organization of, 135
Rowan, Mission of, 148
RUID, 143
Satisfactory Academic Progress (SAP), from ARR, 87
School Closing, 202
School of Osteopathic Medicine, History of, 135
Science Center (SC), 113
Second Year Standard Week Exam Schedule, 30
Second-Year Course Descriptions, 32
Second-Year Exam Week Schedule Sample, 31
Second-Year Program, 29
Seven Competencies of the American Osteopathic Association, 8
Sexual Assault, 178
Sexual Assault Victim's Bill of Rights of New Jersey, 174
Sexual Misconduct and Harassment Policy, 160
Sexual Misconduct and Harassment Violations, Standard Sanctions, 172

Sexual Violence – Victim of, 175
Smart Traveler Enrollment Program (STEP), 192
Standardized Patient Lab (CEAC/SPL), 116
Standards of Dress and Behavior, 46
Standing Committee Chairpersons, SOM, 95
Student Academic Progress Committee, 80, 190
Student Academic Progress Committee, Review by, 81
Student Affairs, 201
Student Body of SOM, 108
Student Clubs, 206
Student Computer Laptop Program, 9
Student Health Services, 203
Student Health, Stratford Campus, 203
Student Intervention Coordinator, 179
Student Lounges, 205
Student Mental Health, 204
Student Professional Societies and Student Clubs, 206
Student Rights, Responsibilities and Disciplinary Procedures, Policy on, 179
Student Scholar, 68, 75, 84
Student Services, 205
Student Wellness Program (SWP), 204
Students with Impairments, 189
Study Rooms, 147
Subspecialty Rotations, Fourth Year, 39
Summer Research Program, 28
Supernumerary, 84
Supernumerary Students, 68
Telephone Numbers, 212
Third and Fourth Years (Clinical Years) - Student Responsibilities, 42
Third-and Fourth-Year Policies, 38
Third-Year Course Descriptions, 50
Third-Year Program, 48
Title IX, 162
Title IX Coordinator for Rowan University, 163
Title IX Coordinators, 163
Title IX Reporting Form, 165
Track Selection, 41
Transcripts, 198
Transfer Credit for Transfer Students, 109
Transfer Procedure, 108
Tuition and  Fees, 109
Tuition and Fees, Policy on, 107
Tuition Deposit, 109
Tuition for 2014-2015, 109
Underrepresented Minority and Economically Disadvantaged Students, 102
University Doctors Pavilion (UDP), 113
University Educational Center (UEC), 113
University Holidays, 43
USMLE, 69
Verifications, 199
Weather Announcements, 39
White Coat Ceremony, 205
Wireless Coverage, 144
Wireless Network, 147
Withdrawal, 85
Withdrawal, Administrative, 85

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

**Received By**
**Risk Management and Insurance**

APR 2 8 2017

J.C.,
*Plaintiff*

V.

**SUMMONS IN A CIVIL CASE**

**ROWAN UNIVERSITY SCHOOL OF**
**OSTEOPATHIC MEDICINE, ET AL.,**
*Defendant*

CASE
NUMBER: **1:17–CV–02778–RBK–KMW**

TO: *(Name and address of Defendant):*

**Received By**
**Risk Management and Insurance**

APR 2 8 2017

Rowan University School of Osteopathic Medicine
One Medical Center Drive
Stratford, NJ 08084

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it)
— or 60 days if you are the United States or a United States Agency, or an office or employee of
the United States described in Fed. R. civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff
an answer to the attached complaint or a motion under rule 12 of the Federal Rules of Civil
Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose
name and address are:

Clara R. Smit, Esq.
100 Horizon Center Blvd
Hamilton, NJ 08691

If you fail to respond, judgment by default will be entered against you for the relief
demanded in the complaint. You also must file your answer or motion with the court.

**WILLIAM T. WALSH**
CLERK

**Ryan Merrigan**
(By) DEPUTY CLERK



**ISSUED ON 2017–04–25 09:55:49,** Clerk
USDC NJD

## RETURN OF SERVICE

| | |
|---|---|
| Service of the Summons and complaint was made by me(1) | DATE |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served: _____

_____

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and

discretion then residing therein.

☐ Name of person with whom the summons and complaint were left: _____

☐ Returned unexecuted: _____

_____

_____

☐ Other (specify) : _____

_____

_____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
| | | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information
contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____          _____
                    *Date*                              *Signature of Server*

                                      _____
                                              *Address of Server*

CLARA R. SMIT, ESQ.
ATTORNEY AT LAW
100 HORIZON CENTER BOULEVARD
HAMILTON, NJ 08691
(732) 843-6600
ATTORNEY FOR THE PLAINTIFF

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

---------------------------------------------------

| | |
|---|---|
| J.C., | **CIVIL ACTION NO.:** |
| **Plaintiff** | |
| v. | |
| | **COMPLAINT AND JURY DEMAND** |
| ROWAN UNIVERSITY SCHOOL OF OSTEOPATHIC MEDICINE and ROWAN UNIVERSITY, | |
| **Defendants** | |

---------------------------------------------------

Plaintiff J. C. (hereinafter "Plaintiff") brings this complaint against the Defendants,

Rowan University and Rowan University School of Osteopathic Medicine (hereinafter

"RowanSOM" or "Defendant"), alleging discrimination based on disability in violation of the

law.

## INTRODUCTION

1.      This is an action for injunctive, monetary, and declaratory relief against the

Defendants, based on their discriminatory conduct against Plaintiff, an individual with

disabilities.

2.      Defendants have discriminated against Plaintiff by failing to accommodate

Plaintiff's disabilities in violation of the Americans with Disabilities Act, as amended, 42 U.S.C.

§12101, *et seq.* (hereinafter "ADA"), the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq.*

(hereinafter "Section 504"), and New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, *et seq.*, (hereinafter "NJLAD"), and subsequently dismissing Plaintiff from RowanSOM.

## JURISDICTION

3.    These claims arise under the ADA and Section 504, and this Court has subject matter jurisdiction based on a federal question under 28 U.S.C. §§1331 and 1343(a)(4).  This Court also has jurisdiction pursuant to: (1) 42 U.S.C. § 2000a, providing for civil actions in this Court by any person subjected to discrimination on the basis of disability in violation of Title II and III of the ADA and (2) 28 U.S.C. § 1343 for any civil rights action authorized by law.

4.    This Court has jurisdiction to issue a declaratory judgment pursuant to 28 U.S.C. §2201(a) and further relief pursuant to 28 U.S.C. §2202.

5.    Venue is proper in the District of New Jersey pursuant to 28 U.S.C. §1391, in that acts of discrimination have taken place in this District and Plaintiff's permanent residence is within this District.

## PARTIES

6.    Plaintiff is a 35 year-old permanent resident of Jersey City, New Jersey.

7.    Plaintiff is a qualified individual with disabilities under the ADA, Section 504, and NJLAD, and was entitled to the leave and extension accommodations that he requested and which were recommended by his doctors.  Plaintiff's diagnosed impairments substantially limit him in the performance of numerous major life activities including, but not limited to, reading, writing, concentrating, thinking, learning, working, and taking tests.  Plaintiff's impairments substantially limit him in the operation of brain and neurological functioning.

8.    RowanSOM is a public medical school located in Stratford, New Jersey, and is a school of Rowan University, a public university located in Glassboro, New Jersey.

- 2 -

9.      Upon information and belief, Defendants are recipients of federal financial assistance for purposes of Section 504.

### **FACTUAL ALLEGATIONS**

10.      Plaintiff commenced his medical education at RowanSOM in the fall of 2011.

11.      After Plaintiff's first year of medical school, RowanSOM granted Plaintiff a three month personal leave of absence following a loss in his personal life.  Plaintiff successfully remediated his first year of courses and from that point onward he achieved good grades.

12.      Plaintiff first attempted the COMLEX Level 1 exam (hereinafter "COMLEX") on September 3, 2014.  He failed to pass on the first attempt.

13.      After successfully completing his online 6-week COMLEX review program Plaintiff attempted the COMLEX for a second time on February 4, 2015, but was unable to earn a passing grade.  He was perplexed by this because he was doing very well in his proctored practice exams, but upon further reflection realized that he experienced significant anxiety during the actual exam.

14.      The Student Academic Progress Committee (hereinafter "SAPC") at RowanSOM mandated that Plaintiff remain off of rotations until he retook the COMLEX.  The school presented him with the option to go on a medical leave of absence from March 16, 2015 to May 18, 2015 so that he could work with a professional to evaluate the reasons for his exam performance issues.  The SAPC also directed Plaintiff to take a 6-week course to run from May 18, 2015 through June 28, 2015, with the expectation that he would retake the COMLEX shortly thereafter.

15.      Plaintiff subsequently consulted several doctors and learned that he has Generalized Anxiety Disorder, Panic Disorder, and Obstructive Sleep Apnea.  Plaintiff also

experienced symptoms of depression. Plaintiff provided Defendant documentation verifying the existence and substantial limitations caused by his diagnosed disabilities.

16.      In the midst of his medical treatment, Plaintiff believed that enrolling in a more comprehensive 14-week COMLEX preparation course from May 18, 2015 to August 23, 2015 would assist him with his review and allow him additional time to work with his doctors to develop an effective treatment regimen, and requested an extension of Defendant's deadline to take the COMLEX. His advisor informed him that he would need to make this request at a SAPC hearing on April 21, 2015.

17.      Plaintiff arrived to the SAPC meeting 15-minutes late due to car trouble and offered documentation to verify his car trouble, but the SAPC refused to see him and decided that Plaintiff would only be allowed to take the shorter COMLEX course which would run from May 18, 2015 through June 28, 2015.

18.      Plaintiff reported to take the COMLEX on July 14, 2015 and experienced severe diarrhea and abdominal cramping that forced him to suffer significant pain and discomfort, and to use the bathroom several times during the exam. Plaintiff withdrew from the exam after the second test block.

19.      On July 15, 2015 the Chairman of the SAPC committee, via email, informed Plaintiff that his final deadline to take the COMLEX was July 30, 2015, and advised Plaintiff to "make every opportunity to optimize your health with your physicians to ensure your ability to complete the exam on your next attempt." It should be noted that this deadline given by the SAPC Chairman was different from the August 31, 2015 deadline later calculated by the medical school's registrar office, and it exacerbated the effects of Plaintiff's anxiety and panic disorder.

20.      On July 29, 2015, the evening before Plaintiff was scheduled to take the

- 4 -

COMLEX, Plaintiff experienced anxiety and stress, and his nocturnal treatment for his sleep apnea was disrupted. He was unable to gain restful sleep and was very fatigued.

21.    Plaintiff sat for the COMLEX on July 30, 2015 and again experienced a panic attack, and severe gastrointestinal upset during the exam. Plaintiff immediately contacted the National Board of Osteopathic Medicine to inquire about whether the July 30, 2015 exam could be voided. By email dated August 18, 2015 the NBOME informed Plaintiff that the July 30, 2015 exam had been cancelled.

22.    By letter dated August 4, 2015 Abby Kurien.MD., Plaintiff's psychiatrist, recommended that he be allowed to cancel his July 30, 2015 COMLEX score and be granted permission to retake the exam once his medical therapy became effective, which Dr. Kurien estimated would be a minimum of four weeks.

23.    By email dated August 18, 2015, the National Board of Osteopathic Medical Examiners (hereinafter "NBOME") also advised Plaintiff to consider applying for test accommodations for future administrations of the COMLEX.

24.    By email dated August 20, 2015, the RowanSOM registrar office informed Plaintiff that he only had three semesters of medical school left.

25.    On August 20, 2015 Plaintiff contacted Assistant Dean Kathryn C. Lambert, RowanSOM, and requested a medical leave of absence and extension to take the COMLEX for the same reasons previously articulated.   Dean Lambert directed Plaintiff to raise his concerns at an SAPC meeting scheduled for September 15, 2015.

26.    By letter dated August 21, 2015 Plaintiff received a letter from Defendants informing him that he was required to appear before the SAPC on September 15, 2015 for a dismissal hearing because he would not be able to complete his academic program within a 5-

year timeframe.  .

27.     Plaintiff attended the dismissal hearing and was given a mere 10-12 minutes to present his case, which was not nearly enough time and caused Plaintiff to feel anxious and rushed.  Plaintiff provided the SAPC eighty-six pages of medical documents and a personal statement describing the actions that he and his doctors needed to take to manage his health. Plaintiff once again requested a medical leave of absence and extension to take the COMLEX, but later learned from a member of the SAPC that, after Plaintiff left, his request for accommodations was never voted on by the committee.

28.     By letter dated September 21, 2015, Plaintiff received a letter from the SAPC recommending his dismissal to the Dean for "failure to complete all required coursework within the maximum timeframe specified for the degree program (not including approved leaves of absence)."

29.     By letter dated September 23, 2015, Plaintiff appealed the SAPC's recommendation to the Dean that he be dismissed and submitted supporting documentation. Plaintiff was given 30-minutes to present his case to the Dean and he once again requested accommodations in the form of a leave of absence and extension to take the COMLEX.

30.     On September 29, 2015 the Dean informed Plaintiff that he supported the SAPC's recommendation for dismissal.

31.     By letter dated September 29, 2015 Plaintiff contacted Assistant Dean Lambert requesting a leave of absence and extension to take the COMLEX.  This request was supported by letters from Plaintiff's doctors (Dr. Abby Kurien, Dr. Jeffrey Tokazewski, Dr. Howard Siegel, Dr. Tanui Bhatnagar, and others) who recommended a medical leave of absence from August 20, 2015 through October 16, 2015. so that Plaintiff's treatment regimen, consisting of medication

and cognitive behavioral therapy, would have time to become effective.

32.     RowanSOM rejected the accommodations (a medical leave of absence and extension to take the COMLEX) that were requested by Plaintiff and recommended by his doctors.

33.     By email dated October 1, 2015, Assistant Dean Lambert told Plaintiff that his request was denied because leaves of absence cannot be used to avoid dismissal for academic or disciplinary reasons.

34.     Defendants' agents made disparaging and offensive remarks to Plaintiff about his disabilities during one of the administrative hearings that he was compelled to attend.

35.     Defendants knowingly required Plaintiff to take the COMLEX, multiple times, before Plaintiff's treatment could reach a sufficiently therapeutic state.

36.     When Plaintiff could not pass the COMLEX by the date(s) arbitrarily selected by Defendants, Defendants dismissed Plaintiff from the medical school.

37.     Defendants alleged in multiple letters to Plaintiff's attorneys that granting Plaintiff's requested leave of absence and extension to take and pass the COMLEX would have been an unacceptable relaxation of RowanSOM's academic standards because he would have then exceeded the school's alleged five-year program completion "requirement."

38.     Defendants refused to follow their own published policies.  For example, RowanSOM's 2014-2015 Handbook states that students are normally limited to two leaves of absences, totaling two years.  Plaintiff had not exceeded two years of approved leave.  The Handbook also describes standard tracks and timelines for completing the D.O. program and clearly states that the general policy is that approved leaves of absences do not count toward the standard five-year completion requirement.  RowanSOM's 2014-2015 Handbook also states that

- 7 -

Defendants offers a lightened course load track which allows students 6 years to complete the D.O. program. What Plaintiff requested would not have violated or relaxed RowanSOM's standard policies and procedures. Nevertheless, all relevant laws require the modification of policies, practices and procedures so as to not result in a discriminatory outcome.

39.     Following his dismissal, Plaintiff retained counsel and sought readmission to RowanSOM. RowanSOM offered readmission on the condition that Plaintiff retake three years' worth of medical school courses that he already successfully completed. This offer for readmission was punitive and discriminatory and Plaintiff, owing in excess of $400,000.00 in student loans, could not accept these unjust terms of readmission.

40.     Plaintiff has been out of medical school since the fall of 2015 and has incurred significant student loan debt, legal expenses, and medical expenses with no medical degree to show for it.

41.     Plaintiff requires testing accommodations for the COMLEX (the same accommodations that he has been granted from the Law School Admission Council and the Graduate Management Admission Council following his dismissal from RowanSOM), but he cannot apply for these accommodations because he is no longer enrolled in a medical school.

42.     Plaintiff is unable to retake the COMLEX (even without accommodations) because he is no longer enrolled in a medical school.

43.     Defendant's actions violate the ADA as well as state and local laws and regulations. ADA regulations state:

    a.   "The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard." 29 C.F.R. §

- 8 -

    1630.2(j)(1)(i).

b. "An impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(j)(1)(ii).

c. "The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment "substantially limits" a major life activity should not demand extensive analysis." 29 C.F.R. § 1630.2(j)(1)(iii).

d. The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for "substantially limits" applied prior to the ADAAA." 29 C.F.R. § 1630.2(j)(1)(iv).

e. "The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical analysis. Nothing in this paragraph is intended, however, to prohibit the presentation of scientific, medical, or statistical evidence to make such a comparison where

appropriate." 29 C.F.R. § 1630.2(j)(1)(v).

f. "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 29 C.F.R. § 1630.2(j)(1)(vi).

g. "An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii).

h. "An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment." 29 C.F.R. § 1630.2(j)(1)(viii).

i. "[I]n determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity." 29 C.F.R. § 1630.2(j)(4)(i).

j. "Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function. In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of

medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity." 29 C.F.R. § 1630.2(j)(4)(ii).

k.   "In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of disability, the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in the major life activity of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population." 29 C.F.R. § 1630.2(j)(4)(iii)

l.   "Any [public or] private entity that offers a course covered by this section must make such modifications to that course as are necessary to ensure that the place and manner in which the course is given are accessible to individuals with disabilities... Required modifications may include changes in the length of time permitted for the completion of the course, substitution of specific requirements, or adaptation of the manner in which the course is conducted or course materials are distributed." 28 C.F.R. § 36.309(c)(1) – (2).

44.   Section 504 enforcement regulations state that schools shall not "Deny a qualified [person with a disability] the opportunity to participate in or benefit from the aid, benefit, or service... Afford a qualified [person with a disability] an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others... Provide a qualified [person with a disability] with an aid, benefit, or service that is not as effective as that provided to others." 34 C.F.R. §104.4(b).  These regulations also state that "In its course examinations or other procedures

- 11 -

for evaluating students' academic achievement in its program, a recipient to which this subpart applies shall provide such methods for evaluating the achievement of students who have a handicap that impairs sensory, manual, or speaking skills as will best ensure that the results of the evaluation represents the student's achievement in the course." 34 C.F.R. §104.44 (c).

45.     Defendants' denial of Plaintiff's reasonable and documented requests for accommodations was deliberately indifferent to Plaintiff's civil rights under the applicable laws.

## FIRST CLAIM

### (Violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.*)

46.     Plaintiff hereby incorporates by reference paragraphs 1 through 45of this Complaint as set forth herein.

47.     Plaintiff is an individual with a disability in that he experiences a physical or mental impairment, which substantially limits one or more major life activities, including, but not limited to, reading, writing, concentrating, learning, working, taking tests, and the operation of the major bodily functions of the brain and neurological system. 42 U.S.C. § 12102 (2)(B). Because of his impairment he required a medical leave of absence and extension of time take the COMLEX. This extension would have also afforded Plaintiff an opportunity to apply for testing accommodations in order to take the COMLEX on a level playing field.

48.     In amending the ADA in 2008, Congress mandated that the Equal Employment Opportunity Commission (EEOC) issue regulations restoring the applicability of the ADA to those whom Congress originally intended to protect. 42 U.S.C. §12010(b)(6).

49.     EEOC regulations provide that "[t]he primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the Amendments Act's purpose of reinstating a broad scope of protection under the ADA, the

definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted..." 28 U.S.C. §1630.1(c)(4).

50.      The ADA amendments expressly rejected earlier case law because previous judicial interpretations of what constituted a disability had created an inappropriately high level of limitation necessary to obtain coverage. 42 U.S.C. § 12102(4)(B) (incorporating findings and purposes of the ADAAA).

51.      Under the ADA, public postsecondary institutions make modifications to policies, practices and procedures, and may not utilize "standards, criteria, or methods of administration that have the effect of discrimination on the basis of disability 42 U.S.C. §§ 12112(b), 12201(f).

52.      The modifications that Plaintiff requested would not have imposed a fundamental alteration but, rather, would level the field so as to allow his medical knowledge and abilities to be fairly and accurately measured and to continue with his medical studies.

53.      Defendants have thus discriminated against Plaintiff on the basis of his disability by intentionally denying him an equal opportunity to demonstrate his medical knowledge and skill in violation of the ADA.

54.      Defendants' policies and practices violated Plaintiff's rights under the ADA and the regulations promulgated thereunder. Defendants' discriminatory policies and practices include, but are not limited to, its:

      a.  Failure to grant accommodations when Plaintiff submitted the requisite documentation;

      b.  Failure to defer to or give considerable weight to Plaintiff's clinicians' recommendations;

- 13 -

   c. Failure to engage in good faith in the interactive process to consider and
implement effective reasonable accommodations for Plaintiff's disabilities;

   d. Dismissing Plaintiff from medical school;

   e. Offering Plaintiff discriminatory and punitive readmission terms; and

   f. As a result of Defendants' actions Plaintiff has experienced sleep disturbance,
fatigue, muscle tension, and headaches.

55.   As a result of the Defendants' violations of the ADA, Plaintiff has suffered or will suffer great injury, including, but not limited to, lost employment opportunities, out-of-pocket pecuniary losses, and severe emotional distress and anguish.

WHEREFORE, Plaintiff requests relief as set forth below.

## SECOND CLAIM

**(Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 701, et seq.)**

56.   Plaintiff hereby incorporates by reference paragraphs 1 through 55of this Complaint as set forth herein.

57.   Plaintiff is an individual with disabilities. His diagnosed impairments, Generalized Anxiety Disorder, Panic Disorder, and Obstructive Sleep Apnea, substantially limits the major life activities of reading, learning, concentrating, working, and taking tests.

58.   Plaintiff is qualified under the Rehabilitation Act in that he can meet the academic and technical standards for admission to or participation in RowanSOM's program.

59.   Defendants are recipients of federal financial assistance.

60.   Defendants' activities thus are subject to the anti-discrimination requirements of Section 504 of the Rehabilitation Act.

61.     U.S. Department of Education regulations enforcing protections for students with disabilities in postsecondary educational programs specifically provide that accommodating an individual with a disability may require the covered entity to change the length of the time for an exam and/or the manner in which the examination is given, or make "changes to the length of time permitted for the completion of degree requirements." 34  C.F.R. §104.44.

62.     Defendants discriminated against Plaintiff solely on the basis of disability. Defendants failed to make modifications to their policies, practices, and procedures to ensure that Plaintiff had equal access to and full enjoyment of its medical school program.

## THIRD CLAIM

## DEFENDANTS VIOLATED THE NEW JERSEY LAW AGAINST DISCRIMINATION

63.     Plaintiff hereby incorporates by reference paragraphs 1 through 62 of this Complaint as set forth herein.

64.     Defendant's conduct is in violation of the N.J.S.A. 10:5-1, et seq., N.J.S.A.

## FOURTH CLAIM

### (Declaratory Relief)

65.     Plaintiff hereby incorporates by reference paragraphs 1 through 64 of this Complaint as set forth herein.

66.     A present and actual controversy exists between Plaintiff and Defendants concerning their rights and respective duties.  Plaintiff contends that Defendants violated and continues to violate his rights under the ADA, Section 504, and NJLAD.  Based upon information and belief, Defendants deny these allegations, thus declaratory relief is necessary and appropriate.

67.     Plaintiff seeks a judicial declaration of the rights and duties of the respective parties accordingly.

WHEREFORE, Plaintiff requests relief as set forth below.

## RELIEF REQUESTED

WHEREFORE, Plaintiff prays for judgment as follows:

A.     Enter a declaratory judgment, pursuant to Rule 57 of the Federal Rules of Civil Procedure, stating that Defendants' practices, policies and procedures have subjected Plaintiff to discrimination in violation of Section 504 of the Rehabilitation Act, Title II and III of the Americans with Disabilities Act, and the New Jersey Law Against Discrimination;

B.     Permanently enjoin Defendants from any practice, policy and/or procedure which will deny Plaintiff equal access to, and benefit from Defendants' services or which deny Plaintiffs communication with Defendants. Enter a permanent injunction ordering Defendants to readmit Plaintiff to RowanSOM on a "leave of absence" status so that the NBOME considers him eligible to apply for and obtain COMLEX testing accommodations; and allow Plaintiff the opportunity to secure and test with the COMLEX testing accommodations recommended by his doctors and his record be modified to remove references to academic jeopardy occasioned by RowanSOM's failure to provide Plaintiff with the accommodations recommended by his physicians; and allow him to resume rotations immediately upon passage of COMLEX;

C.     Enter judgment against the Defendants awarding Plaintiff full recovery of his medical school tuition, with interest, which is currently in excess of $400,000.00;

D.     Enter judgment against the Defendants awarding Plaintiff recovery of reasonable attorney's fees, costs and expenses incurred in pursuing his rights and in bringing and prosecuting this litigation. The costs incurred thus far are in excess of $25,000 including, but not

limited to multiple forced COMLEX registrations, letters and statement from his doctors, and the need to engage counsel in pursuing his civil rights;

    E.    Enter judgment against the Defendants awarding Plaintiff such compensatory damages and punitive damages as may be proven by Plaintiff and to which he is entitled; and

    F.    Award for such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury for all of the issues a jury properly may decide, and for all of the requested relief that a jury may award

Respectfully submitted,

/s/ Clara R. Smit, Esq.
Clara R. Smit, Esq.
Attorney for Plaintiff

## CERTIFICATION

Pursuant to Rule 4:5-1, I, Clara R. Smit, certify that I am a member of the firm of Clara R. Smit, attorney for the Plaintiff stated herein. To my information and belief, the matter in controversy is not the subject of any other action pending in any other Court, or of a pending arbitration proceeding and no other action or arbitration proceeding is being contemplated. At this time, the Plaintiff knows of no other party who should be joined in this action.

/s/ Clara R. Smit
Clara R. Smit, Esq.
Attorney for Plaintiff

Dated: April 20, 2016

# EXHIBIT C



J████ C█████, M.P.H, C.C.R.P.

████████████
Jersey City, NJ 07302
Tel:█████████

Email: ████████@Gmail.com, ████████@Rowan.edu

Kathryn C. Lambert, DO, FAOASM
Assistant Dean for Student Affairs
Rowan University School of Osteopathic Medicine
One Medical Center Drive, Suite 210
P.O Box 1011
Stratford, NJ 08084

Sep 29th, 2015

Dear Dr. Lambert,

The following attachments are included for your careful consideration:

- **Attachment 1:** Letters from treating physicians regarding medical leave of absence request for 08/20/2015 until 10/16/2015
- **Attachment 2**: Letter from Dr. Kathryn C. Lambert of approval for medical leave of absence (LOA) effective 3/16/15 and ending 5/18/15.
- **Attachment 3**: Documents regarding psychotherapy for testing anxiety
- **Attachment 4:** Documents regarding psychiatric care for panic disorder and depression
- **Attachment 5**: Documents from pulmonology & sleep specialists regarding obstructive sleep apnea in (chronological order)
- **Attachment 6**: Document from Ear, Nose, Throat (ENT) specialist regarding obstructive sleep apnea and chronic rhinitis (chronological order)
- **Attachment 7**: Documents regarding the mandibular advancement custom appliance for obstructive sleep apnea (chronological order)
- **Attachment 8**: Documents from allergy specialist regarding obstructive sleep apnea and chronic rhinitis
- **Attachment 9**: RowanSOM Education Handbook – Section on leave of absence
- **Attachment 10:** Rowan University Policy on Leave of Absence
- **Attachment 11:** Personal statement presented at the 9/15/2015 Student Academic Progress Committee (SAPC) hearing
- **Attachment 12**: Correspondences with National Board of Osteopathic Medical Examiners regarding 7/30/2015 COMLEX Level I cancelation

As you are aware, I suffer from chronic illness of obstructive sleep apnea (OSA) as well as severe testing anxiety with panic disorder. Rowan University School of Osteopathic Medicine (RowanSOM) Center for Teaching and Learning (CTL),

Academic Affairs, Student Affairs, and Student Academic Progress Committee (SAPC) were all aware for these two medical conditions from the initial date of diagnosis. They consistently demonstrated compassionate support and accommodation when needed. For example, when I was initially diagnosed with OSA in December 2013, Dr. Boyd allowed me to postpone examinations until I initiated my treatment. When I was initially diagnosed with severe testing anxiety on in March 2015, you kindheartedly granted me a medical leave of absence to start on an intense regiment of psychoanalysis and cognitive behavioral therapy (Attachment 2, pages 12-14). When either or both of these aliments are not well managed, it will become an unfortunate impairment that interferes with my ability to perform the particular essential task of completing a required 8-hr long multiple-choice licensing exam which was the requirement before I was permitted to return to rotations. In fact, this is the exact reason as why my treating psychiatrist (see Attachment 1, page 6), psychologist (see Attachment 1, page 7), and pulmonologist (see Attachment 1, page 8) all wrote letters on my behalf specifically recommending 07/30/2015 Level I cancelation and postponement of the Level I exam until restoring the treatments, and likewise NBOME honored my request to void 7/30/2015 Level I examination and suggested that I inquire if this impairment may need testing accommodation (Attachment 12, page 123).

On 8/20/2015, I contacted you to request immediate accommodation in terms of an additional medical leave of absence effective immediately to restore my mental illness as well as my nocturnal treatment for obstructive sleep apnea before I could report to take the COMLEX-USA Level I exam. You did not provide me with a formal written response and advised to discuss my request at the student academic progress committee (SAPC hearing on 09/15/2015. I formally made that request at the SAPC hearing on 9/15/2015 along with supporting medical documents, and I still did not receive any specific response regarding my formal request for medical leave of absence. I asked Dr. Linda Boyd who attended the 9/15/2015 SPAC hearing if my specific request for medical leave of absence was discussed or voted on at the hearing, she confirmed that it was not discussed or voted on.

I have carefully reviewed School of Osteopathic Medicine and Rowan University policies (Attachment 9, pages 107-110 & Attachment 10, pages 111-112). On 8/20/2015, I acted within my rights as an active student to request a medical leave of absence. The circumstance for this leave of absence is similar to the medical leave of absence approved by you for 03/16/15 until 05/18/15 for 9-weeks (Attachment 2, Pages 12-14). According to the RowanSOM education handbook medical students can request up to two years for a medical leave of absence I am currently below this limit. There is a clause stating, "Leave of Absence cannot be used to avoid dismissal for academic or disciplinary reasons". I believe that this is not directly applicable in my case because at the time that I requested the medical leave of absence on 8/20/2015, I did not meet any criteria for dismissal and if the time were approved for medical leave of absence, it would have paused the 5-year clock in my case eliminating the risk for dismissal all together and need to appear before the SAPC committee on 09/15/2015. Disregard of my request for medical leave of absence

and wrongful escalation of the matter for dismissal hearing may have inflicted undue emotional distress worsening my mental illness as it shown in my medical records by worsening the depression and need for increase dosage of the relevant psychiatric medication (Attachment 4, page 28).

I have copied following relevant key Rowan University administration members and requested if they could please specifically evaluate whether my request for leave of absence effective from 08/20/2015 until 10/16/2015 with intention to return as an active student on 10/17/2015 conquered with University Policies and my rights as an active full time student on 08/20/2015 and if disregard for this important request was the direct violation of university policies on student physical and mental health and medical of leave of absences accommodation for emergent circumstances.

- Dr. Ali Houshmand , Rowan University President
- Thomas A. Cavalieri, D.O., FACOI, FACP, Dean at RowanSOM
- Janice A. Ciesielski, The Student Ombudsperson at RowanSOM
- Richard Jones, Rowan University Vice-President for Student Life & Dean of Students
- Katharine Garnier, M.D., Stratford Campus Director of Student Health
- Linda Boyd, DO, Senior Associate Dean for Academic Affairs at RowanSOM

I hereby respectfully request your approval to be placed on a medical leave of absence effective from 08/20/2015 until 10/16/2015 with intention to return as an active student on 10/17/2015. I request if you could please carefully review my medical documents and letters from physicians and provide me with a formal written response on my official request.

Warmest regards,

J███  C███

- **Attachment 1:** Letters from treating physicians regarding medical leave of absence request for 08/20/2015 until 10/16/2015



## Penn Medicine

*Owned and Operated by Clinical Health Care Associates of New Jersey, PC*

**Penn Family Medicine Gibbsboro**

63 N. Lakeview Dr., Ste. 201
Gibbsboro, NJ 08026
856-783-1777
Fax: 856-783-8519

**Jeffrey Tokazewski, MD**
**Rosemarie Villamayor, MD**
**Risha Hertz, RN, APN-C**

September 23, 2015

### Attending Physician Statement

Re: J███ C███
DOB: ███1982

To Whom It May Concern:

J███ C███ is an active patient in my practice.

He has the following medical conditions:

Patient Active Problem List
Diagnosis

- Sleep apnea
- Anxiety state, unspecified

He has had poorly-treated obstructive sleep apnea throughout this summer and into the fall. He has had multiple evaluations with his pulmonologist and with an otolaryngologist, who determined that CPAP is not effective for him. He requires an appliance to correct tongue obstruction, which is being formed at present time.

During this time period, he has had severe fatigue, sleepiness, lightheadedness, headache, and difficulty concentrating

It is my medical opinion that Mr. C███ is medically unable to attend school from 8/20/15 until 10/16/15 due to the above circumstances.

If you have any further questions regarding this patient, please contact my office after obtaining written permission from my patient per HIPAA

Sincerely,

Jeffrey Tokazewski MD

**Telephone:** 1 (856) 783-1777 Fax 1 (856) 783-8519
*Clinical Health Care Associates of New Jersey, P.C.'s physicians are proud to be
affiliated with the medical staff of the University of Pennsylvania Health System*

Penn Chart

**Palisade Behavioral Care**
**221 Palisade Avenue**
**Jersey City, NJ 07306**
**Phone (201) 656-3116**
**Fax (201) 656-9044**

August 4, 2015

Re: J█████ C█████
D.O.B. █████1982

To Whom It May Concern:

Mr. J████ C████ is a patient in my office and is being treated for severe testing anxiety and panic disorder. He reported twenty sessions of psychotherapy to reduce testing anxiety in preparation for his COMLEX exam. He still experienced severe anxiety and symptoms consistent with panic attack while taking his COMLEX USA Level-1 exam on July 30, 2015. I prescribed him Paroxetine 12.5mg daily starting on 08/03/2015 and Propanol 20mg to be taken 1-hr before the exam.

I recommend that you allow him to void this COMLEX USA Level-1 examination taken on July 30, 2015 and grant him permission to retake his exam once the course of the medical therapy has become effective, which I anticipate will take a minimum of four weeks.

If you have any further questions regarding Mr. C████ please contact my office after obtaining written permission from him per HIPAA.

Sincerely,

Abby Kurien, M.D.
AK/mp

Howard B. Siegel, Ph.D.
Clinical Psychologist
7 Kensington Avenue
Jersey City, N.J. 07304
201-333-9322

August 12, 2015

To Whom It may Concern:

    Mr. J█ C█ had been in psychotherapy with me since March 20, 2015.
Mr. C█ started treatment with me because of extreme test anxiety and panic disorder.
We discussed deep breathing techniques along with various exercises to train him to get
into something concrete happening at the time of his panic feelings.

    Mr. C█ also started taking a Kaplan preparation course for his exam. He was quite
disciplined in his approach to studying the material. I was very impressed with the
amount of dedicated time he gave to his studies. He felt very good about his
understanding of the material. He was prepared to take the test. At he exam he almost
immediately developed an intestinal disorder and left the exam. He was allowed
to take the exam the next time it was given. This time in addition to the gastro-intestinal
disorder he also had a full blown panic attack and tried unsuccessfully to try what I taught
him to do.

    It seems that he was very aware that this was his last chance and that set off the panic
disorder. It was a do or die feeling that made him anxious. I suggest that you allow him to
take the exam with the explicit understanding that he could take it over again if he needed
to. My feeling is that openness would allow his anxiety to dissipate and he would do well
on the exam.

Sincerely,

Howard B. Siegel, Ph.D.



Tanuj Bhatnagar MD

August 3, 2015

To Whom It May Concern:

Mr. J█████ C█████ is a patient of mine and is being re-assessed for obstructive sleep apnea. His sleep disturbance is affecting his ability to study for his exams. Work up and treatment should be addressed in next 6 to 8 weeks. Please allow him to postpone his COMLEX exam while I work with him to addresses his sleep issues.

If you have any question I could be reached at 201-636-5050.

Thank you.

Sincerely,

Tanuj Bhatnagar MD

Tanuj Bhatnagar MD

RE: J███ C███, DOB ████/1982

Sept 08, 2015

To Whom It May Concern,

Mr. J███ is my patient and has obstructive sleep apnea. He has been using cpap machine since his diagnosis in December 2013. He has lost significant weight and recent work up shows persistent sleep apnea. He has been having difficulty in tolerating cpap and his sleep is being affected as a result. It is medically necessary for him to continue treatment and the next best treatment available for his condition is oral appliance.

Thank you.

Sincerely,

Tanuj Bhatnagar MD



**BlueSleep**®

Snoring and Sleep Apnea Centers

## LETTER OF MEDICAL NECESSITY

## Oral Appliance Therapy (OAT) for Obstructive Sleep Apnea

NAME: C_____, J_____   DATE: 9/2/2015

The above named patient was diagnosed with obstructive sleep apnea.  Office notes are attached.

The patient:   has refused   (failed)   not a candidate for   CPAP therapy   prefers OAT

The patient has:   Severe Sleep apnea   Mild or moderate sleep apnea

Co-morbid conditions include: _Mood disorder_ and _EDS_

According to the recommendations and clinical guidelines of the American Academy of Sleep Medicine (AASM,) and the Centers for Medicare and Medicaid Services (CMS,) he is a candidate for oral appliance therapy to treat his obstructive sleep apnea.

Sincerely yours.

Jordan C Stern, MD

**Medical Director**

**Board certification in Otolaryngology & Sleep Medicine**

cc, patient.



261 5th Avenue | David A. Godin, M.D., F.A.C.S.
9th Floor | Jay N. Dolitsky, M.D., F.A.A.P.
New York, NY 10016 | Ofer Jacobowitz, M.D., Ph.D., F.A.A.S.M., F.A.A.O.A.
Office: 212-679-3499 | Roheen Raithatha, M.D.
Fax: 212-683-4551 | Robert J. Sporter, M.D.

September 17, 2015

Re: J███ C███
DOB: ████/1982
33 year old

To Whom It May Concern:

Please allow Mr. J███ C███ to take medical leave of absence to complete and recover from a Septoplasty, submucous resection of inferior turbinate reduction and right sinus endoscopy concha bullosa middle turbinate reduction surgery.

This surgery is medically necessary to restore his breathing. He will require a minimum of 2 weeks for recovery from date of surgery.

Should you need further information, please do not hesitate to contact the office.

Limitations / Remarks:

Sincerely,

*Ofer Jacobowitz*

electronically signed

Ofer Jacobowitz MD  PhD, FAASM, FAAOA
electronically generated

- **Attachment 2**: Letter from Dr. Kathryn C. Lambert of approval for medical leave of absence (LOA) effective 3/16/15 and ending 5/18/15.

From: **Lambert, Kathryn C** lamberkc@rowan.edu
Subject: RE: LOA Request
Date: March 26, 2015 at 3:45 PM
To: C█████ J███ C██████ █████@rowan.edu
Cc: Garwood, Joann Jersey garwoojj@rowan.edu, Wilmes, Regina Rousso wilmesrr@rowan.edu, Boyd, Linda boyd@rowan.edu, Giacobbe, Jacqueline A. giacobja@rowan.edu, Cardello, Lisa M cardello@rowan.edu

Hello J██

Please be advised that I am approving your request for a medical leave of absence (LOA) effective 3/16/15 and ending 5/18/15. I ask that you provide a note from your treating clinician supporting your need to go on a medical LOA as soon as possible. You will be expected to return to RowanSOM on 5/18/15 to begin a period of independent study in preparation for retaking your COMLEX 1 exam. As the period requested is for 9 weeks, I am going to complete and approve a make-up clinical weeks form for you to document this time away from your clerkships.

Regarding your request for reduced tuition, I have asked Regina Wilmes to provide me with the total number of weeks of curricular requirements you have completed during this academic year. Once I have this, I will be able to answer you request. I'll let you know about this soon.

Please don't hesitate to contact me if you have any questions. Take good care.

Best,
Dr. Lambert

*Kathryn C. Lambert, DO, FAOASM*
Assistant Dean for Student Affairs
RowanSOM
One Medical Center Drive, Suite 210
P.O Box 1011
Stratford, NJ 08084
P (856)566-6972
F (856) 566-6341


ROWAN UNIVERSITY
School of Osteopathic Medicine

CONFIDENTIALITY NOTICE: This email communication may contain private, confidential or legally privileged information intended for the sole use of the designated and/or duly authorized recipient(s). If you are not the intended recipient or have received this email in error, please notify the sender immediately by email and permanently delete all copies of this email including all attachments without reading them. If you are the intended recipient, secure the contents in a manner that conforms to all applicable state and/or federal requirements related to privacy and confidentiality of such information.

**From:** C█████ J███ C██████
**Sent:** Wednesday, March 25, 2015 2:27 PM
**To:** Lambert, Kathryn C
**Subject:** LOA Request

Dear Dr. Lambert,

I hope this message finds you well.

Follow up to our in person meeting, I would like to request your approval to go on LOA effective 03/16/2015 and with definitive plan of return to SOM effective 05/18/2015.

Moreover, I have paid full tuition for Fall 2014 and Spring 2015 semesters. Since I was only allowed to complete limited weeks of clerkships in both semesters, I would like request consideration for discounted tuition for the the subsequent semester(s) after my return from LOA.

Thank you for continued compassionate support. I truly appreciate your time and effort.

Warmest regards,
J███  C███

J███ C███, MPH, CCRP
Medical Student

Rowan University School of Osteopathic Medicine
1 Medical Center Dr, Box 124
Stratford, NJ 08084
Web: http://www.linkedin.com/in/

# EXHIBIT D

**From:** "Cavalieri, Thomas A" <cavalita@rowan.edu>
**Date:** June 26, 2015 at 3:17:43 PM EDT
**To:** "C█████, J████ C███████" <███████@rowan.edu>
**Cc:** "Butler, Debra S" <butlerds@rowan.edu>
**Subject: Comlex Level I**

Dear J████,

I know you recently received an email from Dr. Jermyn regarding taking COMLEX I on July 2nd. He communicated with you before I had the opportunity to let him know that I have given you permission to extend the date to July 14th.

Best wishes for success.


Thomas A. Cavalieri, D.O., FACOI, FACP
Dean
Endowed Chair for Primary Care Research
Professor of Medicine

Rowan University-School of Osteopathic Medicine
856-566-6995
856-566-6865 (FAX)
cavalita@rowan.edu


**From:** C█████, J████ C███████
**Sent:** Tuesday, July 14, 2015 9:42:01 PM
**To:** Cardello, Lisa M
**Subject:** COMLEX Level I

Dear Lisa,

I hope you're doing great. I reported to my test on 7/14 as authorized. Unfortunately, I had to leave the Prometric center due to an unforeseen sudden acute illness. I had to withdraw from my examination prior to completion. I had to leave in little over two hours after the start of the exam when I started having severe symptoms. I went to the nearest urgent care facility for immediate care. Discharge summary is attached to this email.

I have contacted NBOME . They told me that the will receive the report from the proctor tomorrow and someone will contact me. I will let you know as soon as I hear from them. I really apologize for the inconvenience.

Warmest regards,
J████ C███

**From:** Jermyn, Richard
**Sent:** Wednesday, July 15, 2015 7:06 PM
**To:** C███, J███ C███
**Cc:** Cavalieri, Thomas A; Boyd, Linda; Giacobbe, Jacqueline A.; Lambert, Kathryn C
**Subject:** SAPC violation

Your inability to complete the Comlex level 1 exam on 7/14/15 places you in violation of the SAP Committee mandate and Dr. Cavalieri's requirements.

As a chair of the SAPC, and in consultation with the Dean, we are offering you one last opportunity to take this exam.  We have confirmed that there is availability in NYC / Long Island in the month of July.

Please make every opportunity to optimize your health with your physicians to ensure your ability to complete the exam on your next attempt.

Failure to take the exam by July 30 will result in an automatic referral to the SOM Hearing Body for violation of the SAPC requirements.

Sent from my iPhone



RE:

J████ C████
09/15/2015 Hearing
Personal statement

Dear Members of the
Student Academic Progress Committee (SAPC):

Before I start, I would like to sincerely apologize if this presentation is extensive. Since this is an important dismissal hearing, I am obligated to share all relevant information so the voting members are well informed regarding my circumstances. I truly appreciate your time and consideration in advance.

Since we last met, a number of health related events transpired pertaining to my third and final attempt at the COMLEX Level I examination. The purpose of this personal statement is to outline and explain what occurred. As you may recall, Dean Cavalieri permitted me to take the Level I exam on 7/14/2015. For reasons then unknown to me, I had severe diarrhea, abdominal cramping, and had to run to the bathroom repeatedly during the exam outside the scheduled break time. I had to withdraw from the exam after the second block, went to a nearby acute care center and the NBOME cancelled the examination (see pages 74-76). Sometime later, Dr. Jermyn informed me via email that I was required to take the exam by 7/30/2015.

On July 30th, I took the Level I exam in New York as planned, but experienced disruptions in nocturnal for my obstructive sleep apnea the night before as well numerous panic attacks throughout it, likely dramatically limiting my performance. Since I am not in a position that can afford an additional Level I failure and that my mental health was certainly not yet optimized, given the acute events experienced during the exam, I requested that it be voided. On 8/19/2015, I was notified by the NBOME that my request to void the exam was approved, however, with the condition that I may not reschedule the exam for 60 days from the July 30th administration (See pages 77-78 and Part 1, item 4).

In the days following July 30th, I made appointments to see my psychiatrist, psychologist and pulmonologist seeking advice on how to aggressively restore my health. Below are the prompt actions I took to restore my mental and physical health:

1

2

## PART 1: MENTAL ILLNESS

ITEM 1: I would like to remind you that it was not until after failing Level 1 for the second time that the extent of my testing anxiety was realized. The plan recommended to me at the SAPC meeting on 03/17/2015 was to work with a psychologist on testing anxiety issues, take an immersion board review course recommended by CTL, and to return back to rotation after completion of the COMLEX Level I exam. I precisely followed the recommended plan.

ITEM 2: I completed the 6-week comprehensive Kaplan Medical course in New York City (05/18/2015 – 6/28/2015) and completing 2,200 practice questions. I was in lecture about 8-9 hours per day and had to commute about 2 hours each day. As God as my witness, I woke up every morning at 4:00 AM to pre-read the entire lecture notes for that day. I was always among the first to enter the lecture hall when the doors opened at 7:30 am to claim one of the coveted front row seats. It was my sincere attempt to do everything I possibly could to increase my knowledge and confidence. The certificate of completion is attached (see page 86).

ITEM 3: I started working with the clinical psychologist Dr. Howard Siegel starting 03/20/2015 for testing anxiety. The treatment plan recommended was psychoanalysis, cognitive behavioral therapy, and relaxation techniques. Attached insurance records (pages 4-8) demonstrate my compliance to continuous sessions since 03/20/2015.

ITEM 4: Both the psychologist and I had thought the treatment was effective and that progress was made. On 7/30/2015, I took the Level 1 exam in New York as planned, however, several panic attacks during the exam was clear evidence that despite my greatest efforts to optimize my mental health by that date, I simply was not able to do so. Repeated bouts of palpitations, lightheadedness, profuse sweating, blurry vision, tremors,

abdominal distress, nausea and difficulty breathing were far from optimized. Please see below the letter from my treating psychologist (also on page 3):

Howard B. Siegel, Ph.D.
Clinical Psychologist
7 Kensington Avenue
Jersey City, N.J. 0782.
201.333.9822

August 12, 2015

To Whom It may Concern:

Mr. [blacked out] had been in psychotherapy with me since March 20, 2015. Mr. C[...] started treatment with me because of extreme test anxiety and panic disorder. We discussed deep breathing techniques along with various exercises to train him to get into something somatic happening at the time of his panic feelings.

Mr. C[...] also started taking a Kaplan preparation course for his exam. He was quite disciplined in his approach to studying the material. I was very impressed with the amount of dedicated time he gave to his studies. He felt very good about his understanding of the material. He was prepared to take the test. At the exam he seemed immediately developed as maximal disorder and left the exam. He was allowed to take the exam the next time it was given. This time in addition to the gastro-intestinal disorder he also had a full blown panic attack and tried unsuccessfully to try what I taught him to do.

It seems that he was very aware that this was his last chance and that sort of the panic disorder. It was a show of the feeling that made him anxious. I suggest that you allow him to take the exam with the explicit understanding that he could take it once again if the needed to. My feeling is that openness would allow his anxiety to dissipate and he would do well on the exam.

Sincerely,

Howard B. Siegel Ph.D.

## PART 1: MENTAL ILLNESS  (CONTINUED)

**ITEM 5:** Unfortunately, there was no way to determine if my treatment was truly effective other than actually attempting to take the real COMLEX exam, since there is no alternative method to simulate the conditions and environment that trigger and provoke my testing anxiety and panic attacks. After persistence and exacerbation of symptoms on the 7/30/2015 Level 1 exam, I was referred to see a psychiatrist Dr. Abby Kurien. He started me on a multifaceted pharmacotherapy regimen consisting of the SSRI Paxil CR 12.5mg daily, Adderall XR 10 mg daily, and Propanolol 20 mg twice daily, a beta blocker, for the treatment of my disorders which now includes depression and panic attacks (see page 11-12). I was advised to wait 4-8 weeks for the SSRI medication to become therapeutic before scheduling to take the exam.  He also pointed out that the GI distress experienced on the July 14th exam were likely related to and caused by my underlying conditions. Please see the letter below from my psychiatrist (also on page 10)

**ITEM 6:** On 8/31/2015, Dr. Kurien made adjustments to my medications by increasing the dose of Paxil CR to 25 mg daily (SSRI) due to persistence of my depression symptoms, Adderall XR was increased to 10 mg twice daily, and propranolol was decreased to 10 mg daily due to adverse effects of hypoglycemia and dizziness (see page 14). After dose adjustments, my depression symptoms resolved indicating that the SSRI has reached the therapeutic level, which is also a good sign that it will be effective to control my testing anxiety and panic disorder when retaking the COMLEX Level I. I was able to tolerate the reduced dose of propranolol with no issues.

**ITEM 7:** I am doing well now and my mental health is optimized. My plan is to continue to follow up with the psychiatrist and remain in psychotherapy to maintain my optimal mental health throughout the rest of my medical training.

---

Palisade Behavioral Care
221 Palisade Avenue
Jersey City, NJ 07306
Phone (201) 656-3116
Fax (201) 656-9044

August 4, 2015

Re: J█ █
D.O.B ██████1982

To Whom It May Concern:

Mr. J█ █ is a patient in my office and is being treated for severe testing anxiety and panic disorder. He reported twenty sessions of psychotherapy to reduce testing anxiety in preparation for the COMLEX exam. He still experienced severe anxiety and symptoms consistent with panic attack while taking his COMLEX USA Level-1 exam on July 30, 2015. I prescribed him Paroxetine 12.5mg daily starting on 08/03/2015 and Propranol 20mg to be taken 1-hr before the exam.

I recommend that you allow him to void this COMLEX USA Level-1 examination taken on July 30 2015 and grant him permission to retake his exam once the course of the medical therapy has become effective  which I anticipate will take a minimum of four weeks.

If you have any further questions regarding Mr. C█████  please contact my office after obtaining written permission from him per HIPAA.

Sincerely,

Abby Kurien, M.D.
AK/mp

3

## PART 2: OBSTRUCTIVE SLEEP APNEA

*Brief explanation for non-physician attendees: OSA is spontaneous obstruction of the upper airway which causes repetitive pauses in breathing during sleep associated with a reduction in blood oxygen saturation. The Apnea–Hypopnea Index (AHI) is an index used to indicate the severity of OSA. It is represented by the number of apnea and hypopnea events per hour of sleep. The apneas (pauses in breathing) must last for at least 10 seconds and be associated with a decrease in blood oxygen saturation.*

**ITEM 1:** I was initially diagnosed with OSA on 12/23/2013 during my second year of medical school with AHI of 25.2 events/hr by way of nocturnal polysomnography (see page 36).

**ITEM 2:** After a second titration polysomnography study on 1/6/2014 (my birthday), I was started on a treatment plan of weight-loss and 6-cmH20 continuous- positive airway pressure (C-PAP) nocturnal treatment on 1/27/2014 (see page 38 -42). Effective C-PAP therapeutic pressure of 6-cmH20 demonstrated an 88% reduction in AHI. Through a disciplined exercise and diet plan, I was able to reduce my weight by 60 pounds between 12/23/2013 and 9/09/2015 (see pages 38 and 49).

**ITEM 3:** My treatment was effective until the last weeks of July 2015 when I started having consistent disruptions in my sleep and nocturnal C-PAP treatment. I saw my pulmonologist on 8/03/15 for evaluation and he ordered a re-assessment work up. Please see the letter below from my pulmonologist (also on page 16).

August 3, 2015

To Whom it May Concern:

Mr. J█████ is a patient of mine and is being re-assessed for obstructive sleep apnea. His sleep disturbance is affecting his ability to study for his exams. Work up and treatment delays by addressed in next four weeks. Please allow him to postpone the USMLE exam within four weeks until his re-addresses his sleep issues.

If you have any question I could be reached at 201-□□-□□□□.

Thank you.

Sincerely,

[signature]

█████ Raherागar MD

**ITEM 4:** I completed the new nocturnal polysomnography study on 8/10/15, which showed persistence of OSA but with a change in AHI to 9.8 events/hr. My physician ordered another polysomnography with CPAP titration due to the change in AHI from the previous 12/23/2013 study (see page 18-26). My physician also observed positional variation in the severity of my OSA and referred me to an ENT specialist to evaluate the patency of my upper airways.

4

## PART 2: OBSTRUCTIVE SLEEP APNEA (CONTINUED)

**ITEM 5:** On 8/17/2015, I saw Dr. Aylon Glaser, an ENT specialist. On diagnostic endoscopy, he found a reversal of the previously repaired deviated septum in addition to inferior turbinate hypertrophy, which explains the positional variation in both my OSA and C-PAP treatment. He started me on an intranasal steroid to treat the nasal congestion, which further complicates my C-PAP treatment. He referred me to an allergy specialist for further testing (see page 44-48).

**ITEM 6:** On 8/24/2015, I saw Dr. Harshna Mehta for allergy consultation. Upon comprehensive testing, she found 3+ grass allergy and 4/5 weed allergy. She informed me that this could be the underlying cause of the nasal congestion that is complicating my C-PAP treatment. She started me on a stronger intranasal steroid for now and recommended to consider immunotherapy in the following year (see page 67-73).

**ITEM 7:** On 8/31/2015, I completed another nocturnal polysomnography with C-PAP titration, which showed an increase in the effective therapeutic pressure to 9 cm-H20 to achieve a 59% reduction in AHI (see page 27-35). The previously prescribed CPAP pressure of 6 cm-H20, and the nights before the 7/30/2015 Level 1 exam, was 1/27/2014 and found to be insufficient to manage my illness (see page 41). The fatigue from this disruption in my sleep may have exacerbated my testing anxiety on that day. The study also showed: an absence of N3 sleep while on C-PAP, more spontaneous arousals while on C-PAP (157) vs. recent baseline (96), and more central apnea while on C-PAP (9) vs. recent baseline (1). I was then referred to see a specialist for a mandibular advancement appliance, an alternative treatment option for OSA. Please see the letter of medical necessity from my pulmonologist in this regard (also on page 65).

---

Tanuj Bhatnagar, M.D.

Sept 08, 2015

RE: J████ C███ DOB 0█/██/1982

To Whom It May Concern,

Mr. J████ is my patient and has obstructive sleep apnea. He has been using cpap machine since his diagnosis in December 2013. He has lost significant weight and recent work up shows persistent sleep apnea. He has been having difficulty in tolerating cpap and his sleep is being affected as a result. It is medically necessary for him to continue treatment and the next best treatment available for his condition is oral appliance.

Thank you.

Sincerely,

Tanuj Bhatnagar MD

## PART 2: OBSTRUCTIVE SLEEP APNEA (CONTINUED)

**ITEM 8:** On 9/02/2015, I saw Dr. Jordan Stern for evaluation regarding a mandibular advancement appliance to treat my OSA (see page 60-64). He recommended this new treatment over C-PAP to effectively manage my illness for the following reasons:

- Positional variation and nasal mucosal dryness, irritation, and epistaxis associated with C-PAP treatment due to the reversal of previously repaired deviated septum
- Persistent allergic rhinitis and nasal congestion that could get further exacerbated by nocturnal C-PAP usage
- Increase in C-PAP pressure requirement despite improving in severity index is likely due to weakening of pharyngeal and tongue muscles from continuous C-PAP usage in this case.

Please see below the letter of medical necessity issued by Dr. Stern (also on page 63). I have immediately started the process to obtain this appliance and I will have it in the coming weeks.

**ITEM 9:** I am happy to see progress in my treatment for OSA and my physicians and I are optimistic that this new treatment will effectively manage my illness.

On 8/20/2015, I contacted Dr. Lambert to request medical leave of absence effective 08/20/2015 until 10/01/2015 to address the aforementioned medical issues before I can report to retake the Level I exam. She informed me that given my circumstances, the request for medical leave of absence must be approved by the SAPC committee. According to the RowanSOM education handbook students can request up to two years for a medical leave of absence (see page 82-84). I am currently below this limit. I hereby respectfully request the SAPC's approval to be placed on a medical leave of absence effective from 08/20/2015 until 10/01/2015.

Following the 60-day grace period mandated by the NBOME, the first day I will be able to retake the COMLEX Level I exam would be on 10/02/2015. If the committee grants me this opportunity, I will be prepared to take the exam at that date.



### LETTER OF MEDICAL NECESSITY

### Oral Appliance Therapy (OAT) for Obstructive Sleep Apnea

NAME: _____ DATE: 9/2/2015

The above named patient was diagnosed with obstructive sleep apnea. Office notes are attached.

The patient:   has refused   failed   not a candidate for CPAP therapy   prefers OAT

The patient has:   Severe Sleep Apnea   Mild or moderate Sleep Apnea

Co-morbid conditions include: _High Blood press_ , _AFIB_ , _CHF_

According to the recommendations and clinical guidelines of the American Academy of Sleep Medicine (AASM) and the Centers for Medicare and Medicaid Services (CMS), he is a candidate for oral appliance therapy to treat his obstructive sleep apnea.

Sincerely yours,

Jordan Stern, MD
Medical Director
Board Certification in Otolaryngology & Sleep Medicine

cc. patient.

Clinical Center: 212-681-6174      90 Broadway, Suite 903, New York, NY 10006      Corporate: 646-762-7298

## PART3 : ADDITIONAL CONCERNS:

**ITEM 1:** From 8/3/2015 until 8/20/2015, I was on rotations at Christ Hospital. I also reported for family medicine and OMM orientation on July 6th and 7th, as requested by Dr. Scott. I immediately stopped reporting to rotations the day after the exam was voided by the NBOME, on 8/20/2015. I spoke to Regina Wilmes who informed me that these 3 weeks of rotations was not counted when calculating the 08/31/2015 deadline for the 5-year timeframe for completing the DO degree. If the SAPC were to count these days and consider them completed, I will be short of the 5-year maximum by only 9-10 days. In such a situation, I will still be able to remain within the 5-year timeframe by making up for these days during the winter holiday and by using some personal days. Please see the email below from Regina Wilmes (also on page 80).

**ITEM 2:** After requesting that the NBOME void my 7/30/2015 exam, they explained that it was still scheduled to be scored until my request was approved. I was notified on 8/19/2015 at 3:48 PM that my request was approved and the exam would now be voided. Unsure that the exam could in fact be voided, I waited for this confirmation from the NBOME before notifying CTL. If the NBOME decided not to void the exam and still grade it, I felt at that time it would be a moot point to notify CTL. I also did not know it would take them almost 3 weeks to make that decision. Furthermore, discussing this matter required me to specifically share that I am now receiving psychiatric pharmacotherapy. This was not a subject I felt comfortable sharing unless absolutely necessary either due to approval of the void request or failure on the Level I third attempt.

---



Regina Rousso Wilmes
To   C■■  J  C■■
Remaining time frame

August 24, 2015 at 11:46 AM
Inbox - Rowan 




Per your request, I am letting you know that you have more semesters left (this fall is one of them). If you return on Monday, August 31st and take no breaks at all (meaning no flex time this year or next fall), then you could complete all your remaining clerkship requirements by the end of 5 years. The final date of next fall semester is December 6th (a Sunday).

You asked me if I had accounted for the past 3 weeks of rotations that you have been on during August 2015 after you took the exam on July 30th . Since you were expected to stay off rotations until you had taken COMLEX 1, I explained that I had not. Since you already knew you had asked for your score be negated, the July 30th exam would not fulfill the requirement of "taking" Level 1. Therefore, you should not have begun rotating. When you tried to explain your logic as to why those 3 weeks of rotation should count, I said you would have to discuss that with the SAP Committee.

Sincerely,

Regina Wilmes, Associate Registrar
Rowan University School of Osteopathic Medicine
1 Medical Center Drive, Suite 210
PO Box 1011
Stratford, NJ 08084
856-566-7055
Fax 856-566-6475
wilmesr@rowan.edu

8

## CONCLUDING REMARKS:

Throughout my time at SOM, the administration and faculty have consistently spoken of the great compassion that our school embodies and instills in all of its students, which for the time being, still includes me. At this time of great need, I am now pleading for your compassion and understanding, both for the extenuating circumstances that prevented my ability to complete the Level 1 exam by the deadline and for the opportunity to give this 3rd and final attempt at Level 1 my absolute everything. Because as a third year student who overcame many obstacles in completing all first and second year courses as well as rotations I was permitted to complete, the possibility of being dismissed is dangerously close. I hope that you find it within your hearts to grant me one last chance to triumph over this great obstacle. It is my greatest hope that you support, encourage and join me in this journey.

Thank you for your time, consideration, and above all else, your great compassion.

Yours very respectfully,

Sincerely,

## LIST OF ATTACHMENTS:

| | |
|---|---|
| **Attachment 1:** Documents regarding psychotherapy for testing anxiety | Pages 2-8 |
| **Attachment 2:** Documents regarding psychiatric care for panic disorder and depression | Pages 9-14 |
| **Attachment 3:** Documents from pulmonology & sleep specialists regarding obstructive sleep apnea | Pages 15-42 |
| **Attachment 4:** Document from Ear, Nose, Throat (ENT) specialist regarding obstructive sleep apnea and chronic rhinitis | Pages 43-58 |
| **Attachment 5:** Documents regarding the mandibular advancement custom appliance for obstructive sleep apnea | Pages 59-66 |
| **Attachment 6:** Documents from allergy specialist regarding obstructive sleep apnea and chronic rhinitis | Pages 67-73 |
| **Attachment 7:** Documents from urgent care on 7/14/2015 | Pages 74-76 |
| **Attachment 8:** Correspondences with National Board of Osteopathic Medical Examiners regarding 7/30/2015 COMLEX Level 1 cancelation | Pages 77-78 |
| **Attachment 9:** Correspondence with Regina Wilmes, Associate Registrar regarding 8/31/2015 COMLEX level 1 deadline calculation | Pages 79-80 |
| **Attachment 10:** RowanSOM Education Handbook – section on leave of absence | Pages 81 - 84 |
| **Attachment 11:** Kaplan Medical certificate of immersion course completion | Pages 85-86 |

**LIST OF ATTACHMENTS:**

| | |
|---|---|
| **Attachment 1:** Documents regarding psychotherapy for testing anxiety | **Pages 2-8** |
| **Attachment 2:** Documents regarding psychiatric care for panic disorder and depression | **Pages 9-14** |
| **Attachment 3:** Documents from pulmonology & sleep specialists regarding obstructive sleep apnea | **Pages 15-42** |
| **Attachment 4:** Document from Ear, Nose, Throat (ENT) specialist regarding obstructive sleep apnea and chronic rhinitis | **Pages 43-58** |
| **Attachment 5:** Documents regarding the mandibular advancement custom appliance for obstructive sleep apnea | **Pages 59-66** |
| **Attachment 6:** Documents from allergy specialist regarding obstructive sleep apnea and chronic rhinitis | **Pages 67- 73** |
| **Attachment 7:** Documents from urgent care on 7/14/2015 | **Pages 74- 76** |
| **Attachment 8:** Correspondences with National Board of Osteopathic Medical Examiners regarding 7/30/2015 COMLEX Level I cancelation | **Pages 77- 78** |
| **Attachment 9:** Correspondence with Regina Wilmes, Associate Registrar regarding 8/31/2015 COMLEX level I deadline calculation | **Pages 79-80** |
| **Attachment 10:** RowanSOM Education Handbook – section on leave of absence | **Pages 81 - 84** |
| **Attachment 11:** Kaplan Medical certificate of immersion course completion | **Pages 85- 86** |

\* \* \* \* \*

**Attachment 7:** Documents from urgent care
on 7/14/2015

Medrite Urgent Care
330 W 42nd St
New York, NY 10036-6902
212-695-4444



C█████, J████  (07/14/2015)          Patient Clinical Summary (page 1 of 2)

Patient: J███ C███, Sex: M (ID= 74789)
Date of Birth: ████ 1982
Log= 12109264 (Room= Exam 2)

You were seen at Medrite Urgent Care (42ND ST) on Tuesday, July 14, 2015.

Your Diagnosis for today's visit is:

- 1. Diarrhea

You have been Prescribed the following medications. Please take as instructed.

- Continue Taking: Lunesta # Refills(0)
- Prescribed: Cipro 500mg 1 tablet by mouth Twice A Day for 7 Days #14 Refills(0).
  Prescribed at 1:26 PM on 07/14/2015
  Prescription printed

Recommendations / Plan:

- Please return to the clinic in 3 days if not better. Call or return to this clinic sooner if your condition worsens or if you have any concerns.
- Fluids, rest, Tylenol
  Cipro 500mg 2x/day for 7 days
  If worsen return to MedRIte

Instructions:

- Please read the Exit Care Documents provided:
  - Diarrhea

Thank you for allowing us to serve you today.
Please call this clinic at 212-695-4444 if your condition changes or you have any concerns.

You were discharged by Platzman, Michael DO on 7/14/2015 1:27:14 PM.

Medrite Urgent Care
930 W 42nd St
New York, NY 10036-6902
212-695-4444


Save Time. Feel Better.

C▮▮▮▮ ▮▮▮▮ (07/14/2015)          Patient Clinical Summary (page 2 of 2)

Race: White
Ethnicity: Not Hispanic or Latino
Preferred Language: English

## Your Reason for visiting us:

- The patient presents with a chief complaint of constant diarrhea of the abdomen since Tue. Jul 14, 2015. It has the following quality: watery. The patient describes the severity as moderate. Context: Pt states that he has diarrhea. Pt states abdominal pain. PT denies any vomiting or fever. Pt denies taking any medication. Was taking an exam and kept getting up to leave. No fever or chills, no traveling. The patient also reports nausea as an abnormal symptom related to the complaint.

## Your Vital Signs recorded during this visit were:

- Main vitals: Vital signs obtained 07/14/2015 12:58 PM
  Temperature: 98.7 °F (Oral), Respirations: 15/min, O2 saturation: 99%, O2 Delivery: RA,
  Weight: 170 LBS, Height/Length: 5' 10", BMI: 24.4
  First entered 07/14/2015 12:58 by Assistant, Medical
  Last edited 07/14/2015 13:17 by Assistant, Medical

## Your Social History recorded includes:

- Tobacco Use: Never smoked

## Your Medical History recorded includes:

- Insomnia Unspecified: insomnia (status Active)

## Your Symptoms during this visit:

The following symptoms were marked as negative/normal: change in appetite, chills, fatigue, fever, sweats, weight loss, chest pain/ pressure, fainting, fluttering/ palpitations, headache, light headedness, loss of consciousness, numbness/ tingling, poor balance, weakness, anxiety/ nerves, depression, frequent infections, nodes/ glands, blurred vision, contact lenses, double vision, eye discharge, eye pain, eyeglasses, dizziness, ear pain, nasal congestion, nose discharge, sneezing, sore throat, congestion, cough, shortness of breath, wheeze, abdominal pain, rectal/ perirectal complaints, urinary/bowel changes, vomiting, discharge, frequent urination, nighttime urination, painful urination, sexual difficulties, joint pain, muscle pain, swelling, bruising, itching, laceration, rash, redness, skin sores.

The following symptoms were marked as positive/abnormal:

- Diarrhea (see *Reason for visit*)
- Nausea

## According to our documentation, you are on the following Medications (see also Prescribed medications above):

- Lunesta:

76

**Attachment 8:** Correspondences with National Board of Osteopathic Medical Examiners regarding 7/30/2015 COMLEX Level I cancelation

**Client Services**
To: ▮▮▮ C▮
RE: COMLEX Level I - 7/30 - Acute illness

August 19, 2015 at 3:44 PM
Inbox - Gmail

Dear Mr. C▮

Thank you for your reply. Please note that your COMLEX Level 1 eligibility was reset. A $590 voucher was created for your account and is available to be used toward your next registration process. You can log on your NBOME online account at any time to submit a new registration. Once your registration is complete, the "Schedule" link will be available under the Exam Status of your My Account tab. This will give you access to schedule your Level 1 examination on the Prometric system for any of the available dates.

If you have any questions, please don't hesitate to contact me.

Sincerely,

Mirela
NBOME
Client Services Representative
866-479-6828

The information contained in this email message and its attachments is intended only for the private and confidential use of the recipient(s) named above, unless the sender expressly agrees otherwise. If the reader of this message is not the intended recipient and/or you have received this email in error, you must take no action based on the information in this email and you are hereby notified that any dissemination, misuse or copying or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by email and delete the original message.

---

J▮ C▮
To: Client Services
Re: COMLEX Level I - 7/30 - Acute illness

August 18, 2015 at 8:01 PM
Sent - Gmail

Dear Mirela,

Thank you for your email. I confirm acceptance of this decision. I request to void the 7/30/15 COMLEX-USA Level I administration.

Sincerely,
J▮ C▮

---

**Client Services**
To: ▮▮▮ C▮
RE: COMLEX Level I - 7/30 - Acute illness

August 18, 2015 at 2:55 PM
Inbox - Gmail

Dear Mr. C▮

The NBOME received your request to void the July 30, 2015 COMLEX-USA Level I administration and the additional materials provided. We understand that test taking is a stressful experience for you. However, this is the second request to void an administration for a non-adverse testing condition. Please refer to the Bulletin of Information, Section V. B., if this is an impairment that may require test accommodations. As a one-time courtesy the NBOME will grant your request to void the July 30, 2015 Level 1 administration. However, due to the fact that this is the second request to void on examination, you may not reschedule to take the examination within 60 days from the date of the examination, July 30, 2015, and may not elect to withdraw from any future examination.

Please confirm and provide your acceptance of this decision by Friday, August 21, 2015 via the clientservices@nbome.org e-mail address.

Sincerely,

Mirela
NBOME
Client Services Representative
866-479-6828
clientservices@nbome.org

The information contained in this email message and its attachments is intended only for the private and confidential use of the recipient(s) named above, unless the sender expressly agrees otherwise. If the reader of this message is not the intended recipient and/or you have received this email in error, you must take no action based on the information in this email and you are hereby notified that any dissemination, misuse or copying or disclosure of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by email and delete the original message.

**Attachment 9:** Correspondence with Regina Wilmes, Associate Registrar regarding 8/31/2015 COMLEX level I deadline calculation

J C
To: Regina Rousso Wilmes
Re: Remaining time frame

August 24, 2015 at 9:55 AM
Sent - Rowan

Thank you for your email Regina. I appreciate it. One more question regarding the winter break after the fall 2015 semester. Was that counted in calculation. Is that time available if I find opportunity to make up clinical time?

Thanks,
J

J C MPH, CCRP
Medical Student

Rowan University School of Osteopathic Medicine
1 Medical Center Dr, Box 124
Stratford, NJ 08084
Web: [link]

---

Regina Rousso Wilmes
To: C , J C
Remaining time frame

August 24, 2015 at 9:35 AM

Per your request, I am letting you know that you have three more semesters left (this fall is one of them). If you return on Monday, August 31st and take no breaks at all (meaning no flex time this year or next fall), then you could complete all your remaining clerkship requirements by the end of 5 years. The final date of next fall semester is December 6th (a Sunday).

You asked me if I had accounted for the past 3 weeks of rotations that you have been on during August 2015 after you took the exam on July 30th. Since you were expected to stay off  rotations until you had taken COMLEX 1, I explained that I had not.Since you already knew you had asked for your score be rejected, the July 30th exam would not fulfill the requirements of "taking" Level 1. Therefore, you should not have begun rotating. When you tried to explain your logic as to why those 3 weeks of rotation should count, I said you would have to discuss that with the SAP committee.

Sincerely,

Regina Wilmes, Associate Registrar
Rowan University School of Osteopathic Medicine
1 Medical Center Drive, Suite 210
PO Box 1011
Stratford, NJ 08084
856-566-7055
Fax 856-566-6475
wilmesr@rowan.edu

CONFIDENTIALITY NOTICE: This email communication may contain private, confidential, or legally privileged information intended for the sole use of the designated and/or duly authorized recipient(s).  If you are not the intended recipient or have received this email in error, please notify the sender immediately by e-mail and permanently delete any copies of this e-mail including all attachments without reading them. If you are the intended recipient, secure the contents in a manner that conforms to all applicable state and/or federal requirements related to the privacy and confidentiality of such information.

**Attachment 10:** RowanSOM Education
Handbook – section on leave of absence

comply with all requirements of Academic Warning will receive a private letter of admonishment or other disciplinary action at the discretion of the Committee.

If a student's academic performance improves and their average rises above 70 for the course(s) in question and for two consecutive exams, they can request a review of their current academic record to have the status removed through CTL.

## XV.   Academic Probation

The Committee has wide discretion on placing a student on Academic Probation, including limiting a student's choice of clerkship hub. In general, a student who fails two courses in their academic career, or any two COMLEX examinations, will be placed on Academic Probation for a period of at least one calendar year. In the case of failed COMLEX examinations, the student will be on Academic Probation at least until the student has passed the examination. Academic Probation requires:

1.   Possible ongoing appearances before the Committee according to a schedule set out by the Committee members.

2.   Student compliance with all recommendations of the Committee.

3.   Prohibition against student holding any office in student government, clubs, etc.

4.   Prohibition against student serving on any committees.

5.   Prohibition against student travel to conventions, conferences, meetings, recruiting trips or other travel that will require time away from the classroom.

6.   Participation in an individualized remediation program designed with the Center for Teaching and Learning. The Committee may make other academic requirements. Students on Academic Probation who fail to meet all requirements of Academic Probation may be recommended for dismissal.

## XVI.  Leave of Absence

A.   Administrative Leave of Absence

1.   A student may be placed on administrative leave of absence for academic or personal circumstances following review by the Committee.

2.   A student may be placed on administrative leave of absence any other time by the Assistant Dean for Student Affairs on the basis of academic or personal circumstances. The circumstances and the conditions of the

82

leave will be provided in writing to the student and the Committee by the Assistant Dean for Student Affairs.

B.   Medical or Personal Leave of Absence

    1.   A leave of absence may be granted by the Committee upon recommendation of the Assistant Dean for Student Affairs for a student having personal or medical problems that are unlikely to be resolved while the student is in full-time attendance.

    2.   Any student requesting a leave of absence for personal or medical reasons shall consult with the Assistant Dean for Student Affairs before submitting a written request.

    3.   Written requests for leave of absence for personal or medical reasons for students in good academic standing may be acted on by the Assistant Dean for Student Affairs. Leaves of Absence cannot be used to avoid dismissal for academic or disciplinary reasons. Written requests for medical leave of absence must be accompanied by verification from the student's healthcare provider. However, it is within the discretion of the Assistant Dean for Student Affairs to grant a request for a personal or medical leave of absence for emergent circumstances.

C.   Maximum Leave of Absence
Maximum cumulative leaves of absence are two years, unless the student is participating in an approved dual degree program, or for other reasons as specified by the Committee. A student is normally limited to two (2) leaves of absence during the four-year curriculum.

D.   Return from Medical Leave of Absence

    1.   Students planning to return from medical leave should submit a letter to the Assistant Dean for Student Affairs requesting return from medical leave no later than thirty days before the intended date of return.

    2.   The student is then instructed by the Assistant Dean for Student Affairs to make an appointment with the Director of Student Health, School of Osteopathic Medicine, for evaluation of readiness to re-enter the program.

    3.   The Director of Student Health will present a report and recommendation to the Assistant Dean for Student Affairs for subsequent review and recommendations of the Committee.

    4.   The student will be placed in Supernumerary status upon return.

5.   In the absence of the thirty day required written notification from a student regarding their intention to return to the School from a medical leave of absence, the student will be administratively withdrawn.

E.   Return from Personal Leave of Absence

1.   Students planning to return from personal leave should submit a letter to the Assistant Dean for Student Affairs requesting return from personal leave no later than thirty days before the intended date of return.

2.   The student will be placed in supernumerary status upon return.

3.   In the absence of the thirty day required written notification from a student regarding their intention to return to the School from a personal leave of absence, the student will be administratively withdrawn.

## XVII. Student Scholar

Students occasionally want to enhance their academic program with non-curricular opportunities such as research or clinical experiences that last longer than a typical elective period. Those students are designated as Student Scholar.

A student who is approved for Student Scholar has active, full-time enrollment status. The student remains eligible for financial aid, student health insurance, parking, etc. Student Scholars are charged a Maintain Matriculation fee but are not charged tuition. The designation of Student Scholar is listed as a non-credit experience on the student's transcript for each approved term.

To obtain approval for the Student Scholar designation the student submits the "Request to Participate in a Non-Credit Clinical Experience" form along with a detailed description of what they plan to do to the Senior Associate Dean for Academic Affairs. The Senior Associate Dean meets with the student to review the plan and approves or disapproves the plan in writing. The student returns to their for-credit curricular requirements at the conclusion of the experience.

## XVIII. Withdrawal

Withdrawal from the School of Osteopathic Medicine is defined as permanent separation of an individual from the School of Osteopathic Medicine. A student may voluntarily withdraw or may be involuntarily withdrawn by administrative action ("Administrative Withdrawal").

**Attachment 11:** Kaplan Medical certificate of immersion course completion



KAPLAN MEDICAL

# Certificate of Completion

is awarded to

**J C**

for successfully completing the

Kaplan Medical USMLE® Step 1 LivePrep Program

May 18, 2015 to June 28, 2015

Program Manager

Medical Advisor

Designated School Official

USMLE® is a joint program of the Federation of State Medical Boards (FSMB) and the National Board of Medical Examiners (NBME). Test names and other trademarks are the property of the respective trademark holders. None of the trademark holders are affiliated with Kaplan.



LEGAL MANAGEMENT

## ZUCKERMAN & FISHER, L.L.C.
## Attorneys at Law

OCT 0 6 2015

**RECEIVED**

5 Mapleton Road, Suite 100
Princeton, New Jersey 08540
www.zuckfish.com

(609) 514-0514 Phone
(609) 514-0614 Fax
zf@zuckfish.com

October 5, 2015

**By Federal Express**
Melissa Wheatcroft, Esq.
Rowan University
Office of the General Counsel
201 Mullica Hill Road
Glassboro, NJ 08028

Re:    J███ C███ / Rowan University, School of Osteopathic Medicine

Dear Ms. Wheatcroft:

I am writing on behalf of my client, J███ C███.

Mr. C███ was a student at Rowan University, School of Osteopathic Medicine, from September 2011 until his dismissal effective September 29, 2015. The reason for Mr. C███'s dismissal was that he did not complete his COMLEX Level I exam within the School's five-year rule. I believe the decision to dismiss Mr. C███ is a violation of the New Jersey Law Against Discrimination in that the School failed to provide Mr. C███ with a reasonable accommodation for his known disabilities. I write this letter in an effort to expeditiously resolve this matter without the need for litigation.

Mr. C███ suffers from two well-documented disabilities: obstructive sleep apnea (OSA), and severe testing anxiety with panic disorder. As a result of these disabilities, he requested reasonable accommodation in the form of a medical leave of absence. His request, which was supported by his physicians, was denied and no interactive discussion took place to determine if any other accommodation was available. Instead, the School simply dismissed Mr. C███ for failure to complete his course of study within the allotted time.

Mr. C███ was first diagnosed with OSA on December 12, 2013. He began treatment for this condition and sought reasonable accommodation in the form of permission to postpone exams when treatment was ineffective to address his symptoms. Rowan agreed to the accommodation Mr. C███ and his doctor requested. As a result, Mr. C███ was able to complete his second year of medical school.

Mr. C███ took his COMLEX Level I Exam for the first time on September 3, 2015 and did not pass. Students are permitted to take this exam three times. The Student Academic Progress



*Our job is to*    *protect your job*



Melissa Wheatcroft, Esq.
Rowan University
Office of the General Counsel
October 5, 2015
Page 2

Committee (SAPC) required that Mr. C███ enroll in a PASS board review program and to take a proctored assessment COMAE Form D exam before he could be cleared to take the COMLEX Level I for the second time. He complied with both of these requirements and then sat for the COMLEX Level 1 exam on February 4, 2015. Although he had no trouble passing the COMSAE Form D exam, Mr. C███ again failed the high stakes COMLEX Level 1 Exam. It was at this point that he realized he was suffering from severe testing anxiety.

Because of his second COMLEX failure, Mr. C███ was placed on Academic Probation and was again required to appear before the SAC, which he did on March 17, 2015. Mr. C███ explained the issue he was having with severe test anxiety and proposed that he work with a psychologist and then enroll in a 7-week board review course through August 16, 2015, following which he would take the test again. The SAPC gave Mr. C███ the option of going on a medical leave of absence from March 16, 2015 through May 18, 2015, so he could work with a psychologist, followed by a 6-week review course through June 28, 2015, with a plan to take the test shortly thereafter.

After working with his psychologist and getting a better understanding into his anxiety disorder, Mr. C███ requested permission to enroll in a more comprehensive review course, from May 18, 2015 through August 23, 2015. This request was denied due to the mistaken belief that he would not have time to take the COMLEX Exam and still remain within the five-year rule. Mr. C███ later learned that he had until August 31, 2015 to take the exam. Since the COMLEX Exam was offered on August 18, 2015 and on September 2, 2015, the School could have offered Mr. C███ a reasonable accommodation by allowing him to take the COMLEX exam in September or, at the very least, allowed him to take it on August 18, 2015. Instead, it refused to provide any accommodation and forced him to take it before he was medically prepared to do so.

Mr. C███ sat for the COMLEX Exam on July 14, 2015. However, he had severe diarrhea with abdominal cramping and had to run to the bathroom repeatedly during the exam. Because Mr. C███ was unable to complete the exam due to illness, it was cancelled. Dr. Jermyn, the chairman of the SAPC, informed Mr. C███ that his final deadline for taking the COMLEX Level I Exam would be July 30, 2015. Once again, Mr. C███ should have been given until August 31, 2015, to take the Exam (or later, as a reasonable accommodation). Instead, and despite their awareness of Mr. C███'s medical conditions, the SAPC refused to accommodate him. Rather, the Committee exacerbated his medical condition by warning him that he must "make every opportunity to optimize your health with your physicians to ensure your ability complete the exam on your next attempt."



Melissa Wheatcroft, Esq.
Rowan University
Office of the General Counsel
October 5, 2015
Page 3

Mr. C█████ reported again to take the COMLEX Level I Exam on July 30, 2015. This time, in addition to the GI distress he had experienced previously, Mr. C█████ also experienced panic attacks as well as symptoms associated with his OSA. Despite these severe symptoms, he attempted to finish the exam and then immediately made appointments with his physicians to evaluate his health. He saw his pulmonologist for a work up of his OSA symptoms and was referred to a psychiatrist for medication for his anxiety symptoms. All medical documentation was shared with Rowan.

After discussion with his physicians and their recommendation that he be permitted to void the test and re-take it after his medical treatment becomes effective, Mr. C█████ contacted the National Board of Osteopathic Medical Examiners on August 4, 2015 to request that his test be voided. The Board notified him on August 19, 2015, that his request to void the exam was approved, but that he could not reschedule the exam for 60 days from the July 30, 2015 administration. The following day, Mr. C█████ advised the School that the exam had been voided. He also contacted Dr. Lambert, Assistant Dean for Student Affairs, and requested a medical leave of absence from August 20, 2015 until October 1, 2015, to resolve his health issues. Dr. Lambert said she could not approve Mr. C█████'s request and that he would have to take it up with the SAPC.

On August 21, 2015, Mr. C█████ received a letter from the SAPC, requiring his attendance at a dismissal hearing on September 15, 2015, because he had not yet completed the COMLEX Level 1 exam, which meant that he would not be able to complete the academic program within the five-year time limit. Mr. C█████ was permitted to submit a statement and briefly address the Committee, but, on September 21, 2015, the SAPC notified Mr. C█████ that it was recommending his dismissal. Mr. C█████'s request for a reasonable accommodation for his disability was not considered.

Mr. C█████ appealed the Committee's recommendation to the Dean but, on September 29, 2015, the Dean informed Mr. C█████ that he concurred with the Committee's recommendation and that, therefore, he was being dismissed from Rowan University School of Osteopathic Medicine, effective immediately.

Mr. C█████ has sacrificed enormously to fulfill his dream of becoming a doctor. When his own medical issues threatened his success, he aggressively pursued treatments that would allow him to continue in the Rowan SOM program. Although the School was initially willing to accommodate Mr. C█████'s disabilities, it ultimately failed to do so in two important respects. First, it refused to allow Mr. C█████ to take a longer review course and obtain therapeutic treatment for a longer period,



Melissa Wheatcroft, Esq.
Rowan University
Office of the General Counsel
October 5, 2015
Page 4


even though he could have done so and still taken the COMLEX Level I Exam before August 31, 2015, which would have allowed him to complete the program within five years. Second, once Mr. C███ s disabilities prevented him from completing the exam on the SAPC's last-chance date, the School refused to grant Mr. C███'s request for a medical leave of absence so he could address his symptoms. Instead, it rigidly enforced it's five-year rule, without regard to Mr. C███ s disabilities. This amounts to a failure to engage in the interactive process and a failure to provide reasonable accommodation. The consequences are enormous for Mr. C███, professionally, financially, and emotionally.

Mr. C███ is prepared to take the COMLEX Level I exam on the next available date, assuming at least two weeks' notice. He has finally obtained the medical treatment he needs so that his symptoms will not prevent him from being successful. Mr. C███ will waive his claim for disability discrimination and related claims if Dean Cavalieri is willing to reverse his dismissal decision and immediately reinstate him so that he can take his exam and continue with rotations.

Thank you for your prompt attention to this matter. I hope to hear from you soon.

Very truly yours,

Elizabeth Zuckerman

cc:   Mr. J███ C███

# EXHIBIT G

# JO ANNE SIMON, P.C.

356 Fulton Street, 3rd Floor
Brooklyn, New York 11201
www.joannesimon.com

(718) 852-3528 (V/TTY)
(718) 875-5728 (FAX)

Admitted NY & NJ Bars

July 7, 2016

**Via E-Mail to cavalita@rowan.edu**

Thomas A. Cavalieri, D.O., FACOI, FACP
Office of the Dean
Rowan University School of Osteopathic Medicine
One Medical Center Drive, Suite 305
Stratford, NJ 08084

   **RE:**   **J█ C█**

Dear Dean Cavalieri:

  We represent Mr. J█ C█, an individual with disabilities who was dismissed from Rowan University School of Osteopathic Medicine (hereinafter "the medical school") in the fall of 2015. We write to request that Mr. C█ be readmitted to the medical school and placed on a leave of absence that will permit him to apply for testing accommodations for the COMLEX[1] and resume his education and training after he has passed the COMLEX exams.[2]

  We have thoroughly reviewed Mr. C█' academic record, medical history, and correspondence with the medical school. Based upon the record, it is apparent that Mr. C█ inability to pass the COMLEX exams by the deadlines set by the medical school is not a reflection of his incompetence or lack of medical knowledge. It is a reflection of the impact of his disabilities when they are not allowed to be effectively treated and when they are not appropriately accommodated.[3]

---

[1] The COMLEX is a licensing exam that is offered by the National Board of Osteopathic Medical Examiners and required by the medical school.

[2] Mr. C█ only has three semesters remaining at the medical school. He has successfully completed the didactic curriculum and only has three semesters of clerkships remaining.

[3] In Bartlett v. New York State Board of Law Examiners the court found that the Board of Law Examiners could not logically conclude that Bartlett failed the bar exam because she lacked knowledge or skills when it required her to take the bar exam without the extended time accommodations she needed and requested. 2001 WL 930792 (S.D.N.Y. Aug 15, 2001). *See also* 34 C.F.R. §104.44 (c), which provides that "in its course examinations or other procedures for evaluating students' academic achievement in its program, a recipient to which this subpart applies shall provide such methods for evaluating the achievement of students [with disabilities] as *will best ensure that the results of the evaluation represents the student's achievement in the course*."

Prior to his dismissal from the medical school, Mr. C███was diagnosed with Generalized Anxiety Disorder, Panic Disorder, and Obstructive Sleep Apnea, and also experienced symptoms of depression. Mr. C███provided the medical school documentation verifying the existence and limitations of these disabilities, as well as documentation from his doctors recommending that a leave and extension to take the COMLEX exam be granted so that his treatment regimen, consisting of medication and cognitive behavioral therapy, would have time to become effective.

The medical school did not grant Mr. C███ request for disability accommodations (in the form of a leave and extension to take the exams). As a consequence, Mr. C███was required to take the examination when, due to the aforementioned circumstances, the medical school knew or should have known that he was incapable of successfully completing it because of his medical condition at the time. The stress from all of this exacerbated the symptoms of Mr. C███ Generalized Anxiety Disorder and Panic Disorder. Mr. C███panicked because he knew that he was not in the proper mental/emotional state to take the COMLEX. He subsequently contacted the National Board of Osteopathic Medical Examiners to inquire about cancellation and one of the board's representatives told him that he should consider applying for standardized testing accommodations.

Subsequent to his dismissal from medical school, Mr. C███discussed the necessity of testing accommodations with his clinicians, and they recommend that he be provided 50% extended time and off-the-clock breaks for his standardized exams. Mr. C███applied for these accommodations for the Graduate Management Admission Test (GMAT) and was approved.[4] These are the same accommodations that he wishes to request for the COMLEX.

Mr. C███ impairments, individually and especially when combined, substantially limit his ability to process information, concentrate, communicate, and take tests under the same conditions and time constraints as most people. Mr. C███is therefore protected by the Americans with Disabilities Act, as amended, 42 U.S.C. §§ 12101 et seq. (hereinafter "ADA") and Section 504 of the Rehabilitation Act of 1973, 28 U.S.C. § 794 et seq. (hereinafter "Section 504).[5] Broadly, these federal law guarantee Mr. C███equal opportunity and protection from disability discrimination in education and testing.

---

[4] The law says that the National Board of Osteopathic Medical Examiners must grant Mr. C███ request for disability accommodations. In September 2015, the U.S. Justice Department issued an updated technical assistance manual for all testing entities, wherein it explained: "If a candidate requests the same testing accommodations he or she previously received on a similar standardized exam or high-stakes test, provides proof of having received the previous testing accommodations, and certifies his or her current need for the testing accommodations due to disability, then a testing entity should generally grant the same testing accommodations for the current standardized exam or high-stakes test without requesting further documentation from the candidate." See, http://www.ada.gov/regs2014/testing_accommodations.html

[5] An individual has a disability within the meaning of the ADA and Section 504 if that individual suffers a physical or mental impairment that substantially limits one or more of the individual's major life activities or major bodily functions. 42 U.S.C. §12102(2)(A). Major life activities include activities such as reading, writing, learning, concentrating, sleeping and test-taking, and bodily functions include respiration and brain function. See Regulations to Implement the Equal Employment Provisions of the Americans with Disabilities Act, as Amended, 29 C.F.R. § 1630.2. The definition of who is protected is to be construed liberally and even prior to the 2008 amendments did

We believe that the medical school erred in dismissing Mr. C███ when it knew of his disabilities, his disability related needs, and the recommendations of his doctors.[6] We would like to believe that this was not done intentionally and that the school would welcome the opportunity to take the necessary steps to allow Mr. C███ an equal opportunity to complete his medical degree and pursue a medical career.  Enclosed please find new documentation from Mr. C███ doctors illuminating why he should have been accommodated (as opposed to dismissed), how his conditions have stabilized, and what he needs going forward with the COMLEX.[7]

Please contact me at your earliest opportunity to let me know if the medical school is interested in amicably resolving this matter.

Very truly yours,

*Mary J Goodwin*

Mary J. Goodwin, Esq.

Encl:  (1)   A June 16, 2016 letter from Howard B. Siegel, Ph.D.;
       (2)   A June 10, 2016 letter from Abby Kurien, M.D.;
       (3)   A November 13, 2015 letter from the Graduate Management Admission Council Approving Mr. C███ to test with 50% extended time and extra off-the-clock breaks;

---

not require a failure to achieve. *See also* Doe v. Samuel Merritt University, 2013 WL 428637, at *5-6 (N.D.Cal., Feb. 1, 2013), which explains how test-taking is a major life activity.

[6] Institutions shall make such modifications to its academic requirements as are necessary to ensure that such requirements do not discriminate or have the effect of discriminating, on the basis of [disability], against a[n]… applicant or student." 34 C.F.R. § 104.44(a).

[7] In Argenyi v. Creighton University, Nos. 11–3336, 11–3461, 2013 WL 149803 (C.A.8. Jan. 15, 2013), the United States Court of Appeals for the 8th Circuit found that Plaintiff Argenyi's allegations of disability discrimination against his school were supported where his school refused to grant his requests for accommodation, and pointed to Argenyi's doctor's urging the school "to consider Argenyi's specific requests, explaining that Argenyi 'is the best person to judge what [assistance may be necessary]' since no one else can really understand'" the impact of his disabilities.  Id. at 4.[7] Indeed, the same is true for Mr. Rodriguez and Dr. Gavriele-Gold's recommendations. *See* Landefeld v. Marion General Hospital, Inc., 994 F.2d 1178 (6th Cir. 1993), the Court of Appeals for the 6th Circuit found that a hospital's prior knowledge of the plaintiff's (an internist with bipolar disorder) disability is highly probative evidence of the hospital dismissing the plaintiff solely in response to his disability. ." *See also*, Wong v. The Regents of the University of California, 192 F.3d 807, 817 (9th Cir. 1999), which states that a school's ". . . deference is not absolute, however: courts still hold the final responsibility for enforcing the Acts, including determining whether an individual is qualified, with or without accommodation, for the program in question. We must ensure that educational institutions are not "disguis[ing] truly discriminatory requirements" as academic decisions; to this end, "[t]he educational institution has a 'real obligation ... to seek suitable means of reasonably accommodating a handicapped person *and to submit a factual record indicating that it conscientiously carried out this statutory obligation.*' " Zukle, 166 F.3d at 1048 (quoting Wynne v. Tufts Univ. Sch. of Med., 932 F.2d 19, 25-26 (1st Cir.1991) (en banc) (Wynne I)) (emphasis added). *See* Williams v. Clarke County Department of Human Resources, 834 F.Supp.2d 1310, 1320 (S.D. Ala., 2011) ("The fundamental legal principle on which Williamson's failure-to-accommodate claim founders is that an employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.") (internal citations omitted).

cc:     Mr. J█████C███

Linda Boyd, D.O., Senior Associate Dean for Academic Affairs
Kathryn C. Lambert, DO, FAOASM, Assistant Dean for Student Affairs
George Scott, D.O., Assistant Dean for Clinical Education
Richard Jermyn, D.O., Chairman of the Student Academic Progress Committee
Vincent J. DeRisio, D.O., FCAP, Associate Dean for Clinical Affairs
Deborah Podolin, Ph.D., Voting Member, Student Academic Progress Committee
Millicent Channell, D.O., Voting Member, Student Academic Progress Committee
Martin Forsberg, M.D., Voting Member, Student Academic Progress Committee
Gary Goldberg, Ph.D., Voting Member, Student Academic Progress Committee
Marita Lind, M.D., Voting Member, Student Academic Progress Committee
Thomas Newmark, M.D., Voting Member, Student Academic Progress Committee
Aubrey Olson, D.O., Voting Member, Student Academic Progress Committee
Victor J. Scali, D.O., Voting Member, Student Academic Progress Committee
Andriy Pavlenko, M.D., Voting Member, Student Academic Progress Committee
Michele Tartaglia, D.O, Voting Member, Student Academic Progress Committee
Marcia Watson, D.O., Voting Member, Student Academic Progress Committee

Howard B. Siegel, Ph.D.
Clinical Psychologist
7 Kensington Ave
Jersey City, N.J. 07304
201-333-9322

June 16, 2016

Re: J████ C███
DOB: ████1982

To Whom It May Concern:

I am writing to you in support of Mr. J███ C████' petition for readmission to Rowan University School of Osteopathic Medicine. Mr. C███ has been a patient of mine in individual psychotherapy since March 30, 2015. He has seen me for weekly sessions and our most recent session was on June 9, 2016.

I am very familiar with Mr. C███' disabilities and the difficulties that he experienced last year at Rowan prior to his dismissal. I found that he satisfied diagnostic criteria for Generalized Anxiety Disorder (F 41.1) and Panic Disorder (F41.0). His symptoms included sleep disruptions, palpitations, irritability, self-doubt, excessive worry and ruminations. It turns out that he also suffered from sleep apnea.

Over the past several months an effective combination of pharmacological intervention and cognitive behavior therapy has enabled Mr. C███ to live a more productive life, even with the added anxiety caused by his dismissal from Rowan University School of Osteopathic Medicine. I had recommended that the medical school allow him to go on medical leave until his conditions were better managed. This request was denied despite the fact that it takes several weeks to months to determine if the medication or cognitive behavior therapy was effective.

Mr. C███' dismissal from medical school was very traumatic for him and caused him to experience even more anxiety. However, in the many months that have followed he has worked closely with his doctors, myself included, to develop a very effective treatment regimen. He also had to deal recently with the unfortunate passing of his grandmother while he was visiting with her in Florida.

He currently holds a position with Merck where he is responsible for leading important research initiatives and prior to that he held another competitive research position.is ability to maintain balance with his personal life and the demands of his high level position, while simultaneously studying to keep his medical knowledge fresh, demonstrate to me that Mr. C███ possesses the tools needed to resume medical school and pursue a successful medical career.

I recommend that Mr. C███ be permitted to return to Rowan University School of Osteopathic Medicine on a leave of absence status until he is able to request and obtain testing accommodations for the COMPLEX, namely extra off-the-clock breaks and extended test time of at least 50% extended time. Theses accommodations will help him to utilize learned compensatory strategies too restore his focus and reduce the anxiety and panic symptoms that he experienced on this exam several times prior. Mr. C███ applied for 50% extended time and accommodations and extra off-the-clock breaks for the Graduate Management Admission Test and this request was approved. I believe that Mr. C███ deserves a fair opportunity to resume and complete his medical education and I am hopeful that Rowan University will readmit him as described for the fall 2016 semester.

Please feel free to contact me should you have any questions.

Yours truly,

Howard B. Siegel, Ph.D.

**Palisade Behavioral Care**
**221 Palisade Avenue**
**Jersey City, NJ 07306**
**Phone (201) 656-3116**
**Fax (201) 656-9044**

June 10, 2016

Rowan University
School of Osteopathic Medicine
One Medical Center Drive
Stratford, New Jersey 08084-1501

Re: J█████ C████
DOB: ████ 1982

To Whom It May Concern:

I am a medical doctor specialized in psychiatry.  I completed post-graduating medical training in both neurology at New York University Hospital and in psychiatry at Rutgers, the State University of New Jersey. I have significant experience helping patients manage a range of mental health concerns including anxiety disorder, panic disorder, and post-traumatic stress disorder (PTSD). I spent a significant part of my career serving patients in the Veterans Administration system. I write to follow up on my previous letters that have been submitted to Rowan University School of Osteopathic Medicine on Mr. C████' behalf.

As you know, I've been treating Mr. C████ for nearly a year.  He came to me with a previously diagnosed Anxiety Disorder and had been experiencing an increase in the severity and frequency of his anxiety symptoms.  After my own clinical assessment I determined that he met criteria for both a Generalized Anxiety Disorder and a Panic Disorder.  In my prior letters I occasionally referred to Mr. C████' Generalized Anxiety Disorder as "test anxiety" because these symptoms have been consistently pronounced in the high stakes setting of the COMLEX, but I wish to clarify that Mr. C████' anxiety symptoms also exist outside of the testing environment and have affected him in his private life and in his prior dealings with Rowan University.

Mr. C███ anxiety disorders caused him to experience significant ongoing worry and sleep disturbances which caused him to feel, amongst other things, on edge, irritable, and easily fatigued. Mr. C███ has reported a significant amount of anxiety and panic on timed tasks, resulting in shortness of breath, dizziness, and difficulty focusing. As a compensatory strategy, Mr. C███ subconsciously avoided situations that triggered these panic symptoms. This included not only the COMLEX itself, but communications with his Rowan University superiors about his taking and passing the exam by a certain time. Also frustrating matters was that Mr. C███ did not know that he needed and could qualify for extended time accommodations on exams such as the COMLEX.

Over time, Mr. C███ has benefited greatly from a combination of medication and cognitive behavioral therapy with his therapist, Dr. Siegel. However, it is clear to me as a professional who is familiar with his strengths and weaknesses, that he requires extended time testing accommodations going forward. I recommend that Mr. C███ be permitted to pursue exam accommodations of 50% extended time with breaks or 100% extended time from the National Board of Osteopathic Medicine and complete his medical education at Rowan University. Anxiety disorders can happen to anyone at any time in their life, no one is immune. But once they, like Mr. C███, have been able to find an effective treatment regimen (which, unfortunately, does not happen "overnight"), they are able to function at high levels and succeed. I strongly support Mr. C███ readmission to Rowan University so that he can be given an opportunity to succeed and pursue a career as a doctor.

Sincerely,

Abby Kurien, M.D.
AK/mp

From: **testingaccommodations** testingaccommodations@gmac.com  
Subject: J███ C██ - regarding your request for GMAT accommodations
Date: November 13, 2015 at 3:37 PM
To: ██████@gmail.com



November 13, 2015

Dear J███ C██,
We have reviewed your request for GMAT® test accommodations in accordance with GMAT® Test Accommodations Guidelines within the framework of the Americans with Disabilities Act as recently amended. You have been approved for 50% additional time and one additional break when you sit for the GMAT exam. Other accommodations: separate testing room.

| | |
|---|---|
| Analytical Writing Assessment | 45 Minutes |
| Break | 8 Minutes (Additional Break) |
| | |
| Integrated Reasoning | 45 Minutes |
| Break | 8 Minutes |
| Quantitative | 112.5 Minutes |
| Break | 8 Minutes |
| | |
| Verbal | 112.5 Minutes |

This approval may be used for up to five administrations of the GMAT® test within one year of the approval date listed above (subject to payment and to scheduling availability). This accommodation approval will expire in one year's time. You must space retakes of the exam at least 16 days apart and you cannot take the exam more than 5 times in a 365 day period. You must use the contact information below to schedule and pay for any test appointments that involve accommodations. Note that a standard testing appointment cannot be changed to an accommodated testing. If you schedule a standard appointment without using the scheduling method described below, your standard appointment will NOT include any accommodations and you will be subject to GMAC's cancellation fee policy.
In order to schedule and pay for your accommodated testing, you will need to contact the GMAT Accommodations Scheduling Specialist in your region using the information below:
For candidates in North and South America, call:
Telephone (toll-free): 1-800-466-0450 7 am to 7 pm Central Time, Monday - Friday
Telephone: 1-952-681-3948, 6 am to 7 pm Central Time, Monday - Friday
Fax: 1-952-681-3681

For candidates in the Asia-Pacific Region, call:
Telephone: +852-3077-4926, 9 am to 6 pm AEST, Monday - Friday
In India: +91 120 439 7830, 9 am to 6 pm Indian Standard Time, Monday - Friday
Fax: +60 3 8319 1092
For candidates in China, call:
Telephone: 86-10-82345675, 8:30 am to 5 pm China Standard Time, Monday - Friday
Fax: 86-10-61957800

For candidates in Europe, Middle East, or Africa please email a copy of your accommodations letter and five possible dates that you would like to take the GMAT exam to GMATCandidateServicesEMEA@Pearson.com.

All testing appointments are scheduled on a first-come, first served basis. Pearson VUE will make every effort to schedule an appointment for you within 30 days of your requested testing date. Please be aware that no unauthorized personnel may enter the testing room or remain in the reception area. If you have a physical disability and require assistance in activities such as reaching the testing room, using the rest room or eating lunch, you will need to request an additional accommodation and be very specific in outlining the functions this person will perform for you. Test center staff can provide only services directly related to test taking.

To aid your preparation, the GMATPrep® software contains free practice questions and two full-length GMAT® exams. As you have been granted 50% extra time, you can unlock this feature as follows:

*    Either download the GMATPrep® software from www.mba.com/gmatprep or request a copy of the software on CD when you book your exam (may take up to 4 weeks to arrive).
*    After you have installed the software, start GMATPrep®.
*    From the home screen, click 'Settings' (bottom left corner). The Settings screen will open.
*    Enter the following code in the Accommodations box: K7OJ-N39M-B3GKL-ZERT.
*    Click the Submit button and 50% extra time will be activated.

Additionally, the GMAT Official Guide is available for purchase as a digital talking book. To purchase, please visit www.mba.com/dtb.

Cordially,

GMAT® Disability Services

China | India | United Kingdom | USA                    GMAC® | Makers of the GMAT® Exam | gmac.com

The information in this transmission is confidential and intended only for the recipient listed above. If you are not the intended recipient, please advise the sender immediately by reply e-mail and delete this message and any attachments without retaining a copy. If you are not the intended recipient, you are hereby notified that any disclosure, copying or distribution of this message, or the taking of any action based upon it, is strictly prohibited.