**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

---------------------------------------------------------

J.C.,                                        CIVIL ACTION NO.:

     **Plaintiff**                          1:17-cv-02778-RBK-KMW

v.


ROWAN UNIVERSITY SCHOOL OF
OSTEOPATHIC MEDICINE and
ROWAN UNIVERSITY,

     **Defendants**

---------------------------------------------------------


---

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

---


Jo Anne Simon, Esq.
Jo Anne Simon, P.C.
356 Fulton Street, 3rd Floor
Brooklyn, NY 11201
(718) 852-3528


Clara R. Smit, Esq.
100 Horizon Center Boulevard
Hamilton, NJ 08691
(732) 843-6600

*Counsel for Plaintiff*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT.................................................................................. 1

PROCEDURAL HISTORY AND STATEMENT OF FACTS.............................................. 3

LEGAL ARGUMENT........................................................................................... 21

    POINT I

        J.C. SUFFICIENTLY ALLEGED THAT HE IS PROTECTED BY THE
        ADA AND REHABILITATION ACT AND THAT ROWAN FAILED TO
        PROVIDE ACCOMMODATIONS THAT HE REQUESTED AND THAT HIS
        TREATING CLINICIANS RECOMMENDED...............................................23

            A. J. C. is a Qualified Individual with a
            Disability...............................................................................23

            B. Defendant Had Sufficient Notice and Knowledge of
            J.C.'s Diagnosed Disabilities and His Requests
            for Disability Accommodations.............................................27

            C. Defendants Were Required to Make Modifications to
            its Policies, Practices, Procedures, and the
            Length of its Courses and Programs So that J.C.'s
            Disabilities Could Be Accommodated....................................28

            D. The Accommodations that J.C. Requested Were
            Reasonable and Would Not Have Fundamentally
            Altered, Weakened, or Harmed Defendants'
            Osteopathic Medical Program................................................35

    POINT II

        J.C. IS ENTITLED TO RELIEF UNDER THE NEW JERSEY LAW
        AGAINST DISABILITIES.................................................................... 38

    POINT III

        J.C. IS ENTITLED TO DECLARATORY RELIEF.................................... 39

CONCLUSION.................................................................................................. 40

i

**TABLE OF AUTHORITIES**

**Cases**

Argenyi v. Creighton University,
    703 F.3d 441 (8th Cir. 2013)...............................................36, 37

Ashcroft v. Iqbal,
    556 U.S. 662 (2009)...............................................................22

Bartlett v. N.Y. State Bd. of Law Examiners,
    970 F. Supp. 1094 (S.D.N.Y. 1997).......................................24, 33

Bartlett v. N.Y. State Bd. of Law Examiners,
    2 F. Supp. 2d 388(S.D.N.Y. 1997)............................. . 24

Bartlett v. N.Y. State Bd. of Law Examiners,
    156 F.3d 321 (2d Cir. 1998)..................................................24

Bartlett v. N.Y. State Bd. of Law Examiners,
    527 U.S. 1031 (1999)........................................................ 24

Bartlett v. N.Y. State Bd. of Law Examiners,
    226 F.3d 69 (2d Cir. 2000).............................................. .........24

Bartlett v. N.Y. State Bd. of Law Examiners,
    No. 93 CIV. 4986(SS), 2001 WL 930792,
    (S.D.N.Y. August 15, 2001).............................................24, 33

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007)...........................................................22, 23

Chin v. Rutgers, *et al*,
    Civil Action No.: 14-1332,
    2016 WL 2653908 (D.N.J. May 9, 2016).....................37, 38, 39

Chin v. Rutgers, *et al.*,
    Civil Action No.: 14-1332,
    2017 WL 2703587(3d Cir. June 22, 2017)........................... 38

Chisolm v. McManimon,
    275 F.3d 315 (3d Cir. 2001)............................................. 39

Dean v. Univ. at Buffalo School of Med. and Biomedical Sciences,
    804 F.3d 178 (2d Cir. 2015)...........................30, 31, 32, 33, 34, 35

Doe v. Samuel Merritt University,
    921 F.Supp.2d 958 (N.D. Cal. 2013)................................24, 35, 36, 37

Ensslin v. Twsp of North Bergen, 275 N.J. Super. 352
    (N.J. Super. Ct. App. Div. 1994).................................................39

Hall v. U.S. Postal Serv.,
    857 F.2d 1073(6th Cir.1988)...................................…...29

In re AZEK Building Products, Inc., Marketing and Sales
Practices Litigation,
    82 F.Supp.3d 608 (D.N.J. 2015)................................................39

In re Burlington Coat Factory Sec. Litig.,
    114 F.3d 1410(3d Cir. 1997)..................................................23

In re Rockefeller Ctr. Props. Sec. Litig.,
    184 F.3d 280(3d Cir. 1999)....................................................23

Landefeld v. Marion General Hospital, Inc.,
    994 F.2d 1178 (6th Cir. 1993).........................................…..35

Mayer v. Belichick,
    605 F.3d 223 (3d Cir. 2010)...................................................23

Noll v. Int'l Bus. Machs. Corp.,
    787 F.3d 89 (2d. Cir. 2015)..................................…...32

Nunes v. Wal-Mart Stores Inc.,
    164 F.3d 1243 (9th Cir. 1999)................................................29

Papasan v. Allain,
    478 U.S. 265 (1986)..........................................................22

Phillips v. Cty. of Allegheny,
    515 F.3d 224 (3d Cir. 2008)..................................................22

U.S. Airways, Inc. v. Barnett,
    535 U.S. 391 (2002)......................................................32, 33

Wernick v. Fed. Reserve Bank of N.Y.,
    91 F.3d 379 (2d Cir. 1996)...................................................32

Wong v. Regents of Univ. of Cal.,
    192 F.3d 807 (9th Cir.1999).................................................37

**Statutes**

42 U.S.C. §12102................................................................................24, 27

N.J.A.C. 13:13-2.1 ........................................................................26

N.J.S.A. 10:5-1................................................................................38

N.J.S.A., 10:5-29.1........................................................................26

**Regulations**

28 C.F.R. § 36.309 ........................................................................29

29 CFR § 1630.2................................................................24, 25, 26, 27

34 C.F.R. §104.4 ........................................................................29

34 C.F.R. §104.44 ........................................................................30

**Other Authorities**

"Anxiety Disorders," National Institute of Mental Health,
    https://www.nimh.nih.gov/health/topics/anxiety-
    disorders/index.shtml ........................................................14


"How to Register," National Board of Osteopathic Medical
Examiners,
    http://con.nbome.org/intro/m_regist
    ration_information.html........................................................21


"Living with Sleep Apnea," National Heart, Lung, and Blood
Institute,
    https://www.nhlbi.nih.gov/health/health-
    topics/topics/sleepapnea/livingwith ........................................6


"What Is Sleep Apnea?," National Heart, Lung, and Blood
Institute,
    https://www.nhlbi.nih.gov/
    health/health-topics/topics/sleepapnea........................................6

## PRELIMINARY STATEMENT

Plaintiff J.C. (hereinafter "J.C."), a private citizen and resident of New Jersey, is a former student of Rowan University School of Osteopathic Medicine.  Defendants are post-secondary academic institutions.  J.C. was diagnosed with Generalized Anxiety Disorder, Panic Disorder, and Obstructive Sleep Apnea, and experienced symptoms of depression while in medical school. These physical and mental impairments substantially limit the operation of J.C.'s brain, respiratory, and neurological systems, and substantially limit his ability to read, write, learn, concentrate, process information, communicate, sleep, and take tests under the same conditions and time constraints as most people.

Defendants were first made aware of J.C.'s impairments in on around December 2013, nearly two years before J.C.'s dismissal from the medical school.  J.C. kept Defendants apprised of his condition through oral and electronic/written communication, and by providing Defendants copies of letters, reports, and medical documentation from his treating clinicians. Despite having knowledge and notice of J.C.'s disabilities and his need for specific accommodations, Defendants refused to grant: (1) J.C.'s request for an adequate extension of time to study and prepare for the COMLEX Level I exam (hereinafter "the COMLEX"); and (2) a leave of absence of sufficient length to

1

allow him and his doctors to develop an effective treatment regimen for his disabilities.

Defendants assert that J.C. requested an extension and leave of absence because he was being dismissed for academic reasons, but this is simply false.  J.C. requested these disability accommodations prior to his August 21, 2015 letter notification from Defendants that he was at risk of academic dismissal for failure to pass the COMLEX.  Despite being provided an abundance of documentation from several qualified clinicians, Defendants ignored J.C.'s request(s) for an extended study schedule and medical leave as a disability accommodation. Despite repeated invitations to do so, Defendants did not even attempt to engage J.C.'s doctors to understand J.C.'s unique accommodation needs as an individual with a disability.

During J.C.'s dismissal hearing, one of the members of the Student Academic Progress Committee ("SAPC") questioned his fitness to continue in the program and in the profession with his diagnosed impairments.  Defendants' failure to grant J.C.'s requests for accommodation forced him to take the COMLEX under conditions that resulted in his score measuring the impacts of his unaccommodated disabilities, and not his knowledge of the tested subject-matter.  At the time of his dismissal from RowanSOM, J.C. was in good academic standing.

Defendants are disingenuous in their assertion that J.C. attempted to use leave (which tolls the standard five-year time limit to complete his degree requirements) as a tool to avoid academic dismissal.  Defendants knew or should have known that J.C.  was incapable of successfully completing the COMLEX when it demanded that he take the exam when his impairments were, *at that time*, uncontrolled and disabling.  It appears that Defendants denied J.C.'s requests for accommodation so that it could force him out due to their misconceptions about his disability, under the pretense that he failed to complete his degree requirements within five-years.  This five-year requirement is a requirement Defendants themselves impose in their policy; however this policy could have been modified to accommodate J.C.'s disabilities. In fact, Defendants' own handbook states that an alternative 6-year degree track is offered.

Defendants discriminated against J.C. on the basis of disability in violation of the federal and state disability civil rights statutes by refusing to grant him accommodations in the form of a medical leave of absence of sufficient length and an adequate extension to take and pass the COMLEX.

### PROCEDURAL HISTORY AND STATEMENT OF FACTS[1]

---

[1] The Procedural History and Statement of Facts have been combined for the court's convenience because they are intertwined.

3

J.C.  commenced his medical education at RowanSOM in the
fall of 2011. After J.C.'s first year of medical school,
RowanSOM granted J.C. a three month personal leave of absence
following a loss in his personal life.  J.C. successfully
remediated his first year of courses and from that point onward
he achieved good grades in his medical school courses.  However,
when taking his Osteopathic Manipulative Medicine ("OMM") exam
in December 2013, he experienced acute anxiety that caused him
to earn a failing grade. J.C. was evaluated by Jeffrey
Tokazewski, M.D. who diagnosed him with anxiety and prescribed
him beta-blocker medication "to be taken one hour before his
test to see if this remediates his symptoms."  Exhibit 1.
Around this same time, J.C. also experienced increasingly
debilitating insomnia and sleep disturbances that caused him to
miss a few of his exams.  J.C. informed Defendants of his
condition at that time. Exhibit 2.

On January 7, 2014, J.C.  received an email from Anna-Kay
Thomas, Academic Affairs Program Development Specialist at
RowanSOM, who wrote "I hope you feel better.  As we discussed,
please send me an email explaining why you missed the exam
yesterday.  Additionally, you will also need to provide an
excuse for the exam missed and a letter from your doctor…"
Exhibit 3.  J.C. responded via email that same day: "I have not
received my treatment yet… On Monday, my doctor ordered more

testing which I completed yesterday.  He will contact me as soon
as they finish reviewing the results to prescribe my treatment.
He provided me with a note to be excused from examinations until
I initiate my treatment.  Regarding the other letter you
requested, I will get that from my doctor tomorrow."  Id.

By email dated January 8, 2014, J.C. sent his medical
documents to George J. Scott, M.D., Assistant Dean for Clinical
Education, and informed Dr. Scott that he had been in
communication with the Center for Teaching and Learning (also
known as "CTL," the office that handles requests for disability
accommodations at RowanSOM) but was advised by Anna-Kay Thomas
to also reach out to him.  J.C. wrote, in part:

> I have been suffering from sleep disorder
> and initially was diagnosed with chronic
> insomnia and managed with nightly medication
> since July 2013.  Unfortunately, during
> examination days in December, I experienced
> a rebound insomnia episode… This made me
> unable to initiate sleep for several nights
> continuously and rendered me cognitively
> impaired, physical fatigued with blurry
> visions, and unable to report to
> examinations.  My physician tried different
> classes [of] medications to initiate sleep.
> I had severe adverse side effects from the
> first medication.  He switched me to a
> different medication, which I tolerated
> better.  However, I was still not feeling
> well and presented with cardiovascular
> symptoms pointing to the possibility of
> respiratory problems during sleep.  Per my
> doctor's order, I stayed at Virtua-Voorhees
> for an overnight evaluation on Dec 23rd.  Dr.
> Thomas Grookett evaluated my studies and
> diagnosed me with obstructive sleep apnea on

5

Dec 28th.  I was scheduled to see him on his earliest available appointment on Friday Jan 3rd which got canceled due to snow.  I subsequently saw his colleague, Dr. Donald Auerbach on Monday Jan 6th.  He ordered an additional overnight polysomnogram with CPAP and CPAP/BiPAP titration… I am now waiting for my doctor to review the results and prescribe my treatment.  My doctors provided me with notes to be excused from examinations until I start my treatment."

Exhibit 4.[2]  On January 9, 2014, J.C. emailed this same

information to Anna Kay Thomas, Linda Boyd, Senior Associate

---

[2] According to the National Heart, Lung, and Blood Institute: "Sleep apnea usually is a chronic (ongoing) condition that disrupts your sleep… breathing pauses or becomes shallow, you'll often move out of deep sleep and into light sleep. As a result, the quality of your sleep is poor, which makes you tired during the day. Sleep apnea is a leading cause of excessive daytime sleepiness." https://www.nhlbi.nih.gov/health/health-topics/topics/sleepapnea "Sleep apnea can be very serious. However, following an effective treatment plan often can improve your quality of life quite a bit. Treatment can improve your sleep and relieve daytime sleepiness. Treatment also might lower your risk for high blood pressure, heart disease, and other health problems linked to sleep apnea. Treatment may improve your overall health and happiness as well as your quality of sleep (and possibly your family's quality of sleep)...Follow up with your doctor regularly to make sure your treatment is working. Tell him or her if the treatment is causing bothersome side effects.  Ongoing care is important if you're getting CPAP (continuous positive airway pressure) treatment. It may take a while before you adjust to using CPAP. If you aren't comfortable with your CPAP device, or if it doesn't seem to be working, let your doctor know. You may need to switch to a different device or mask. Or, you may need treatment to relieve CPAP side effects." https://www.nhlbi.nih.gov/health/health-topics/topics/sleepapnea/livingwith

Dean for Academic Affairs, Jacqueline Giacobbe, Center for Teaching and Learning (CTL) Director, and Millicent King Channell, Assistant Dean for Curriculum and Member of Student Academic Progress Committee.  Exhibit 5. By email dated January 23, 2014 J.C.  informed Vincent J. DeRisio, Associate Dean for Clinical Affairs and Medical Director, Russell Griesback, Assistant Dean for Clinical Education, Bernd Spur, Associate Professor, Dr. Channell, and Dr. Scott that he was advised by his doctors that he would receive his C-PAP machine on Monday, January 27th and wrote that he contacted CTL to arrange his make-up examination(s).  Exhibit 6.  Anna Kay Thomas and Latoya Langston were copied on these emails.

By email dated January 27, 2014, AnnaKay Thomas informed J.C. that he needed to schedule a meeting with Dr. Scott. Exhibit 7.  By email dated January 27, 2014, Anna-Kay Thomas emailed J.C. to advise him of his OMM remediation exam dates. Id.  Several other agents of RowanSOM were copied on this email, including, but not limited to, Lisa M. Cardello, Latoya Nicol Langston, Jacqueline A. Giacobbe, Kathryn L. Kupiec, and Millicent King Channell.  J.C. passed the OMM exam after retaking it.

By email dated January 28, 2014 Anna Kay Thomas emailed J.C. and wrote "please note your approved schedule and *accommodations* below for OMS II Gastroenterology Exam." Exhibit

8, (emphasis added). Veronika R. Kramer-Feeley, Jacqueline A. Giacobbe, Lisa M. Cardello, Latoya Nicol Langston, and Patrick Owen Chadd were copied on this email referencing J.C.'s accommodations.

J.C. first attempted the COMLEX on September 3, 2014. He was unable to pass on the first attempt. He appeared before the Student Academic Progress Committee (hereinafter referred to as "SAPC") on October 28, 2014. By letter dated October 31, 2014, Defendants informed J.C. that he was required to "attend" a January 2015 PASS immersion Board review program in Champagne, Illinois. On November 7, 2014 J.C. met with Dean Cavalieri to express his concerns with Defendants' requirements, namely that he physically attend the immersion PASS program in Illinois. Dean Cavalieri decided to uphold the Student Academic Progress Committee's decisions. By email dated November 20, 2014, Plaintiff emailed Richard Jermyn, Chairman of Student Academic Progress Committee and wrote, in part:

> [d]ue to a medical reason, I would not be able to relocate to Champagne, Illinois to complete the Jan 6th course referenced in the committee's recommendation. I suffer from a chronic condition of obstructive sleep apnea (moderate, near severe) for which I receive nightly continuous positive airway pressure (CPAP) treatment. For successful therapy, I have learned over time that I need to run the machine on maximum humidity and high heat (86 F) to avoid nasal mucosal irritation and congestion… The room also has to be dark and quiet between hours of 9:00pm

and 5:00am, which are my structured sleep
schedule that I should not deviate from.
The need for a quiet environment is because
my sleep is lighter when I am connected to
the CPAP equipment, and I could wake up with
any small environmental noise… It would not
be feasible for me to find the same level of
accommodation in terms of a quiet
environment and temperature controlled room
in Champagne, IL for the short-term duration
of the PASS program. Moreover, my DME
provider is local only to New Jersey and
they provide me with urgent repairs to my
CPAP equipment if needed, which happened
several times this year.  If my sleep and
treatment is compromised, my board
preparation and study schedule will greatly
suffer… I have contacted the PASS program to
inquire if they have any alternative courses
close to my residence at Jersey City, NJ.
They mentioned that the only other option
would be the online version of the PASS
program… The program includes all of the
lectures, follow-up lecture assessments with
video explanations from Dr. Francis, 2 full-
length assessments, weekly drill sessions,
and the 2014 course notebooks.  I would like
to ask for the SAP committee's approval to
alternatively enroll in the online version
of the PASS Program.

Exhibit 9.

By email dated November 21, 2014, Dr. Jermyn refused to

consider J.C.'s request for an alternative course format and

wished him "good luck" in his board preparation. Exhibit 10.

By letter dated December 1, 2014, Dr. Tokazewski explained

the medical necessity of J.C.'s request for an alternative PASS

format as an accommodation.  Exhibit 11.  This documentation,

along with Plaintiff's sleep study was forwarded by J.C. to

Katharine M. Garnier, Medical Director at RowanSOM.  In a
December 8, 2014 email Dr. Garnier wrote, in part:

> I have reviewed the documents, the letter
> from your personal physician and the copy of
> your original sleep study… I spoke to you
> earlier today and you relayed the measures
> you have had to go through to achieve a
> suitable environment to both initiate and
> maintain sleep… You and your physician both
> attest to lack of adequate sleep impacting
> your cognition and concentration, which
> could negatively influence both your health
> and learning objectives… While the
> residential program may provide an optimal
> learning environment in general, it does
> appear that it would be difficult, if not
> impossible, to provide you with your
> required controlled conditions… while I do
> not believe that sleep apnea is a recognized
> disability under the ADA act, the
> alternative of the online PASS program would
> be a reasonable *accommodation* for your
> particular circumstances.  I have copied Dr.
> Lambert on this email.

Exhibit 12, (emphasis added).

     After successfully completing his online 6-week COMLEX
review program J.C. attempted the COMLEX for a second time on
February 4, 2015, but was unable to earn a passing grade.  He
was perplexed by this because he had been doing very well in his
proctored practice exams, but upon further reflection he
realized that he had experienced severe anxiety during the exam.

     The SAPC mandated that J.C. remain off rotations until he
retook the COMLEX.  RowanSOM allowed him to take a medical leave
of absence from March 16, 2015 to May 18, 2015 so that he could

work with healthcare professionals to evaluate the reasons for his exam performance issues. Exhibit 13. The SAPC also directed J.C. to take a 6-week course to run from May 18, 2015 through June 28, 2015, with the expectation that he would retake the COMLEX shortly thereafter.

J.C. subsequently consulted several doctors and learned that his Generalized Anxiety Disorder was very severe and that he suffered from Panic Disorder in addition to his Obstructive Sleep Apnea.  J.C. also experienced symptoms of depression. J.C. provided Defendant documentation verifying the existence and substantial limitations caused by these diagnosed impairments.

In the midst of his medical treatment, J.C. came to realize that enrolling in a more comprehensive 14-week COMLEX preparation course from May 18, 2015 to August 23, 2015 would assist him with his review and allow him additional time to work with his doctors to develop an effective treatment regimen.  His advisor informed him that he would need to make this request at a SAPC hearing on April 21, 2015.  J.C. arrived to the SAPC meeting 15-minutes late due to car trouble and offered documentation to verify his car trouble, but the SAPC refused to see him and, by letter dated April 27, 2015, decided that J.C. would only be allowed to take the shorter 7-week COMLEX course which would run from May 18, 2015 through June 28, 2015.

11

Exhibit 14.  That same day J.C. emailed Dean Cavalieri (and copied Kathryn C. Lambert, Linda Boyd, Richard Jermyn, Deborah P. Podolin-Whiting, Jacqueline A. Giacobbe, Lisa M. Cardello, Regina Rousso Wilmes, and Ferin Ford) and offered the evidence and supporting documentation that the SAPC would not consider on April 21, 2015.  Exhibit 15.

J.C. wrote: "I was not able to provide the SAPC members with the attached revised written statement that contains new information that is vital to their decision… this 14-week class will allow my psychologist and I to adequately work out my test taking fears and anxiety… I am merely asking for a chance to let my psychotherapy work."  J.C. also explained that the 7-week course was more condensed and would allow him very little time outside of the preparation course to work with his doctors. Attachments to J.C.'s email included an April 23, 2015 letter from his psychologist, Howard B. Siegel, who wrote, in part: "He wanted to take the 14-week Kaplan course that prepares him for his exam.  He prefers the 14-week class over the 7 week class so he can have more time to study and work with me on reducing his anxiety.  It would seem the longer test preparation would be helpful to [J.C.]." Id... By email dated April 28, 2015 Dean Cavalieri responded that he would be reviewing all of the information that J.C. offered and would be speaking with him on Thursday of that week.  Exhibit 16.  Nevertheless, Dean

12

Cavalieri upheld the SAPC's decision.

J.C. completed the 7-week course and, as he and his doctors expected, and as RowanSOM *should have* expected, he did not have sufficient time to stabilize and treat his disabilities. J.C. reported to take the COMLEX on July 14, 2015 and his anxiety caused him to experience severe diarrhea and abdominal cramping causing significant pain and discomfort, and forced him to make multiple urgent trips to the bathroom during the exam. J.C. withdrew from the exam after the second test block because he was too ill to continue.

On July 15, 2015 the Chairman of the SAPC committee, via email, informed J.C. that his final deadline to take the COMLEX was July 30, 2015, and advised J.C. to "make every opportunity to optimize your health with your physicians to ensure your ability to complete the exam on your next attempt." Exhibit 17. It should be noted that this arbitrary deadline given by the SAPC Chairman was different from the August 31, 2015 deadline later calculated by the RowanSOM's registrar office, and this discrepancy further heightened the effects of Plaintiff's anxiety and panic disorder.[3]

---

[3] According to the National Institute of Mental Health, "[p]eople with panic disorder have recurrent unexpected panic attacks, which are sudden periods of intense fear that may include palpitations, pounding heart, or accelerated heart rate; sweating; trembling or shaking; sensations of shortness of

On July 29, 2015, the evening before he was scheduled to re-take the COMLEX, J.C. experienced severe anxiety and stress, and his nocturnal treatment for his sleep apnea was disrupted. He was unable to gain restful sleep and was very fatigued.  J.C. sat for the COMLEX on July 30, 2015 and again experienced a panic attack and severe gastrointestinal distress during the exam.  J.C. immediately contacted the National Board of Osteopathic Medicine (hereinafter "NBOME") to request that the July 30, 2015 exam could be voided.

By email dated August 18, 2015 the NBOME informed J.C. that it would void his July 30, 2015 exam as a courtesy, and it also advised him to consider applying for test accommodations for future administrations of the COMLEX.[4]  Exhibit 18.

On August 20, 2015 J.C. contacted Assistant Dean Kathryn C. Lambert, RowanSOM, via email (time-stamped 12:26 AM) and requested a medical leave of absence and extension to take the COMLEX for the same reasons previously articulated.  Exhibit 19. J.C. wrote: "I hereby request your approval to go on a medical

---

breath, smothering, or choking; and feeling of impending doom. Panic disorder symptoms include: Sudden and repeated attacks of intense fear; Feelings of being out of control during a panic attack; Intense worries about when the next attack will happen; Fear or avoidance of places where panic attacks have occurred in the past." https://www.nimh.nih.gov/health/topics/anxiety-disorders/index.shtml

[4] Prior to this point J.C. was unaware that individuals could receive accommodations on standardized examinations.

leave of absence effective 08/20/2015.  I intend to return as an
active student on 10/02/2015.  I am requesting this time for
continuous psychotherapy and effective pharmacotherapy for the
medical condition of severe testing anxiety and panic disorder."
Id.

By letter dated August 21, 2015 Defendants informed J.C.
that he was required to appear before the SAPC on September 15,
2015 for a dismissal hearing because he would not be able to
complete his academic program within a 5-year timeframe.
Exhibit 20.  Contrary to Defendants' assertions in their motion
to dismiss that they had no notice of J.C.'s disabilities, the
only reason articulated for his dismissal was "you have not yet
completed the School requirement to take your COMLEX Level I
exam, which will extend your academic program beyond the five-
year time limit as stated in the Academic Rules and
Regulations." Id.

By email dated August 24, 2015, the RowanSOM registrar's
office informed J.C. that he only had three semesters of medical
school left.  Exhibit 21.  Regina Wilmes, Associate Registrar
wrote: "you have three more semesters left (this fall is one of
them).  If you return Monday, August 31st and take no breaks at
all (meaning no flex time this year or next fall), then you
could complete all your remaining clerkship requirements by the
end of 5 years.  The final date of next fall semester is

15

December 6th (a Sunday)."

Dean Lambert directed J.C. to raise his concerns and make his requests at an SAPC meeting scheduled for September 15, 2015. By email dated August 24, 2015, J.C. emailed Richard Jermyn (and copied Thomas A. Cavalieri, Kathryn C. Lambert, Linda Boyd, and Deborah P. Podolin-Whiting) and wrote, in part:

> I contacted Dr. Lambert to request a medical leave of absence on 8/20/2015, and she informed me that in my circumstance the request for leave of absence has to be approved by the student academic progress committee (SAPC). I hereby writing to you to request SAPC's approval to go on a medical leave of absence effective 8/20/2015 until 10/01/2015. I am requesting this leave of absence to optimize my health in order to successfully retake the COMLEX Level I examination and address the following issues: To aggressively treat the mental illness that impaired my ability to complete the COMLEX Level I exam on 7/30/2015 via continuous psychotherapy and pharmacotherapy. My treating psychiatrist recommended a grace period before the pharmacotherapy becomes effective… To complete the reassessment work up for obstructive sleep apnea including monitoring the response to the newly prescribed nocturnal treatment regimen… supporting medical documents are attached to this email. Please let me know.

Exhibit 22. The documentation offered in support of this renewed request for leave as a disability accommodation included, but was not limited to, the following: an August 4, 2015 letter from Abby Kurien, M.D., who recommended that J.C. be allowed to cancel his July 30, 2015 COMLEX score and be granted

16

permission to retake the exam once his medical therapy became effective, which she estimated would be a minimum of four weeks; an August 3, 2015 letter from Tanuj Bhatnagar, M.D., who wrote that "[J.C.] is being re-assessed for obstructive sleep apnea. His sleep disturbance is affecting his ability to study for his exams.  Work up and treatment should be addressed in the next 6 to 8 weeks.  Please allow him to postpone his COMLEX exam while I work with him to address his sleep issues;" and an August 12, 2015 letter from Howard B. Siegel, Ph.D. explaining that "it was a do or die feeling that made him anxious." Id.

J.C. attended the September 15, 2015 dismissal hearing and was given a mere 10-12 minutes to present his case, which was not nearly enough time and caused him to feel even more anxious and rushed.  J.C. provided the SAPC eighty-six pages of medical documents and a personal statement describing, in great detail, the actions that he and his doctors needed to take to manage his health.  At the hearing J.C., once again, requested a medical leave of absence and extension to take the COMLEX, but later learned from a member of the SAPC that, after J.C. left, *his request for accommodations was never voted on by the committee*.

By letter dated September 21, 2015, J.C. received a letter from the SAPC recommending his dismissal to the Dean for "failure to complete all required coursework within the maximum timeframe specified for the degree program (not including

17

approved leaves of absence)." Exhibit 23. By letter dated
September 23, 2015, J.C. appealed the SAPC's recommendation to
the Dean that he be dismissed and submitted supporting
documentation. J.C. was given 30-minutes to present his case to
the Dean in person and he once again requested accommodations in
the form of a leave of absence and extension to take the COMLEX.

On September 29, 2015, the Dean informed J.C. that he
supported the SAPC's recommendation for dismissal. By letter
dated September 29, 2015 J.C. contacted Assistant Dean Lambert
and renewed his request for a leave of absence and extension to
take the COMLEX. This request was supported by documentation,
as submitted previously, from J.C.'s doctors (Dr. Abby Kurien,
Dr. Jeffrey Tokazewski, Dr. Howard Siegel, Dr. Tanuj Bhatnagar,
and others) who recommended a medical leave of absence from
August 20, 2015 through mid-October so that J.C.'s treatment
regimen, consisting of medication and cognitive behavioral
therapy, would have time to become effective. RowanSOM rejected
J.C.'s request for accommodation.

By email dated October 1, 2015, Assistant Dean Lambert told
J.C. that his request was denied because leaves of absence
cannot be used to avoid dismissal for academic or disciplinary
reasons. Defendants' agents made disparaging and offensive
remarks to J.C. about his disabilities during one of the
administrative hearings that he was compelled to attend.

Defendants knowingly required J.C. to take the COMLEX multiple times, before his treatment could reach a sufficiently therapeutic state, and did this knowing full well this would cause him further suffering.  When Plaintiff could not pass the COMLEX by the date(s) they arbitrarily selected, Defendants dismissed J.C. from the medical school.

Defendants alleged in multiple letters to J.C.'s attorneys that granting J.C.'s requested leave of absence and extension to take and pass the COMLEX would have been an unacceptable relaxation of RowanSOM's academic standards because he would have then exceeded the school's alleged five-year program completion "requirement."

Defendants however, selectively followed their own published policies.  For example, RowanSOM's 2014-2015 Handbook states that students are "normally" limited to two (2) leaves of absence, totaling two years.  Exhibit 24, pp. 82-84. Plaintiff had not yet exceeded two years of approved leave.  The Handbook also describes standard tracks and timelines for completing the D.O. program and clearly states the general policy that approved leaves of absences do not count toward the standard five-year completion requirement. Id. at 86.  RowanSOM's 2014-2015 Handbook also states that Defendants offer a lightened course load track which allows students 6 years to complete the D.O. program. Id. at 90-91.  Clearly, J.C.'s requests would not have

violated or relaxed RowanSOM's standard policies and procedures. Moreover, the laws require the modification of policies, practices and procedures so as to not result in a discriminatory outcome. Exhibit 25.

Following his dismissal from RowanSOM, J.C. retained counsel and sought readmission.  Defendants' argument that they had no notice of J.C.'s disability status is deliberately disingenuous and easily belied by the facts.  The evidence shows that RowanSOM and J.C.'s counsel communicated extensively in an attempt to resolve the matter, culminating with RowanSOM proposing readmission on the condition that J.C. retake three years' worth of medical school courses that he already successfully completed and that he do so at his own expense. Id. This offer for readmission was punitive and discriminatory and J.C., already owing in excess of $400,000.00 in student loans, could not accept these unjust terms.  J.C. has incurred significant student loan debt, legal expenses, and medical expenses with no medical degree to show for his hard work, dedication and academic success.

Subsequent to his dismissal from RowanSOM, J.C. and his doctors determined that he requires testing accommodations for the COMLEX (the same accommodations that the Law School Admission Council and the Graduate Management Admission Council granted him following his dismissal from medical school).  Id.

20

It should be noted that had Defendants granted J.C. the requested leave of absence, he and his doctors would have reached this same conclusion about COMLEX accommodations; they only needed time to do so.  J.C. cannot now apply for these COMLEX accommodations because he is precluded from taking the COMLEX (even without accommodations) since he is no longer enrolled in a medical school.[5]

On April 24, 2017 J.C. brought suit against Defendants alleging discrimination based on disability.  J.C. seeks reinstatement to Rowan School of Medicine and placement on leave status so that he can be eligible to apply to the NBOME for COMLEX testing accommodations that he and his doctors have determined are necessary.  J.C. also seeks compensatory and punitive damages, and declaratory relief.  Defendants were served with process on April 28, 2017 and were permitted an extension of time to respond.  On July 17, 2017 Defendants filed a motion to dismiss J.C.'s complaint for failure to state a claim upon which relief can be granted.  Plaintiff timely opposes Defendants' motion for the reasons articulated herein.

## **LEGAL ARGUMENT**

When all of the factual allegations alleged in J.C.'s complaint are accepted as true, the court can very easily

---

[5] http://con.nbome.org/intro/m_registration_information.html

reasonably infer that Defendants lack credibility and discriminated against J. C. in violation of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and the New Jersey Law Against Discrimination.

When a defendant moves to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(6), a district court must "accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the plaintiff]." Phillips v. Cty. of Allegheny, 515 F.3d 224, 228 (3d Cir. 2008). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted). Plaintiff bears an "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). Factual allegations that are assumed to be true "must be enough to raise a right to relief above the speculative level." Twombly, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content

allows the court to draw the reasonable inference that the defendant is liable for misconduct alleged." Id. This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" Id. (citing Twombly, 550 U.S. at 556).

The Third Circuit has also held that in addition to the complaint itself "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant under Rule 56]." In re Rockefeller Ctr. Props. Sec. Litig., 184 F.3d 280, 287 (3d Cir. 1999). Courts may consider any "document integral to or explicitly relied upon in the complaint," In re Burlington Coat Factory Sec. Litig., 114 F.3d at 1426, and "undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010). The emails and documents referenced herein and attached hereto are integral and explicitly relied upon in J.C.'s complaint and are undisputedly authentic documents.

## POINT I

**J.C. SUFFICIENTLY ALLEGED THAT HE IS PROTECTED BY THE ADA AND REHABILITATION ACT AND THAT ROWAN FAILED TO PROVIDE ACCOMMODATIONS THAT HE REQUESTED AND THAT HIS TREATING CLINICIANS RECOMMENDED.**

**A. J. C. is a Qualified Individual with a Disability.**

23

An individual has a disability within the meaning of the
Americans with Disabilities Act (ADA) if that individual suffers
a physical or mental impairment that substantially limits one or
more of the individual's major life activities or major bodily
functions.  42 U.S.C. §12102(2)(A). Major life activities
include activities such as reading, writing, learning,
concentrating, communicating, sleeping, and breathing.  29 CFR §
1630.2.  Test taking is also a recognized major life activity.
*See* Jane Doe v. Samuel Merritt University, 921 F.Supp.2d 958
(N.D. Cal. 2013) and Bartlett v. N.Y. State Bd. of Law
Examiners,.970 F. Supp. 1094, 1117 (S.D.N.Y. 1997)(Bartlett I),
*aff'd,* 2 F. Supp. 2d (S.D.N.Y. 1997)(Bartlett II), *aff'd in part
and vacated in part on other grounds,* 156 F.3d 321 (2d Cir.
1998) (Bartlett III), *vacated and remanded*, 527 U.S. 1031
(1999)(Bartlett IV), affirmed in part and remanded in part, 226
F.3d 69 (2d Cir. 2000)(Bartlett V), affirmed in part, 2001 WL
930792 (S.D.N.Y.)(Bartlett VI).  Major life activities also include
operation of the brain, respiratory, and neurological systems. 29
CFR § 1630.2.

"The comparison of an individual's performance of a major
life activity to the performance of the same major life activity
by most people in the general population usually will not
require scientific, medical, or statistical analysis. Nothing in
this paragraph is intended, however, to prohibit the

presentation of scientific, medical, or statistical evidence to make such a comparison where appropriate." 29 C.F.R. § 1630.2(j)(1)(v). "The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures." 29 C.F.R. § 1630.2(j)(1)(vi).

Disabilities such as anxiety, panic, and depression, and even sleep apnea, may be episodic, but are nevertheless protected by the ADA, which states that "[a]n impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." 29 C.F.R. § 1630.2(j)(1)(vii). "An impairment that substantially limits one major life activity need not substantially limit other major life activities in order to be considered a substantially limiting impairment." 29 C.F.R. § 1630.2(j)(1)(viii).  "[I]n determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity." 29 C.F.R. § 1630.2(j)(4)(i).

"Consideration of facts such as condition, manner, or
duration may include, among other things, consideration of the
difficulty, effort, or time required to perform a major life
activity… the length of time a major life activity can be
performed; and/or the way an impairment affects the operation of
a major bodily function. In addition, the non-ameliorative
effects of mitigating measures, such as negative side effects of
medication or burdens associated with following a particular
treatment regimen, may be considered when determining whether an
individual's impairment substantially limits a major life
activity." 29 C.F.R. § 1630.2(j)(4)(ii).[6]

"In determining whether an individual has a disability
under the "actual disability" or "record of" prongs of the
definition of disability, the focus is on how a major life
activity is substantially limited, and not on what outcomes an
individual can achieve. For example, someone with a learning
disability may achieve a high level of academic success, but may
nevertheless be substantially limited in the major life activity

_____

[6] Under the NJLAD, the definition of disability is even broader. A
nonphysical disability is defined as "suffering from any mental,
psychological or developmental disability resulting from
anatomical, psychological, physiological or neurological
conditions which either (a) "prevents the normal exercise of any
bodily or mental functions" or (b) is "demonstrable, medically
or psychologically, by accepted clinical or laboratory
diagnostic techniques". N.J.S.A. 10:5-29.1 *et seq*, N.J.A.C,
13:13-2.1.

of learning because of the additional time or effort he or she must spend to read, write, or learn compared to most people in the general population." 29 C.F.R. § 1630.2(j)(4)(iii).

J.C. is an individual with a disability in that he experiences physical and/or mental impairments (generalized anxiety disorder, panic disorder, sleep apnea, and depression), which substantially limit one or more major life activities, including, but not limited to, reading, writing, concentrating, learning, working, breathing, sleeping, and taking tests, and the operation of the major bodily functions of the brain, respiratory, and neurological systems. 42 U.S.C. § 12102 (2)(B). While enrolled at RowanSOM as an osteopathic medical student in good standing, J.C. required accommodations in the form of a medical leave of absence (of sufficient length) to develop an effective treatment regimen for his disabilities and an extension of time take the COMLEX.

## B. Defendant Had Sufficient Notice and Knowledge of J.C.'s Diagnosed Disabilities and His Requests for Disability Accommodations.

In their Motion to Dismiss, Defendants repeatedly assert that Rowan had no notice or knowledge of J.C.'s disabilities prior to its commencement of academic dismissal proceedings, and in doing so is attempting to mislead the court.  Defendants were first made aware of at least some of J.C.'s diagnosed impairments in or around December 2013.  Beginning early 2014

Defendants began to "accommodate" (a word that Defendants used in correspondence with J.C.) J.C.'s disabilities with rescheduled exams.  Defendants later, with much resistance, accommodated J.C.'s disabilities by approving a modification of the format of a RowanSOM required COMLEX review course (J.C. was permitted to take an online course in lieu of an in-person course).  These requests for accommodations were supported by medical documentation from qualified clinicians and were submitted to RowanSOM agents (both academic deans and administrators responsible for processing requests for accommodations).  Defendants' assertions lack credibility because this ongoing exchange of information is well documented by the emails referenced in J.C.'s complaint, many of which are referenced herein and attached hereto as Exhibit 25. In addition, J.C. first requested an adequate extension of time to take the COMLEX and/or a leave of absence of sufficient length in or around March or early April of 2015, at least four months before RowanSOM informed him that he was being considered for dismissal.

   **C. Defendants Were Required to Make Modifications to its Policies, Practices, Procedures, and the Length of its Courses and Programs So that J.C.'s Disabilities Could Be Accommodated.**

   "Any [public or] private entity that offers a course covered by [the ADA] must make such modifications to that course

28

as are necessary to ensure that the place and manner in which
the course is given are accessible to individuals with
disabilities… Required modifications may include changes in the
length of time permitted for the completion of the course,
substitution of specific requirements, or adaptation of the
manner in which the course is conducted or course materials are
distributed." 28 C.F.R. § 36.309(c)(1) – (2).  "Determining
whether a proposed accommodation (medical leave in this case) is
reasonable, including whether it imposes an undue hardship on
the employer, requires a fact-specific, individualized inquiry.
See Hall v. U.S. Postal Serv., 857 F.2d 1073, 1080 (6th
Cir.1988) (reversing grant of summary judgment in a
Rehabilitation Act claim)."  Nunes v. Wal-Mart Stores Inc., 164
F.3d 1243, 1247 (9th Cir. 1999).

Section 504 enforcement regulations state that schools
shall not "Deny a qualified [person with a disability] the
opportunity to participate in or benefit from the aid, benefit,
or service… Afford a qualified [person with a disability] an
opportunity to participate in or benefit from the aid, benefit,
or service that is not equal to that afforded others… Provide a
qualified [person with a disability] with an aid, benefit, or
service that is not as effective as that provided to others."
34 C.F.R. §104.4(b).  These regulations also state that "In its
course examinations or other procedures for evaluating students'

academic achievement in its program, a recipient to which this
subpart applies shall provide such methods for evaluating the
achievement of students who have a handicap that impairs
sensory, manual, or speaking skills as will best ensure that the
results of the evaluation represents the student's achievement
in the course." 34 C.F.R. §104.44 (c).  Defendants' denial of
J.C.'s reasonable and documented requests for accommodations (in
the form of a leave of absence of sufficient length and
extension to take and pass the COMLEX) was deliberately
indifferent to J.C.'s civil rights under the applicable laws.

     The U. S. Court of Appeals for the Second Circuit recently
addressed this very issue in the case of Dean v. University at
Buffalo School of Medicine and Biomedical Sciences, 804 F.3d 178
(2d Cir. 2015).  In Dean, the plaintiff, an individual with
disabilities similar to Plaintiff J.C.'s, was dismissed from his
M.D. program for failure to pass Step 1 of the USMLE by the
deadline that was set by his medical school.  The school's
handbook permitted one eight-week study leave, but the school
granted plaintiff several additional six-week study leaves –
still, plaintiff was unable to pass Step 1.

     Plaintiff Dean informed his medical school dean that he was
dealing with stress, anxiety, and depression that prevented him
from being able to prepare for and pass the exam; he first asked
for one additional month to prepare, but unlike Plaintiff J.C.,

30

he did not request a medical leave.  Plaintiff Dean was
subsequently treated by a psychologist and internist who
recommended a three-month leave of absence, and the school was
informed that this leave of absence was necessary to permit the
plaintiff sufficient time to continue his treatment regimen and
effectively manage his disabilities.  The school eventually
granted a six-week leave of absence and stated that no further
delays would be permitted.  Dean subsequently met with a
psychiatrist who "supported a leave of absence to permit Dean's
treatment interventions to progress and noted a six-to-eight-
week timeframe for anti-depressant medications to achieve
effectiveness."  Id. at 184.

Plaintiff Dean provided this new documentation and once
again requested a three month leave of absence so that "the
medications will reach steady state and be therapeutic, so I can
focus on preparing for the retake of Step 1."  Id. An extension
was granted, but it was significantly less than the three months
that Dean and his doctors had requested.  This leave was
insufficient to allow Dean time to recover and study for the
exam, so he failed and his school dismissed him.  Dean
subsequently brought suit in the United States District Court
for the Western District of New York. The medical school moved
for summary judgment, asserting that it accommodated Dean's
disabilities, and the motion was granted by the District Court.

However, the Court of Appeals reversed the decision and held:

> Dean was not afforded the accommodation he sought…As Dean requested a period some five to seven weeks longer than necessary for the medication to become effective, a trier of fact could find that the additional time Dean sought was clearly to prepare for the Step 1 retake…On this record, a reasonable juror could find that the leave Dean requested included a period for exam preparation and that Defendants understood the scope of his request.
>
> While Defendants did not provide the accommodation Dean sought, it is undisputed that they afforded him an alternative one… We must therefore decide… whether this modification to the exam deadline was a reasonable accommodation.
>
> Where a defendant's educational institution has implemented or offered an accommodation, the institution will be entitled to summary judgment only if the undisputed record reveals that the plaintiff was accorded a " 'plainly reasonable' " accommodation. Noll v. Int'l Bus. Machs. Corp., 787 F.3d 89, 94 (2d Cir.2015) (quoting Wernick v. Fed. Reserve Bank of N.Y., 91 F.3d 379, 385 (2d Cir.1996)). The hallmark of a reasonable accommodation is effectiveness. See U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 400, 122 S.Ct. 1516, 152 L.Ed.2d 589 (2002) ("It is the word 'accommodation,' not the word 'reasonable,' that conveys the need for effectiveness."). The accommodation need not be "perfect" or the one "most strongly preferred" by the student-plaintiff, but it still must be "effective," Noll, 787 F.3d at 95. Given the "fact-specific" nature of the question of whether a measure to accommodate a student's disability is a reasonable accommodation, this determination "must be made on a case-by-case basis." Wernick, 91

> F.3d at 385.
>
> Defendants posit that the accommodation
> offered Dean was reasonable since he had
> studied during two extended periods of leave
> prior to any reported mental health
> condition, such that additional study time
> would not have been necessary.…
>
> We disagree. As an initial matter, we harbor
> serious doubt that earlier periods of study
> suffice to prepare a student for a later
> examination, particularly when the student
> twice failed that very exam… a juror could
> reasonably infer that the abbreviated study
> period encompassed within Dean's leave would
> not have been effective. *See Barnett,* 535
> U.S. at 400, 122 S.Ct. 1516 ("An *ineffective*
> 'modification' or 'adjustment' will not
> *accommodate* a disabled individual's
> limitations."). We therefore cannot conclude
> that Defendants afforded Dean a plainly
> reasonable accommodation.[7]

804 F.3d at 189-191.[8]   In <u>Dean,</u> the medical school granted

several exam extensions and leaves of absences that permitted

the plaintiff's treatment regimen to become effective, but the

court was *still* unable to find that the school satisfied its

legal obligations to accommodate Dean.  Why?  Because the

medical school refused to grant the full leave of absence

---

[7] 804 F.3d at 189-191.

[8] In <u>Bartlett VI</u>, *at *45*, the court found that the Board of Law
Examiners could not logically conclude that Bartlett failed the
bar exam because she lacked knowledge or skills when it required
her to take the bar exam without the accommodations she needed
and requested. In fact, the court found that doing so was a
"waste of her time and money." <u>Id.</u> at *46, *citing* <u>Bartlett I</u>,
970 F. Supp. at 1152.

requested by Dean, which was necessary for him to prepare for the licensing exam *after* developing an effective treatment plan with his doctors.

Here, RowanSOM was less cooperative than the medical school in Dean.  The record demonstrates that RowanSOM did not even grant J.C. sufficient leave time to allow his treatment regimen to become therapeutic, let alone afford him sufficient time to study and prepare for subsequent COMLEX attempts.  Defendants received letters from multiple clinicians and received an abundance of medical records.  An August 12, 2015 letter from Dr. Siegel explained how RowanSOM's actions made J.C.'s anxiety and panic worse.  An August 4, 2015 letter from Dr. Kurien communicated the same and recommended that RowanSOM allow J.C. "to void this COMLEX USA Level-1 examination taken on July 30, 2015 and grant him permission to retake his exam once the course of the medical treatment has become effective, which I anticipate will take a minimum of four weeks."  An August 3, 2015 letter from Dr. Bhatnagar who was treating Plaintiff's J.C.'s obstructive sleep apnea explained that his "sleep disturbance is affecting his ability to study for his exams.  Work up and treatment should be addressed in the next 6 to 8 weeks.  Please allow him to postpone his COMLEX exam while I work with him to addresses [sic] his sleep issues."  J.C. did not receive a dismissal letter until *after* he made his request

34

for a two-month leave of absence.  RowanSOM refused to
accommodate his disabilities with the leave of absence he
requested or engage in an interactive process to consider other
alternative accommodations.  *See* Landefeld v. Marion General
Hospital, Inc., 994 F.2d 1178 (6th Cir. 1993), the Court of
Appeals for the 6th Circuit found that a hospital's prior
knowledge of the plaintiff's (an internist with bipolar
disorder) disability is highly probative evidence of the
hospital dismissing the plaintiff solely in response to his
disability."  There exists ample case law clearly defining the
obligations of institutions such as RowanSOM.

### D. The Accommodations that J.C. Requested Were Reasonable and Would Not Have Fundamentally Altered, Weakened, or Harmed Defendants' Osteopathic Medical Program.

In Doe v. Samuel Merritt University, 921 F.Supp.2d 958
(N.D. Cal. 2013), a plaintiff was enrolled in a podiatric
medical school and diagnosed with a generalized anxiety disorder
and panic disorder.  Like Plaintiff J.C., the plaintiff in Doe
successfully completed her medical school's didactic curriculum
with accommodations.  To advance to the clinical component of
her education, she was required to take and pass part I of the
American Podiatric Medical Licensing Examinations.  Doe was
dismissed from her medical school after three unsuccessful
attempts to pass the exam.  Doe requested that her school allow
her unlimited attempts to take the exam because the "make or

35

break" pressure caused her anxiety to become debilitating.  The
medical school denied her request and dismissed her.  Having
been dismissed, Doe was then ineligible to sit for the American
Podiatric Medical Licensing Examinations.  The court granted
Doe's preliminary injunction and required the medical school to
readmit her on leave status so that she would be eligible to
reattempt and sit for her licensing exam.  The Doe court saw "no
hardship for Defendant if Plaintiff is allowed inactive student
status and is granted the ability to take Part I." Id. at 971.

In Argenyi v. Creighton University, 703 F.3d 441 (8th Cir.
2013), the U. S. Court of Appeals for the 8th Circuit found that
plaintiff Argenyi's allegations of disability discrimination
against his medical school were supported where the medical
school refused to grant his requests for accommodation.  The
court pointed to  Argenyi's doctor's urging Creighton "to
consider Argenyi's specific requests, explaining that Argenyi
'is the best person to judge what [assistance may be necessary]
since no one else can really understand'" the impact of his
disabilities.  Id. at 447.  "After a careful review of the
record, we cannot agree with the district court's conclusion
that Argenyi's allegations were "unsupported." The record
contains five letters from Argenyi's doctors to Creighton
confirming his need." Id.  The case was remanded for trial, a
jury found that Creighton had violated Argenyi's civil rights by

36

refusing to grant the accommodations recommended requested by Argenyi and his doctors.

In Wong v. Regents of Univ. of Cal., 192 F.3d 807, 819 (9th Cir.1999) the U.S. Court of Appeals for the 9th Circuit found that a medical school's decision was not entitled to deference where the medical school "failed to discuss Wong's proposal with any of the professionals who had worked with Wong to pinpoint his disability and help him develop skills to cope with it." The court also found that the school's assertion that granting Wong's request for an accommodation would have violated the purposes of the curriculum was an "after-the-fact justification" that "obviously does not satisfy the University's obligation to present 'undisputed facts' showing that it conscientiously considered whether possible modification would fundamentally or substantially alter the school's standards when it decided it could not accommodate [the plaintiff]." Id.

A case that contrasts greatly with the instant matter, Dean, Doe, Argenyi, and Wong is Chin v. Rutgers, et al, Civil Action No.: 14-1332, 2016 WL 2653908 (D.N.J. May 9, 2016). In Chin, the District Court dismissed the plaintiff's complaint where her medical school had previously granted her nearly two years of leave, several additional months to prepare for her licensing examinations, and "actively sought additional information that would assist in determining whether Plaintiffs'

37

requests to retake the Step-2 examinations could yield passing results." Id. When Rutgers received a letter from Chin's psychiatrist stating that she "will be able to pass her Step II of USMLE Exams in two months if her Bipolar and Panic conditions become stable", it contacted the psychiatrist for more information.  Unlike J.C.'s doctors, Chin's psychiatrist was unable to provide "specific information with respect to whether Plaintiff's psychiatric conditions would stabilize at any time." Id.[9] at 7.  Here, RowanSOM neither granted J.C. even a fraction of what Rutgers granted Chin, nor did  it attempt to communicate with J.C.'s clinicians to understand his disability related needs.

## POINT II

### J.C. IS ENTITLED TO RELIEF UNDER THE NEW JERSEY LAW AGAINST DISABILITIES

Paragraph 63 of J.C.'s complaint incorporated by reference the preceding paragraphs of the complaint (1 through 62) regarding violations of the ADA and Section 504, and paragraph 64 asserted that Defendants' conduct is in violation of the New Jersey Law Against Discrimination, N.J.S.A., 10:5-1, *et seq* for the reasons set forth in those preceding paragraphs.  Contrary

---

[9] The Court of Appeals for the Third Circuit affirmed this court's decision on June 22, 2017. Chin v. Rutgers, *et al.,* Civil Action No.: 14-1332, 2017 WL 2703587 (3d Cir. June 22, 2017).

to Defendants' assertions otherwise, this cause of action was
sufficiently plead.  This court has recently stated that: "The
standards for determining a violation of [Section 504] and NJLAD
are the same as those under the ADA. *See* Chisolm v. McManimon,
275 F.3d 315, 324 n.9 (3d Cir. 2001); see also Ensslin v. Twsp
of North Bergen, 275 N.J. Super. 352, 364 (N.J. Super. Ct. App.
Div. 1994) (applying federal case law interpreting the RA to
NJLAD claims of handicap discrimination and noting that the New
Jersey "Supreme Court has suggested a correlation between State
and federal law on handicap discrimination"). Accordingly, the
Court "confine[s] [its] discussion to the ADA with the
understanding that the principles will apply equally to the
Rehabilitation Act and NJLAD claims." Chisolm, 275 F.3d at 324,
n.9." Chin at *5.

## POINT III

### J.C. IS ENTITLED TO DECLARATORY RELIEF

A present and actual controversy exists between Plaintiff and
Defendants concerning their rights and respective duties.
Plaintiff contends that Defendants violated and continues to
violate his rights under the ADA, Section 504, and NJLAD.
Defendants deny these allegations, thus declaratory relief is
necessary and appropriate. *See* In re AZEK Building Products,
Inc., Marketing and Sales Practices Litigation, 82 F.Supp.3d

608, 624-625 (D.N.J. 2015) ("The Declaratory Judgment Act is a procedural vehicle that creates a form of relief.").

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied in its entirety.


Respectfully submitted,

 /s/ Jo Anne Simon, Esq.
JO ANNE SIMON P.C.
Attorney for Plaintiffs



Dated:    August 7, 2017